# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| ERIC MILLER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ELEVANCE HEALTH, INC., GAIL K. BOUDREAUX, FELICIA F. NORWOOD, MARK B. KAYE, and STEPHEN V. TANAL,<br><br>Defendants. | Case No.   1:25-cv-923<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Eric Miller ("Plaintiff"), by and through his counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, the investigation of his counsel, which included review and analysis of: (i) regulatory filings made by Elevance Health, Inc. ("Elevance" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning Elevance; and (iv) other public information regarding the Company.

## **INTRODUCTION**

1. This securities class action is brought on behalf of all purchasers of Elevance common stock between April 18, 2024, and October 16, 2024, inclusive (the "Class Period"). The claims asserted herein are alleged against Elevance and certain of the Company's current senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Elevance is a healthcare company that, among other things, provides health insurance plans to a variety of markets. This includes contracting with states to administer Medicaid benefits for eligible beneficiaries. Elevance prices premiums based on the historical and expected cost to provide benefits. Among other things, the cost of providing health benefits to members is driven by the level of care a patient requires, often referred to as "acuity," and the members' utilization of the health benefits.

3. States regularly conduct an eligibility review to "redetermine" whether Medicaid beneficiaries still qualify for coverage. In response to the COVID pandemic, the federal government temporarily disallowed states from redetermining the eligibility of Medicaid recipients. The moratorium on redetermination was lifted in 2023, and states resumed the redetermination process. Most states expected to finish the redetermination process by mid-2024.

4. Throughout the Class Period, with the Medicaid redetermination process nearly complete, Defendants represented to investors that they were closely monitoring cost trends associated with the redetermination process and that the premium rates Elevance was negotiating with states were sufficient to address the risk and cost profiles of those patients staying on Medicaid programs. While Defendants acknowledged that Medicaid expenses were rising, they repeatedly assured investors that this was adequately reflected in the Company's guidance for the year. Defendants maintained they had "visibility into 75% of our Medicaid rates and premiums for 2024" and that "[t]he vast majority of those are in line with our expectations and they're actuarially sound." Defendants further reassured investors that "we're intentionally remaining thoughtful and prudent in our outlook," and that, while the Company was seeing an acuity mix shift in the Medicaid business, it was "nothing outside of the bounds of what we've expected and guided for."

5. These representations were materially false or misleading. In truth, the redeterminations were causing the acuity and utilization of Elevance's Medicaid members to rise significantly, as the members being removed from Medicaid programs were, on average, healthier than those who remained eligible for the programs. This shift was occurring to a degree that was not reflected in Elevance's rate negotiations with the states or in its financial guidance for 2024.

6. The truth began to emerge on July 17, 2024, when the Company revealed that it was now "expecting second-half utilization to increase in Medicaid" and that it was "seeing signs of increased utilization across the broader Medicaid population, including in outpatient home health, radiology, durable medical equipment, as well as some elective procedures." In response to these disclosures, the price of Elevance common stock declined by $32.21 per share, or 5.8%, from a closing price of $553.14 on July 16, 2024, to a closing price of $520.93 on July 17, 2024.

7. At the same time, however, Defendants made false, reassuring statements to investors regarding the extent of the cost increase and how that was accounted for in the Company's full year guidance. For example, on July 17, 2024, Defendant Boudreaux claimed that the Company had "prudently maintained [its] full-year outlook given industry-wide dynamics we are navigating in our Medicaid business."

8. Then, on October 17, 2024, Elevance announced its financial results for the third quarter of 2024, revealing that the Company had missed consensus earnings per share ("EPS") expectations for the quarter by $1.33, or 13.7%, "due to elevated medical costs in [its] Medicaid business." Elevance further revealed that it was lowering EPS guidance for 2024 from $37.20 to $33.00, or 11.3%, as it expected these Medicaid issues to continue. These disclosures caused the price of Elevance common stock to tumble by $52.61 per share, or 10.6%, from a closing price of 496.96 on October 16, 2024, to a closing price of $444.35 on October 17, 2024.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of Elevance common stock when the truth was revealed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because many of the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the preparation and dissemination of false and misleading statements. Elevance maintains its corporate headquarters in Indianapolis, Indiana, which is situated in this District.

12. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13. Plaintiff Eric Miller, as indicated in the Certification submitted herewith, purchased shares of Elevance common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

14. Defendant Elevance is a healthcare company that provides health insurance plans to government-operated Medicaid and Medicare markets. Elevance common stock trades on the

New York Stock Exchange ("NYSE") under the ticker symbol "ELV." As of September 30, 2024, Elevance had over 233 million shares of common stock outstanding, owned by hundreds or thousands of investors.

15. Defendant Gail K. Boudreaux ("Boudreaux") has served as Elevance's Chief Executive Officer since 2011.

16. Defendant Felicia F. Norwood ("Norwood") has served as Elevance's Executive Vice President & President, Government Health Benefits since 2018.

17. Defendant Mark B. Kaye ("Kaye") has served as Elevance's Executive Vice President & Chief Financial Officer since September 2013.

18. Defendant Stephen V. Tanal ("Tanal") served as Elevance's Vice President, Investor Relations from February 2021 to November 2024. As of February 3, 2025, he serves as Elevance's Chief Financial Officer, Government Health Benefits.

19. Defendants Boudreaux, Norwood, Kaye, and Tanal are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with Elevance, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

## BACKGROUND

20. Elevance is one of the largest health insurers in the United States, offering health care plans to Individual, Employer Group, Medicaid and Medicare markets. These insurance plans make up the Company's Health Benefits segment, which contributed approximately 87% of the Company's revenue in 2023. Elevance contracts with states to provide Medicaid coverage through a competitive process that involves negotiating rates with individual states. In 2023, Elevance provided Medicaid coverage in 26 states and the District of Columbia, comprising 22% of the Company's medical membership.

21. Elevance negotiates Medicaid premium rates with states on an annual basis, based on the historical and expected cost to provide benefits to these recipients. Among other things, the cost of providing health benefits to members is driven by the level of care a patient requires, often referred to as "acuity," and the members' utilization of the health benefits.

22. States annually review Medicaid recipients for eligibility, removing those who no longer qualify. During the COVID pandemic, the federal government temporarily suspended this redetermination process. This suspension led to a significant increase in the number of individuals enrolled in Medicaid nationwide. In 2023, Congress passed the Consolidated Appropriations Act of 2023, which decoupled Medicaid eligibility from the COVID public health emergency, permitting states to restart redeterminations and begin removing ineligible beneficiaries from Medicaid programs starting April 1, 2023. Most states were expected to complete the redetermination process by June 2024.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

23. The Class Period begins on April 18, 2024, when Elevance held a conference call to discuss its financial results for the first quarter of 2024. Defendant Boudreaux announced that

6

Elevance was increasing its EPS guidance for the year "by $0.10 to be greater than $37.20," based on the Company's first quarter results. She noted that "In the first quarter, our Medicaid business performed in line with our expectations." When asked about the increase in guidance, Defendant Kaye assured investors that "given our business is subject to some variability around medical cost trends, we're intentionally remaining thoughtful and prudent in our outlook."

24. During the call, an analyst asked Elevance executives how the "risk pool and rate adequacy" of Medicaid looked now that approximately 90% of members had been reviewed as part of the redetermination process. Defendant Norwood responded:

> [T]he acuity is in line with what we expected. And I will also say that at this point we have visibility into 75% of our Medicaid rates and premiums for 2024. The vast majority of those are in line with our expectations and they're actuarially sound. As you know, we have ongoing conversations with our state partners as we go throughout this process, and we expect those rates to continue to be actuarially sound. So we're going to continue to work with our state partners. . . . And we're going to make sure that we go through this process with a lot of discipline and rigor, understand the mix of our membership and the leavers versus stayers as we go through this process.

25. On the same conference call, Defendant Kaye admitted that Elevance's Medicaid business did "experience increased, but state-specific utilization attributed to the redetermination mix impacts" but that "we remain very comfortable with what we're seeing there, given those ongoing constructive dialogs with the impacted states." Kaye reiterated that "you could expect Medicaid margins to normalize given we already have line of sight . . . into approximately 75% of the Medicaid premiums for 2024 and that we are comfortable with the actuarial soundness of the rates that we are seeing. Over the long term, Medicaid continues to normalize as we spoke about last quarter, and it is performing as expected."

26. During the Goldman Sachs Global Healthcare Conference on June 12, 2024, Defendant Tanal claimed that "a range of outcomes is assumed in our guidance" and that, while

Elevance was seeing some shifts happening in the risk pool, it was "nothing outside of the bounds of what we've expected and guided for." Tanal continued to tout the Company's visibility into Medicaid redeterminations, stating, "[W]e were set up to monitor acuity and utilization very intently and to have active dialogues with our states. So, we're talking to all of our states almost monthly at this point. . . . Broadly, rates are actuarially sound as well."

27. The statements set forth above in paragraphs 23-26 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, sicker patients with higher acuity tended to remain on Medicaid after redetermination, leading to higher per-patient costs. This increase in cost was occurring at a rate that was not adequately reflected in Elevance's rate negotiations with the states or in its financial guidance for 2024. As a result, Defendants' positive statements concerning Elevance's close monitoring of the redeterminations, the actuarial soundness of its rates and the prudence of its forecasts were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

28. Investors began to learn the truth on July 17, 2024, when Elevance held a conference call to discuss its financial results for the second quarter of 2024. During the call, Defendant Boudreaux revealed that "[a]s a result of redeterminations, our Medicaid membership mix has shifted, resulting in increased acuity," and Defendant Kaye stated that Elevance was now "expecting second-half utilization to increase in Medicaid." Defendant Kaye elaborated that the Company was "seeing signs of increased utilization across the broader Medicaid population, including in outpatient home health, radiology, durable medical equipment, as well as some

elective procedures." Additionally, Defendant Norwood acknowledged "the potential for a short-term disconnect between the timing of our rates and the emerging acuity in our populations."

29. As a result of these disclosures, the price of Elevance common stock declined by $32.21 per share, or 5.8%, from a closing price of $553.14 on July 16, 2024, to a closing price of $520.93 on July 17, 2024.

30. Analysts were taken aback by these revelations. For instance, an analyst from Deutsche Bank commented that "the company appeared to be caught off guard by changes in the Medicaid market, where [UnitedHealth and Centene] warned investors in May." An analyst from Morgan Stanley called the discussion of heighted Medicaid utilization "surprising" and pointed out that "this is the first time [Elevance] has highlighted" the topic that year.

31. Defendants, however, continued to misrepresent and conceal the extent of the increase in costs and continued to assure investors that it was accounted for in Elevance's guidance. During Elevance's July 17, 2024, earnings call, Defendant Kaye stated that "we now expect our full-year benefit expense ratio to be in the upper half of that initial guidance range, i.e., 87% to 87.5%." Defendant Boudreaux claimed that the Company had "prudently maintained [its] full-year outlook given industry-wide dynamics we are navigating in our Medicaid business." Defendant Kaye concurred, stating that the "full-year outlook does allow for both this shift in acuity and increased utilization in the second half of the year." Defendant Kaye further assured investors that Elevance was "closely monitoring acuity and cost trends, notably in Medicaid, and [is] working collaboratively with states to ensure rates remain actuarially sound." He concluded that "Nonetheless, we expect to achieve our full-year adjusted diluted earnings per share guidance of at least $37.20."

32. On October 17, 2024, Elevance held a conference call to discuss its financial results for the third quarter of 2024. During the call, Defendant Boudreaux revealed that the Company's "third quarter adjusted diluted earnings per share were $8.37, which was below our expectations, primarily due to elevated medical costs in our Medicaid business." She further revealed that Elevance had reduced its full-year outlook for adjusted diluted EPS from $37.20 to "approximately $33." These revelations occurred despite the Company reiterating EPS guidance just three months earlier.

33. Defendant Boudreaux described these issues as "timing disconnects between Medicaid rates and acuity," explaining that "[w]hile the rate increases we've received are the highest in the past decade, they are still inadequate to cover 2024 cost trends that we now expect to be 3 to 5 times historical averages." Later, during the same call, Defendant Kaye further disclosed that "[t]he consolidated benefit expense ratio was 89.5% for the third quarter, an increase of 270 basis points year-over-year, principally due to Medicaid cost trend developing worse than expected." This was 2% higher than the 87.5% benefit expense ratio that the Company had reiterated in the prior quarter.

34. When questioned about the sudden change in Medicaid cost trends, Defendant Kaye explained that "we experienced accelerated cost trends in Medicaid throughout the third quarter. And additionally, we saw unfavorable prior-period development related to the current year, specifically in our Medicaid business." He elaborated that "[t]he elevated level of cost trend is driven. . . primarily by the higher overall membership acuity, given the redetermination cycle is now substantially complete."

35. As a result of these disclosures, the price of Elevance common stock declined by $52.61 per share, or 10.6%, from a closing price of $ 496.96 on October 16, 2024, to a closing price of $444.35 on October 17, 2024.

36. Analysts were shocked, with many calling out the size of the shift in Elevance's narrative around these cost trends during the earnings call. An analyst from Wells Fargo remarked that "the magnitude of the revision that's implied there is alarming, particularly given that we're at the end of the membership impacts from redetermination." Similarly, an analyst from Nephron Research commented that "I'm still confused as to what's causing this big acceleration in this trend. Why is that happening so late in the [redetermination] process?"

37. Other analysts were equally shocked. For instance, an analyst from Cantor wrote, "We are surprised at the scale of the MLR miss. . . . We are also surprised to see it all attributed to Medicaid." An analyst from Argus wrote, "the magnitude of the miss in 3Q24 EPS and the spike in medical costs were negative surprises."

## **LOSS CAUSATION**

38. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

39. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Elevance common stock and operated as a fraud or deceit on the Class (defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on July 17, 2024, and October 17, 2024, the price of Elevance common stock declined significantly as the prior artificial inflation came out of the price over time. As a result of their purchases of shares of Elevance common stock during the Class Period, Plaintiff

and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

40. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of Elevance common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Elevance and their families and affiliates.

41. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of September 30, 2024, Elevance had over 233 million shares of common stock outstanding, owned by hundreds or thousands of investors.

42. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

   a. Whether Defendants violated the Exchange Act;

   b. Whether Defendants omitted and/or misrepresented material facts;

   c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

   d. Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

   e. Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

  f. Whether Defendants' conduct impacted the price of Elevance common stock;

  g. Whether Defendants' conduct caused the members of the Class to sustain damages; and

  h. The extent of damages sustained by Class members and the appropriate measure of damages.

43. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

44. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

45. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

46. To the extent that any of the alleged false statements described in this Complaint were forward-looking, Elevance's "Safe Harbor" warnings accompanying any purportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

47. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Elevance who knew the statement was false or misleading. None of the historic or present tense

statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or statements of future economic performance made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

48. At all relevant times, the market for Elevance common stock was an efficient market for the following reasons, among others:

   a. Elevance common stock met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient and automated market;

   b. As a regulated issuer, Elevance filed periodic public reports with the SEC and NYSE;

   c. Elevance regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   d. Elevance was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

49. As a result of the foregoing, the market for Elevance common stock promptly digested current information regarding Elevance from all publicly available sources and reflected such information in the price of Elevance common stock. Under these circumstances, all purchasers of Elevance common stock during the Class Period suffered similar injury through their purchases of Elevance common stock at artificially inflated prices and the presumption of reliance applies.

50. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves a failure to disclose material adverse information regarding Elevance business and operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Elevance's Medicaid offerings to the overall Company and the impact that shifts in acuity and utilization in those offerings could have on the Company's near-term and long-term financial condition, that requirement is satisfied here.

## CLAIMS FOR RELIEF

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

51. Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

52. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Elevance common stock at artificially inflated prices.

53. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Elevance common stock in an effort to maintain artificially high market prices for Elevance common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

54. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

55. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Elevance's true condition from the investing public and to support the artificially inflated prices of Elevance common stock.

57. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Elevance common stock. Plaintiff and the Class would not have purchased Elevance common stock at the prices they paid, or at all, had they

been aware that the market prices for Elevance common stock had been artificially inflated by Defendants' fraudulent course of conduct.

58. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Elevance common stock during the Class Period.

59. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

60. Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

61. The Individual Defendants acted as controlling persons of Elevance within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Elevance, the Individual Defendants had the power and ability to control the actions of Elevance and its employees. By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: May 12, 2025                                  Respectfully submitted,

*/s/ Joseph N. Williams*
Joseph N. Williams (#25874-49)
**WILLIAMS LAW GROUP, LLC**
1101 North Delaware Street
Indianapolis, IN 46202
Telephone: (317) 633-5270
Facsimile: (317) 426-3348
joe@williamsgroup.law

*Local Counsel for Plaintiff Eric Miller*

Jeroen van Kwawegen
Avi Josefson
Scott R. Foglietta
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jeroen@blbglaw.com
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Eric Miller*

Richard A. Maniskas
**RM LAW, P.C.**
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 324 6800
rmaniskas@rmclasslaw.com

*Additional Counsel for Plaintiff Eric Miller*