# EXHIBIT 3

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA**

|  |  |
|---|---|
| ERIC MILLER, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>ELEVANCE HEALTH, INC., GAIL K. BOUDREAUX, FELICIA F. NORWOOD, MARK B. KAYE, and ~~PETER HAYTAIAN~~STEPHEN V. TANAL,<br><br>        Defendants. | No. 1:25-cv-00923-JRS-MJD<br><br>CLASS ACTION<br><br>**CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................ 2

II.    JURISDICTION AND VENUE ....................................................................... 11

III.   THE PARTIES................................................................................................. 11

    A.    Lead Plaintiff ..................................................................................... 11

    B.    Defendants .......................................................................................... 11

IV.    BACKGROUND ............................................................................................. 13

    A.    The Economics of Elevance's Medicaid Insurance Business............................... 13

    B.    Defendants Greatly Benefitted From the Moratorium on Medicaid
        Redeterminations During the Pandemic ................................................... 15

    C.    Congress Permits States to Restart Medicaid Redeterminations .......................... 17

    D.    Heading Into the Class Period, Defendants Downplayed the Impact
        of the Redetermination Process ............................................................. 19

V.     OVERVIEW OF DEFENDANTS' DECEPTION OF INVESTORS ............................. 20

    A.    During the Class Period, Defendants Misleadingly Downplayed the
        Impact of the Redetermination Process on Elevance's Medicaid Business
        and Represented That Their Financial Guidance Already Accounted for
        Higher Medicaid Costs ........................................................................ 20

    B.    Former Elevance Employees Reported That Defendants Closely Tracked
        Redeterminations and Were Aware That Medicaid Costs Were Exploding......... 22

    C.    Former Elevance Employees Reported That Elevance's Medicaid
        Membership Tracking Data and Claims Processing Were Riddled With
        Errors and Did Not Account for Exploding Medicaid Costs.............................. 27

    D.    Armed With Inside Knowledge of Redetermination Outcomes, Defendants
        Engage in Suspicious Insider Trading .................................................... 31

VI.    THE TRUTH IS GRADUALLY REVEALED THROUGH TWO CORRECTIVE
     DISCLOSURES IN JULY AND OCTOBER 2024 ............................................ 32

VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
     AND OMISSIONS ......................................................................................... 35

i

A.   Materially False and Misleading Statements and Omissions That Guidance and Premium Rates Incorporated Increased Medicaid Costs Due to Redeterminations ................................................................................ 36

B.   Materially False and Misleading Statements and Omissions Made Concerning Elevance's Medicaid Business and the Redetermination Process ................................................................................................... 38

C.   Materially False and Misleading Statements and Omissions Concerning Rate Premiums ............................................................................. 42

D.   Materially False and Misleading Statements and Omissions Regarding Elevance's Financial Guidance .......................................................... 45

VIII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER .............................. 48

IX.   LOSS CAUSATION ................................................................................ 54

X.   PRESUMPTION OF RELIANCE ............................................................... 56

XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................ 58

XII.   CLASS ACTION ALLEGATIONS ............................................................. 59

XIII.   CLAIMS FOR RELIEF ........................................................................... 60

XIV.   PRAYER FOR RELIEF ........................................................................... 63

XV.   JURY DEMAND ................................................................................... 63

Court-appointed Lead Plaintiff Stichting juridisch eigenaar Achmea IM Liquid Asset Funds, Stichting Bewaarder Achmea Beleggingspools, and Stichting Bewaarder Syntrus Achmea Beleggingspools (collectively, "Achmea/Blue Sky" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, bring this class action on behalf of themselves and all other persons or entities who purchased or otherwise acquired Elevance Health, Inc. ("Elevance," or the "Company") common stock during the period from April 18, 2024, through October 16, 2024, inclusive (the "Class Period") and were damaged thereby (the "Class"). Plaintiff asserts claims against Elevance and its corporate officers Gail K. Boudreaux, Felicia F. Norwood, Mark B. Kaye, and ~~Peter Haytaian~~Stephen V. Tanal (collectively, "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5.

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, including the investigation of Lead Plaintiff's counsel, which included, among other things, a review of: (i) Elevance's filings with the SEC; (ii) transcripts, press releases, news articles, analyst reports, and other public statements issued by or concerning Defendants; (iii) information supplied by former Elevance employees, industry professionals, and other knowledgeable persons described below; and (iv) other publicly available information.

Lead Plaintiff's investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

I.    INTRODUCTION

1.    This securities class action arises from Defendants' materially false and misleading statements and omissions to investors regarding the financial health of Elevance, a healthcare insurance company, and its Medicaid business. During the Class Period, Elevance was experiencing exploding Medicaid costs due to state government "redeterminations" of Medicaid membership eligibility that removed millions of typically younger and healthier people who had been added to Medicaid rolls during the COVID-19 pandemic. Defendants misleadingly assured investors that that their financial guidance already factored in the increased Medicaid costs. They also claimed that, notwithstanding these dramatically increased costs, Elevance's Medicaid business would support ***double-digit growth in 2024***. Even as Elevance's competitors warned of lower profits due to redeterminations, Defendants represented that they closely monitored Medicaid cost trends, repeatedly asserted that they had accounted for rising Medicaid costs in their financial guidance to investors and rate negotiations with state governments, and told investors to expect at least 12% growth in earnings per share ("EPS") from the Company in 2024. Defendants' misleading representations and omissions caused Elevance's stock price to rocket to new all-time highs and allowed Defendants to continue to enjoy the benefit of their lucrative compensation packages, which were heavily dependent on Elevance's stock price. Defendants Boudreaux (CEO) and Norwood (Executive VP, Head of Medicaid business) also took advantage of the fraud-inflated stock price by pocketing tens of millions of dollars in personal profits from insider stock sales during the Class Period, which was unusual because neither sold ***any*** of their Company holdings at any time before the Class Period except for tax related purposes.

2.    Contrary to their representations to investors, Defendants knew that the state-government led redeterminations were causing Elevance's Medicaid costs to balloon and that their guidance to investors did not remotely account for the massive cost increases plaguing the

Company. While they acknowledged that Medicaid costs were rising, Defendants deceptively downplayed the impact on Elevance and misleadingly omitted that their projected financial results and Medicaid rate negotiations were premised on inaccurate data that Defendants knew did not account for the exploding costs. This is precisely why Boudreaux and Norwood suddenly rushed to sell millions of dollars' worth of their own Company holdings at inflated prices before the truth was fully revealed. When Defendants *did* later reveal the true state of Elevance's Medicaid business—through two corrective disclosures that culminated in Defendants' revelation that increased Medicaid costs of ***three to five times historical averages*** had caused Elevance to miss EPS expectations and forced Defendants to revise down their EPS guidance—the market was shocked. The news sparked a massive sell-off in Elevance stock, which erased over $17 billion in shareholder value.

3.      Elevance is a for-profit healthcare insurance company that offers medical insurance and pharmacy benefit management products. Among Elevance's largest product suites is its Medicaid business, through which Elevance contracts with state governments to provide health services to eligible Medicaid beneficiaries, who are generally patients with limited income and resources. Elevance's Medicaid business generates revenue by state governments paying the Company a fixed monthly fee or rate for each Medicaid member. The Company's Medicaid costs are then incurred through Elevance paying its network of providers for the medical health services provided to Medicaid members. The cost of providing medical benefits to Medicaid members is driven by the level of care a patient requires, which is referred to as "acuity," as well as the members' utilization (or use) of those benefits. Medicaid members who are higher acuity or higher utilization give rise to higher costs for Elevance, while lower acuity/utilization members incur lower costs for the Company. Elevance's profit margin is determined by the fixed rate per

3

Medicaid member paid by state governments minus the Company's costs of managing Medicaid for each member.

4. Prior to 2020, each state would on an annual basis assess the Medicaid eligibility of its constituents currently enrolled in Medicaid and disenroll members who were no longer eligible, which is referred to as the "redetermination" process. During the COVID pandemic (prior to the Class Period), the Federal Government issued a moratorium on states disenrolling members through redetermination. Thus, during the moratorium, Medicaid membership could *increase* as people lost their jobs and became Medicaid eligible but it could not *decrease* through the usual redetermination process that declared people ineligible. As a result, existing Medicaid members who fell out of eligibility—often people who were healthier or had gained new employment with private healthcare benefits—remained on the Medicaid rolls. This moratorium resulted in a windfall to Elevance because it continued to get paid fixed monthly fees for Medicaid members by the states even if those members did not use any Medicaid services. In other words, during the pandemic-related moratorium on redeterminations, Elevance was paid essentially free revenue for low-cost or no-cost members because there was no process to determine that they were ineligible for Medicaid.

5. As a result, Elevance's Medicaid business was extremely profitable while redeterminations were paused. For example, in 2022, the Company's total operating revenue increased by 14% to approximately $156 billion, and operating gains for the year rose 12.9% to $8.5 billion. The growth in Medicaid membership was cited by Defendants as a key factor in contributing to this explosive revenue growth. And the Company's stock price soared to record highs as a result.

6.      As the Company's stock price soared, so too did Defendants' personal fortunes. Indeed, because their compensation packages were heavily stock-based—to the tune of over 82% for Defendant Boudreaux (CEO)—Defendants were highly motivated to keep Elevance's stock price high.

7.      But this COVID-era free money was only temporary. On March 31, 2023, Congress passed legislation directing states to resume the redetermination process starting on April 1, 2023. State governments thus restarted the process of disenrolling members who had fallen out of Medicaid eligibility during the moratorium. Naturally, the members that were no longer eligible were those that were lower cost because they were healthy and no longer required healthcare or had alternate, private insurance. The redeterminations resulted in the removal of generally healthier and employed people from the Medicaid rolls and produced a dramatic shift in Medicaid membership towards higher acuity and higher utilization patients, and thus significantly higher costs for Elevance. In sum, Elevance faced a situation where it was no longer receiving fixed fees for low acuity or low utilization members who cost next to nothing to insure, and it was now primarily servicing higher cost Medicaid members.

8.      Elevance's Medicaid competitors sounded the alarm. For example, Centene Corporation—the largest Medicaid payer in the United States—forecasted a higher Medicaid expense ratio for 2024 to account for "temporary dislocation between rates and acuity." In May 2024, Centene also reported "higher than expected claims receipts" lodged between January and April of 2024, due to redeterminations causing a shift in acuity for its Medicaid members. UnitedHealth Group also warned investors in May 2024 that it expected redeterminations to shift the Medicaid market to higher acuity members, and accordingly, to lower profitability.

9.      Defendants took a different approach, dismissing concerns about the resumption of the redetermination process by misleadingly claiming they had already accounted for rising Medicaid costs in their guidance and assuring investors that they still expected the Company to achieve double-digit growth. For example, Defendants claimed that they had "***planned***" for "***a lot of shifts happening in the risk pool***," their guidance assumed "***a range of outcomes***," and the acuity shift was "***nothing outside of the bounds of what we expected and guided for***," They also started the Class Period by increasing guidance for adjusted EPS by $0.10 to $37.20. As CEO Boudreaux explained, Defendants' EPS guidance reflected "***more than [] 12% growth***" as compared to 2023. Further, Defendants assured investors that they expected increased double-digit growth in 2024 because Elevance's "acuity and mix of [Medicaid] membership . . . is in line with what we expected," its "margins . . . were very much in line with our expectations," and "Medicaid . . . is performing as expected." Analysts accepted Defendants' assurances, echoing Defendants' claims that "the overwhelming majority [of the Medicaid rates negotiated are] actuarily sound and in-line with [their] expectations." Unbeknownst to investors or analysts at the time, Boudreaux just one day later adopted a trading plan to sell a large chunk of her personal holdings in Elevance common stock, despite having never engaged in any open market insider selling since becoming CEO in 2017.

10.     Defendants continued to express their confidence in Elevance's EPS guidance throughout the Class Period. For example, Defendants assured the market that they "feel good about the overall medical loss ratio"—*i.e.*, the relationship between the rates paid to Elevance by the states and the benefits cost incurred by Elevance. Defendants buttressed these claims with assurances throughout the Class Period that they had "visibility into 75% of [the Company's] Medicaid premiums for the year," and that "90%" or "nearly all" of Elevance's Medicaid

6

membership had completed the Medicaid eligibility redetermination process. Defendants also assured investors that they were "watching acuity very closely," and that any increases in utilization were already factored into the rates that they were negotiating with the states as well as their financial guidance to investors.

11. Defendants' representations and omissions were materially false and misleading. Contrary to their assurances, Defendants knew that redeterminations had already negatively affected Elevance's Medicaid business by causing dramatically elevated costs, and that Defendants had not remotely accounted for the impact of those rising costs in their guidance to investors as they had represented. For example, former Elevance employees reported first-hand that at internal "town hall" meetings during the Class Period, Company executives noted that redeterminations were causing many more people to drop out of Medicaid coverage than the Company had originally planned. One former employee specifically noted the contradiction between Defendants' internal statements and their bullish public message to investors about the Medicaid business performing well. Another former employee recalled internal discussions about how redeterminations were resulting in healthier people who did not use their coverage being removed from Medicaid, causing a loss of revenue coupled with an increase in the average cost of providing benefits. Yet another former Elevance employee explained that redeterminations were tracked by the corporate finance team that reported to CFO Kaye, and that Defendants conducted layoffs to try to mitigate the increased costs caused by the redeterminations.

12. Former Elevance employees consistently reported that Elevance's Medicaid membership during the pandemic was bloated by members who either never used their benefits or did not even know they had Medicaid coverage and that the loss of these members caused a massive shift in utilization, costing the Company millions. These former employees also confirmed

that Defendants knew that the loss of Medicaid members through redeterminations would result in lower revenues and higher costs because the people who would be disenrolled were far cheaper to insure. Indeed, in an attempt to soften the devastating impact of the Company's ballooning Medicaid costs, Boudreaux even directed Elevance employees to push disenrolled members into commercial Elevance products in what she described as a "soft-landing strategy." But, as former Elevance employees reported, Defendants knew new enrollments in commercial insurance products would not (and could not) counteract the impact of the shift to higher Medicaid costs caused by the redeterminations.

13. Other former Elevance employees reported that the Company's data systems that tracked Medicaid claims, membership eligibility, and the Company's reporting failed to reflect or account for the exploding Medicaid costs. For example, former employees recounted that there was a significant lag time in Medicaid reporting data—as long as eight months—that Elevance relied on to forecast utilization and costs. Former employees also recounted instances when these issues were elevated to senior leadership and the employees who raised the issues were promptly fired.

14. Defendants' misrepresentations and omissions caused Elevance's stock price to be artificially inflated during the Class Period. Buoyed by Defendants' misstatements, the Company's stock price soared from less than $500 per share shortly before the start of the Class Period to an all-time high of $550.54 on September 3, 2024.

15. The truth was revealed through two corrective disclosures. On July 17, 2024, Defendants were forced to admit that Medicaid utilization would increase in the second half of 2024 due to the shift in acuity caused by redeterminations. This news caused Elevance's stock price to decline from $553.14 on July 16, 2024, to close at $520.93 on July 17, 2024, a 5.8% drop

8

on heavy trading volume. However, Defendants falsely reassured investors by doubling down on their misrepresentations of continued financial success in their Medicaid business. For example, Defendants told investors that they continued to expect Elevance's full year benefit expense ratio to be "in the upper half of our initial guidance range," and that they "fully expect our rates to remain actuarially sound." Defendants also boasted that they "prudently maintained our full-year outlook," claimed they were "closely monitoring acuity and costs trends," and represented that those trends had "certainly been reflected in our updates for the year." While analysts like Deutsche Bank were initially surprised that Elevance did not warn investors earlier of the increase in acuity and utilization, they nonetheless accepted Defendants' assurances that "the full-year outlook already accounted for increased utilization and rate timing mismatch."

16.    The full truth about Defendants' misrepresentations and omissions was not revealed to investors until the second corrective disclosure on October 17, 2024. That day, Defendants stunned the market by disclosing that Elevance had missed quarterly EPS expectations "primarily due to elevated medical costs in our Medicaid business" and they had to slash their full year 2024 EPS guidance by more than 10% to "approximately $33" instead of the $37.20 they had repeatedly touted to investors during the Class Period. Defendants also admitted that the premium rate increases they negotiated with the states were "inadequate to cover 2024 cost trends that we now expect to be *3 to 5 times higher than historical averages*." When questioned by skeptical analysts, Defendants confirmed that the dramatic cost increases were caused by "higher overall membership acuity" from redeterminations.

17.    Defendants' October 17, 2024 revelation caused Elevance's stock price to plummet as shocked investors ran for cover. The Company's stock price fell from $496.96 on October 16,

9

2024, to close at $444.35 on October 17, 2024, a stunning one-day decline of over **$50 per share or 10%** on heavy trading volume. Elevance's stock price has not recovered since.

18. The broader market reaction to Defendants' revelation was equally dramatic. Securities analysts following Elevance expressed alarm, with one analyst remarking that "the magnitude of the revision that's implied there is alarming, particularly given that we're at the end of the membership impacts from redetermination." Other analysts expressed confusion over Elevance's failure to disclose these issues earlier, asking "[w]hy is that happening so late in the [redetermination] process?" Others expressed "surprise" about the scale of Defendants' miss and its complete attribution to Medicaid redeterminations.

19. Tellingly, before the truth was revealed to investors, Boudreaux and Norwood engaged in highly suspicious insider selling. Boudreaux adopted a 10b5-1 trading plan just one day after the beginning of the Class Period and then sold 34,000 shares the very first day permitted under the plan, pocketing over $17 million by selling at prices artificially inflated by her own and the other Defendants' material misrepresentations and omissions. Norwood (President – Government Health Benefits and head of Elevance's Medicaid business) did not bother with a trading plan and associated waiting period. Instead, less than a week after the start of the Class Period, Norwood exercised options that were not going to expire until 2028 and pocketed over $9 million from insider selling.

20. The profits gained by these and other Defendants stand in stark contrast to the massive losses incurred by Lead Plaintiff and other members of the Class. Lead Plaintiff brings this action to recover the damage to Class members that Defendants' misconduct caused and to seek accountability for the violations of the federal securities laws alleged herein.

## II.    JURISDICTION AND VENUE

21.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

22.    Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because many of the acts and transactions giving rise to the violations of law alleged herein occurred in part in this District, including the preparation and dissemination of materially false and misleading statements and omissions. Elevance maintains its corporate headquarters in Indianapolis, which is situated in this District.

23.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE PARTIES

### A.    Lead Plaintiff

24.    Lead Plaintiff Achmea/Blue Sky is a major Dutch insurer and financial services group with a diversified business model spanning the health, property and casualty, pension and life, and investment management industries. Lead Plaintiff purchased Elevance common stock during the Class Period as set forth in the certification previously filed with the Court (ECF 19-2).

### B.    Defendants

25.    Defendant Elevance is a for-profit insurer that provides health insurance plans, including plans for government-operated Medicaid and Medicare markets. Elevance common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ELV."

11

Elevance had over 232 million shares of common stock outstanding at all times during the Class Period.

26.     Defendant Gail K. Boudreaux ("Boudreaux") has served as Elevance's President and Chief Executive Officer ("CEO") since November 2017.

27.     Defendant Felicia F. Norwood ("Norwood") has served as the Company's Executive Vice President and President of Elevance's Government Health Benefits division since June 2018. Norwood served as the head of Elevance's Medicaid business in this role.

28.     Defendant Mark B. Kaye ("Kaye") has served as Elevance's Executive Vice President and Chief Financial Officer ("CFO") since November 2023 and CFO "Designate" since September 2023.

29.     Defendant ~~Peter Haytaian ("Haytaian") has~~Stephen V. Tanal ("Tanal") served as the Company's ~~Executive~~ Vice President, Investor Relations from February 2021 to November 2024, was described by Elevance as "a member of the company's executive leadership team" reporting directly to the CFO, and ~~President of~~ led the Company's investor relations efforts, including "investor relations programs that support the company's growth strategies." Tanal since February 3, 2025 has served as Elevance's ~~Carelon and CarelonRx divisions since October 2021~~CFO, Government Health Benefits.

30.     Defendants Boudreaux, Norwood, Kaye, and ~~Haytaian~~Tanal are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions as senior officers and executives of Elevance, possessed the power and authority to control the contents of the Company's reports to the SEC, statements on conference calls, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's

12

conference call scripts, reports, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading and/or omitted necessary material information.

## IV.    BACKGROUND

31.    Elevance is a for-profit healthcare company. Its Health Benefits segment provides commercial health insurance plans, government-operated Medicaid, Medicare, and Federal Employee Program plans, and pharmacy benefit management services. The Health Benefits segment represents the bulk of Elevance's business—comprising 87% of the Company's revenue in 2023—and Medicaid plans generally represent over 20% of the segment. Elevance's Medicaid plans made up 22% of its Health Benefits membership in 2023, with premiums paid by or on behalf of Elevance's Medicaid members bringing in $56.6 billion in 2023 operating revenue.

### A.    The Economics of Elevance's Medicaid Insurance Business

32.    Elevance's Medicaid business involves the Company entering into contracts with individual states to provide Medicaid services for each state's eligible constituents. In 2023, Elevance had contracts to provide Medicaid coverage in 25 states, United States territories, and the District of Columbia. Under the contracts with these states, Elevance negotiated insurance premiums paid to it at fixed rates per Medicaid member to provide insurance coverage to Medicaid members within a state. Premium rate negotiations are a critical feature of Elevance's business: to maintain profitability in its Medicaid sector, Elevance needs to successfully negotiate premiums

13

that exceed the costs of the Medicaid benefits provided by the Company as utilized by its Medicaid members.

33.     The premiums paid to Elevance are based on the expected cost to provide benefits to Medicaid patients in a given year, determined by recent historical data. As Elevance explained in its Annual Report on Form 10-K for 2023, "[w]e base the . . . Medicaid premiums we charge . . . on our estimates of future medical costs over the fixed contract period." Among other things, the cost of providing health benefits to members is driven by the level of care a patient requires, often referred to as "acuity," and the members' utilization of the health benefits. The more care a given Medicaid member will require in a year, the more it will cost Elevance to insure that person. Likewise, if a member is not likely to use much of their health benefits each year, the cheaper it will be for Elevance to insure them—and the higher the Company's profit margin will be for that member.

34.     Thus, Elevance pays more in expenses in connection with insuring higher acuity patients (who require more care) and patients with higher utilization (who use more insurance benefits) than it pays to insure lower acuity patients with less utilization. However, when it negotiates Medicaid premium rates with states, Elevance is paid fixed monthly fees for each Medicaid patient depending on the patient's eligibility group. Accordingly, Elevance is essentially getting paid free money for lower acuity and lower utilization patients. As noted above, this was especially profitable for Elevance during the COVID-era moratorium on redeterminations, as the Company kept receiving fixed monthly fees for lower acuity and lower utilization patients regardless of the fact that they were no longer eligible for Medicaid.

35.     The factors for Medicaid eligibility vary among the states. Generally, however, only lower-income people who meet other criteria, including being pregnant or having a disability,

14

are eligible to receive Medicaid benefits. Individuals can flow in and out of eligibility due to changes in their income or disability status. For example, a person who was previously unemployed and was below the income ceiling for Medicaid membership could subsequently get a job that provided health insurance, at which point that person would no longer be eligible for Medicaid.

**B.    Defendants Greatly Benefitted From the Moratorium on Medicaid Redeterminations During the Pandemic**

36.    Typically, each state embarks on an annual "redetermination" process where it reviews the eligibility of its Medicaid recipients and disenrolls members who no longer meet that state's criteria.

37.    In March 2020, in response to the COVID-19 pandemic, the federal government suspended Medicaid redeterminations and provided the states with additional funding to continue paying for members who might have otherwise been disenrolled. Between March 2020 and April 2023, redeterminations were frozen. As a result, Medicaid membership spiked significantly, rising by more than 20 million people. Medicaid enrollment peaked at 94 million members in March 2023.

38.    This directly benefited Defendants. For example, during the moratorium on redeterminations, Elevance's Medicaid membership numbers increased year over year by 21.8%, 19.7%, and 9.2% in 2020, 2021, and 2022, respectively. Indeed, the Company's total Medicaid membership rose a staggering 60% between 2019 and 2022, from 7,265,000 to 11,571,000 people. As reported in *The Wall Street Journal*:

> [I]n 2021, as Medicaid membership was swelling, 15% of working enrollees reported having both Medicaid and employer-sponsored health coverage. Including dependents, that translated into over four million people, a number that likely was much higher at the 2023 peak. Add to that a study that showed that millions of people were unaware that they still had Medicaid in 2022 and you have a big chunk of people not using services that are being paid for.

15

The same article quoted an assistant professor at Texas A&M University describing this phenomenon as "***a handout to insurance companies***. . . . Insurers were getting payments from the states even as many folks either didn't know about their coverage, or as they already had other coverage they were using." In sum, as the ranks of Medicaid members increased, Elevance was being paid "cost-free money" in the form of fixed monthly fees from state governments to cover people who cost Elevance little or nothing because they either had separate health insurance or were healthy and therefore were low acuity and/or had low utilization.

39.    Elevance reaped the benefits of the freeze in redeterminations and the ability to maintain coverage for relatively healthy members with low benefit utilization. For example, a former Elevance employee (FE-1), [1] who was a Behavioral Health Care Manager at Elevance from January 2023 to April 2024 and worked with Medicaid members in regions six and seven in Colorado, noted that it was common knowledge that during COVID Medicaid recipients did not need to worry about eligibility and, thus, Elevance was able to simply enroll everybody on Medicaid prior to the pandemic into Medicaid for the following years. FE-1 further reported that, unlike prior to the pandemic, during the COVID-era moratorium on redeterminations, members did not have to fill out an application or ensure that they were still eligible for Medicaid.

40.    These practices enabled Elevance to realize dramatic revenue growth between 2020 and 2023. Between 2021 and 2022, as reported in Elevance's SEC Form 10-K for the fiscal year 2023, Elevance's operating revenue attributable to its Medicaid business increased by nearly 20%, from roughly $44.1 billion to $52.9 billion. As a result, Elevance's stock price soared, skyrocketing

---

[1] Former Elevance employees are referred to herein as "FEs" and all are discussed using feminine pronouns regardless of their actual gender in order to maintain their confidentiality.

16

by over 200% during the three years preceding the Class Period, from $200 per share in late March 2020 to over $500 per share by early April 2024.

41.   As Elevance's stock price increased, Defendants reaped the benefit of their heavily stock-based incentive compensation packages, including valuable stock options, restricted stock units ("RSUs"), and performance-based restricted stock units ("PBRSUs"). For example, in 2024:

a.   Boudreaux received a total of $16.8 million in stock and option awards, which represented over 82% of the value of her total compensation of $20.4 million and dwarfed her $1.6 million base salary. This was a significant increase from her pre-pandemic 2019 compensation when she received stock and option awards worth $11.2 million as part of a total pay package worth $15.5 million.

b.   Norwood received a total of $4.8 million in stock and option awards, which represented over 76% of the value of her total compensation of $6.3 million and dwarfed her $950,000 base salary.

c.   Kaye received a total of $5.5 million in stock and option awards, which represented over 80% of the value of his total compensation of $6.9 million, and dwarfed his $900,000 base salary.

d.   ~~Haytaian received a total of $4.8 million in stock and option awards, which represented over 75% of the value of his total compensation of $6.3 million and dwarfed his $950,000 base salary.~~

**C.   Congress Permits States to Restart Medicaid Redeterminations**

42.   The Consolidated Appropriations Act of 2023 was passed by Congress as an omnibus spending package and signed into law on December 22, 2022. The new law decoupled Medicaid eligibility from the COVID public health emergency, permitting states to restart

17

redeterminations and begin removing ineligible beneficiaries from Medicaid programs starting April 1, 2023. Most states were expected to complete the redetermination process by June 2024.

43.    As a result of the reinstatement of the redetermination process, states began the process of determining which beneficiaries continued to qualify for Medicaid eligibility, which involved sending requests by mail to Medicaid beneficiaries to provide updated income and household information. The result was that healthier and more financially secure members with lower acuity were removed from the Medicaid rolls while sicker patients with higher acuity maintained their Medicaid memberships. This led directly to significantly higher Medicaid costs per patient and higher benefit expense ratios for Elevance.

44.    Thus, the Medicaid population shifted to higher acuity participants who were more likely to take steps to reenroll because they needed Medicaid services and had no other healthcare options, and led directly to significantly higher Medicaid costs per patient and higher benefit expense ratios for Elevance.

45.    Market and industry participants expressed concern about the effect of the resumption of redeterminations. For example, one consultant reported that "MCOs [managed care organizations] with a high proportion of Medicaid members will face headwinds as ineligible members are disenrolled and associated premiums disappear." The Urban Institute projected that "there could be approximately 3.8 million uninsured individuals following the redeterminations." And to the extent disenrolled members already had other insurance elsewhere, as was often the case while redeterminations were paused, MCOs like Elevance could not expect to regain any additional revenue by bringing them back into their system.

46.    Elevance's competitor, Centene, warned investors of the impact of the redetermination process on its business. Specifically, Centene forecasted a higher Medicaid

18

expense ratio for 2024 to account for "temporary dislocation between rates and acuity." In May 2024, Centene also reported "higher than expected claims receipts" lodged between January and April of 2024, due to redeterminations causing a shift in acuity for its Medicaid members.

47.    By contrast, Elevance, with the Individual Defendants at the helm, made no such disclosures. On the contrary, as detailed below, Defendants repeatedly assured investors that disenrollments from redeterminations were counteracted by "actuarily sound" state premium rate increases, and that their earnings per share guidance was conservative and already factored in any cost increases resulting from the shift to higher acuity and utilization caused by the redetermination process.

**D.    Heading Into the Class Period, Defendants Downplayed the Impact of the Redetermination Process**

48.    Despite the significant threat that the newly announced return to redeterminations posed to Elevance's Medicaid business, Defendants sought to reassure investors that the Company would not suffer significant negative effects. For example, during a June 1, 2023 Bernstein Strategic Decisions Conference, Boudreaux was asked about the impact of redeterminations. She responded that "we feel good about Medicaid," and that there was nothing "that would ask us to change our assumptions at this point, but feel good about them."

49.    During a June 13, 2023 Goldman Sachs Global Healthcare Conference, Norwood assured investors that members that had been disenrolled so far had not been removed on the basis of eligibility. Rather, she claimed that "upwards to 80% of what we're seeing in some states is tied to individuals not retaining their Medicaid coverage because of [] administrative reasons"—*i.e.*, that Elevance would be able to get them re-enrolled in Medicaid. She also added that Elevance would "get more and more visibility into what rates look like for 2024, but [had] very good and strong communications" with states.

19

**V.    OVERVIEW OF DEFENDANTS' DECEPTION OF INVESTORS**

**A.    During the Class Period, Defendants Misleadingly Downplayed the Impact of the Redetermination Process on Elevance's Medicaid Business and Represented That Their Financial Guidance Already Accounted for Higher Medicaid Costs**

50.    Throughout the Class Period, Defendants repeatedly assured investors that Elevance's Medicaid business was performing well, they had already accounted for rising Medicaid costs in their guidance issued to investors, and investors could continue to expect double-digit growth in the Company's earnings.

51.    For example, on April 18, 2024, the first day of the Class Period, Elevance hosted a conference call to discuss its earnings for the first quarter of 2024. Boudreaux boasted that Elevance was increasing its guidance for earnings per share in 2024 to "greater than $37.20", which represented *double-digit* growth as compared to 2023. Defendants continued touting Elevance's strong guidance as the Class Period continued, with Boudreaux telling investors on May 31, 2024, that Defendants had "confidence" in their 2024 earnings-per-share guidance of "greater than $37.20, which equates to a little bit *more than a 12% growth rate*." Similarly, on July 17, 2024, even after being forced to admit troubling increases in acuity and utilization costs, Boudreaux and Kaye both explicitly reiterated the "at least $37.20" earnings-per-share guidance, and assured investors that this outlook "allow[s] for both this shift in acuity and increased utilization in the second half of the year."

52.    Defendants also downplayed the impact of the redetermination process on Elevance's Medicaid business and, critically, assured investors that their financial guidance and Medicaid rate negotiations already accounted for increased Medicaid costs due to the redeterminations. Norwood and Kaye assured investors at the April 18, 2024 earnings call that Elevance's Medicaid business was "tracking very much in line with our expectations," that "90%

20

of our members have had their eligibility redetermined" and that much of the Medicaid disenrollment Elevance had experienced was due to "footprint changes" and "procedural reasons" rather than ineligibility. Norwood specifically stated that "in terms of where we are today, with respect to the acuity and mix of that membership, *the acuity is in line with what we expected*."

53.    Likewise, on May 31, 2024, Boudreaux told investors that Defendants were "very comfortable around our overall guide on medical loss ratio, medical benefit ratio for the year." Then on June 12, 2024, ~~Haytaian~~Tanal emphasized that Elevance had "planned" for "a lot of shifts happening in the risk pool," and that the "states are recognizing" and "seeing" the cost increases and were taking them into account in determining Elevance's rates. ~~Haytaian~~Tanal also stated, "[i]n Medicaid, . . . *a range of outcomes is assumed in our guidance*" and, with regard to acuity, there was "*nothing outside of the bounds of what we expected and guided for*."

54.    Analysts covering Elevance reacted positively to Defendants'assurances. For example, Barclays reported on April 18, 2024 that Defendants' earnings-per-share raise "reinforces our view that the company is well-positioned to deliver positively differentiated medical cost trends." That day, UBS noted the "positive" development that "Medicaid redeterminations [were] 90% complete and acuity shifts match[ed] expectations." On May 31, 2024, Stephens noted that "comments provided today by CEO Gail Boudreaux should go a long way towards stabilizing these N-T [near-term] investor fears on the potential impact [of emerging Managed Medicaid medical cost trends] to ELV's financials." On July 17, 2024, Deutsche Bank echoed Defendants' assurances that "the full-year outlook already accounted for increased utilization and rate timing mismatch." And UBS likewise noted that Defendants reassured investors that "the full year outlook does account for both the shift in acuity as well as the increased utilization."

21

55.     As detailed below, multiple former Elevance employees reported that, throughout the Class Period, Defendants were laser focused on the Medicaid redetermination process and knew that the Company's Medicaid costs had ballooned as the redeterminations resulted in a dramatic shift of the acuity mix towards higher cost (higher acuity and/or higher utilization) patients. Defendants also knew, contrary to their repeated assurances to investors, that their financial guidance and Medicaid rate negotiations with state governments did not factor in these cost increases. These reports from former Elevance employees were provided independently by multiple individuals who had direct experience working at Elevance in different roles and at different times, but their reports are strikingly consistent and, thus, mutually corroborating.

**B.      Former Elevance Employees Reported That Defendants Closely Tracked Redeterminations and Were Aware That Medicaid Costs Were Exploding**

56.     Former employee #2 ("FE-2") worked at Elevance from 2011 to 2025 with her most recent title being Cost of Care Manager. Among other responsibilities, she worked on the Company's Medicaid products in Texas, Washington, and Georgia. FE-2 confirmed that Elevance had an internal team that tracked and reported on the redetermination process, which was within the finance department. She explained that the data regarding redeterminations was provided by the state governments and was fed directly into Elevance's Health Care Management System.

57.     FE-2 also confirmed that due to Medicaid membership loss resulting from the redeterminations, revenue from state premium payments began to drop and the Company's Medical Loss Ratio ("MLR")[2] began to rise only a couple of months after states were allowed to

---

[2] The Centers for Medicare & Medicaid Services (CMS) defines "Medical Loss Ratio" (MLR) as "the proportion of premium revenues spent on clinical services and quality improvement." The Affordable Care Act (ACA) mandates that health insurance issuers meet minimum MLR percentages. "Benefit Expense Ratio" is a similar concept used throughout the insurance industry that compares the expenses related to paying out benefits to premium revenues. While CMS and the ACA do not refer explicitly to Benefits Expense Ratio ("BER"), insurance companies like

begin redeterminations in 2023. FE-2 further confirmed that the top executives at Elevance knew that the redetermination process was resulting in fewer Medicaid members, including Elevance's CEO, CFO, and the executives in charge of the Government Health Benefits division.[3] She also confirmed that this meant there was a shift towards sicker patients. FE-2 explained that Elevance, specifically the finance team and the VP of finance, monitored costs and expenses and confirmed that Elevance's MLR was discussed in meetings with the leadership teams, including the President and CEO of Elevance's Wellpoint Texas plan Greg Thompson, the Senior System Analyst of Elevance's Government Business Division Emmanuel Martinez, actuaries, and other finance related employees. FE-2 recounted meetings with Thompson—who reported to Boudreaux, Norwood, and Kaye—where it was discussed that the MLR was rising since many low acuity members who had stopped using Medicaid-covered services were being disenrolled but high acuity members were staying on the rolls.

58.    Former Employee #3 ("FE-3") FE-3 was a Director of Account Management at Elevance from September 2023 to May 2025. FE-3 reported that during quarterly town halls in 2024, Elevance senior leadership, including Boudreaux, discussed pushing members that lost Medicaid coverage through redeterminations to rejoin with another independent product, and characterized it as a "soft-landing" or "back stop" strategy to deal with Medicaid redeterminations.

59.    FE-3's report confirms Boudreaux's direct knowledge that the redetermination process was negatively impacting Elevance's Medicaid business and that her response was to try

---

Elevance often use the term interchangeably with MLR. Elevance, for example, defines BER as representing "benefit expense as a percentage of premium revenue." In this Complaint, MLR and BER should be understood to represent the expense of insuring members as a percentage of premium revenues. A higher MLR or BER percentage means higher costs, as each metric is driven by how much is being spent on costs or expenses.

[3] This was, respectively, Boudreaux, Kaye, and Norwood.

to stem the tidal wave of Medicaid member losses by pushing disenrolled members into commercial plans in an effort to soften the blow of redeterminations. Indeed, there would be no need for her to pursue such a "soft landing" or to implement a "back stop" plan if Boudreaux did not specifically know that Elevance faced a significant problem due to the redeterminations, and that members were not being removed for administrative reasons, as Defendants publicly stated. This plan was evidently implemented at Elevance. For example, FE-1 reported that, starting in November 2023, she personally made calls to try to keep members in the system that had been disenrolled due to redeterminations.

60.    Similarly, Former Employee #4 ("FE-4"), who was a Washington D.C.-based Director of Data Science at Elevance from 2018 through 2021 and Staff Vice President of Advanced Analytics from November 2021 through March 2025, reported that during an internal meeting she attended on February 28, 2024, Boudreaux urged the importance of enrolling former Medicaid members who had lost coverage due to redeterminations in commercial health plans since so many of them would not be eligible for Medicaid going forward.

61.    Former Elevance employees also reported that many of the members who came into the system during the pandemic clearly became ineligible during the pause in redeterminations or did not utilize their benefits and were thus certainly going to be disenrolled in Medicaid once redeterminations began in 2023-24. For example, FE-4 reported that it was commonly understood within the Company that a lot of the people who came in through the moratorium did not use their benefits at all. FE-4 confirmed that these members did not even know they had Medicaid coverage and would have to be the first to go as a result of the redetermination process. FE-4 reported that on the April 18, 2024 Q1 earnings call, Kaye stated that the Medicaid business was performing well, but that this contradicted statements made by Boudreaux at an internal meeting on February

24

28, 2024, when Boudreaux informed employees in attendance that the Company was losing many more people from its Medicaid rolls than they expected.

62.     Former Employee #5 ("FE-5") was a Behavioral Health Team Lead from 2023 through 2025 at Elevance and worked in Denver, Colorado, overseeing a federal grant for Families First and worked with independent-contractor physicians to set referrals. FE-5 recalled discussions of redeterminations during an Elevance internal monthly meeting held in early 2024. Then, at a subsequent meeting, FE-5 recounted discussions that, due to the redeterminations, many more people were dropping out of Medicaid coverage than the Company had planned. FE-5 recalled that the Company revealed internally at this meeting that many more people were being pulled off the Medicaid rolls than anticipated.

63.     Former Employee #6 ("FE-6") was a Senior Director of Population Health Strategy at Elevance from October 2017 to November 2024 working on "Value Based Programs," including those with Medicaid components. She attended strategic meetings where business decisions were made about the status and future of such programs. FE-6 recounted internal discussions that Elevance was likely to incur significant expenses to cover cost increases beyond what was covered by plan premiums. According to FE-6, Elevance's Medicaid programs were inflated and overvalued during the pandemic because people did not lose their coverage. But once redeterminations re-started, the Company expected that it would lose more healthy members because they would likely go back to work. FE-6 confirmed that the effect of the post-pandemic redeterminations would be a loss in revenue for Elevance.

64.     Former Employee #7 ("FE-7") was a Director of Medicaid & Dual Eligible Growth Strategy from April 2023 to November 2024 and worked in the Cincinnati Metropolitan Area. FE-7 worked to retain Medicaid contracts with states and built partnerships in states that did not have

contracts, including reviewing policies and competitive analysis to develop requests for proposals to win state contracts. FE-7 explained that the utilization of the Medicaid members that remained with Elevance after redeterminations increased. In turn, this caused Elevance to face increased Medicaid costs even as revenue was being lost. FE-7 recounted that post-pandemic, Elevance experienced higher Medicaid costs related to behavioral health because of increased utilization of antidepressants and mental health clinical services.

65.    Former employees whose responsibilities included interfacing with states on Medicaid coverage and tracking redeterminations consistently reported that Elevance lost substantial business due to redeterminations, including in particular states. For example, Former Employee #8 ("FE-8") was a Director, Customer Care at Elevance from November 2021 to September 2024 in Massachusetts. FE-8 confirmed that Medicaid redeterminations negatively impacted Elevance's Medicaid business in Massachusetts, including because the Company lost half of its market share in behavioral health because of the resumption of the redetermination process.

66.    FE-7 reported that the Medicaid redeterminations were tracked by the corporate finance team, which rolled up to the Chief Financial Officer.[4] She explained that once the redeterminations restarted, the Company needed to mitigate its costs and labor took the hardest hit, which meant employees were laid off. FE-7 further confirmed that the Company's financial performance was impacted by the loss of revenue due to the drop in enrollment because of the redeterminations.

67.    Former Employee #9 ("FE-9") was a Clinical Quality Program Director at Elevance from September 2017 to August 2025 and worked in the Nashville, Tennessee metropolitan area.

---

[4] During this period, Kaye was CFO.

In this position, FE-9 worked on strategies to retain Medicaid members during the redeterminations on a state-specific level and then nationally for all Medicaid markets. FE-9 stated that in 2024 it was known within the Company that there would be a loss in revenue from the drop in patients due to redeterminations. FE-9 also reported that there was manipulation in how data was classified to highlight only the positives and not mention anything that would reflect poorly.

**C.    Former Elevance Employees Reported That Elevance's Medicaid Membership Tracking Data and Claims Processing Were Riddled With Errors and Did Not Account for Exploding Medicaid Costs**

68.    Defendants knew that Elevance's membership tracking data was in shambles and could not be relied upon in Medicaid rate negotiations with states or financial forecasting, including because it did not account for the exploding Medicaid costs faced by the Company.

69.    As explained above, Medicaid members who were unemployed when they obtained membership but then became employed and began receiving commercial insurance coverage through their employer would lose their eligibility for Medicaid and be disenrolled. These were generally the very same low-cost members who were not using their Medicaid insurance at all while Elevance continued to accept their premium payments from states.

70.    FE-8 explained that the Company's behavioral health system was created in the 1980s and was inherited from older companies Elevance acquired—and, as such, she described it as Elevance's Achilles' heel. She reported that this system was far behind on claims payments, that she worked on reconciliations of claim recoveries in 2022, and that similar issues of reconciling the prior year's claims persisted within Elevance into 2024. FE-8 recalled that these issues with the claims system resulted in difficulties in Medicaid rate negotiations with Massachusetts and New York.

71.    FE-9 noted that during her tenure at Elevance (September 2017 to August 2025), the Company's Medicaid data grew increasingly unreliable, and that this caused significant

27

problems with Elevance's relationships with the states it contracted with and with which it negotiated Medicaid rates. For example, FE-9 explained that, in July 2023, Medicaid data issues led to an eight-month investigation. Then, in August 2023, FE-9 led a three-day meeting where Elevance executives flew in from across the country to discuss the inaccurate data Elevance had been providing to the states.

72.    FE-6 confirmed that the Medicaid data she reviewed often could not be reconciled, including because it came from three different sources, none of which ever completely aligned. FE-6 stated that Bryony Winn, former President of Health Solutions and current president of Carelon Health (a division of Elevance), was aware of the problems with the Medicaid data. However, FE-6 explained that the Company did nothing to improve the data, and *continued to make projections based off of it, which impacted how the Company calculated cost trends*.

73.    Former Employee #10 ("FE-10") was a Manager II of Medicaid Operations from February 2011 through June 2025, focusing on Elevance's Florida Medicaid business. FE-10's responsibilities included responding to complaints from providers and on claim rejection challenges. She encountered instances where providers would go unpaid even when Elevance would hire third-party vendors to assist with claims reviews, and then Elevance would make late payments with three to six months interest. FE-10 explained that these systems issues impacted the Company's visibility into cost trends.

74.    Former Employee #11 ("FE-11") was a Connecticut-based Clinical Reviewer from July 2014 to July 2025 who first worked on Medicaid plans in the east region, then for Elevance's corporate team, creating reports assessing plan performance for corporate leaders that were based on the entirety of the patient population. FE-11 reported to Andrew Boyum, the head of the reporting department. FE-11 confirmed that there were signs that the forecasts Elevance used to

28

account for utilization were ineffective. She confirmed that everyone at the Company, including the data team, knew about the problems with the data by May 2024. FE-11 recalled that when reporting Medicaid numbers to the states, which Elevance did on a weekly basis, there were instances where data was not properly processed and there were no actual numbers for the state, which led to the Company receiving fines.

75.    FE-4 stated that Elevance was flying blind when conducting data analytics thanks to underinvestment in its IT system. One big flaw in its data system was that direct provider payments for Medicaid were lumped together, as opposed to separated out by member or service. FE-4 explained that this flaw made member-level analysis difficult. FE-4 also explained that Elevance's Medicaid reporting system had a suboptimal coordination of benefits data. She described Elevance's system as one of the worst data systems she had ever worked with in her career.

76.    Former Employee #12 ("FE-12") FE-12 was a Senior Manager of the Provider Network at Elevance from June 2022 to June 2025. FE-12 explained that because Elevance's claims processing system resulted in incorrectly denied claims and reimbursement rates, states including Texas, Washington, Nevada, Kentucky, Georgia, and Virginia did not want to renegotiate or work with Elevance.

77.    Former employees also consistently reported a significant lag time in Medicaid reporting that further exacerbated the already strained relationship between Elevance and the states it contracted with for Medicaid services. For example, FE-6 stated that the Medicaid reporting data that Elevance used in forecasting utilization and costs suffered from *eight-month delays*. She explained that this lag in reporting data presented unique challenges including delays in revenue

29

reporting and claims payments. There were instances where employees reviewed members' cost profiles, and those individuals were no longer members.

78.    The Medicaid reporting and redetermination tracking errors were well known within the Company, and Elevance employees attempted to raise the glaring issues they saw to their supervisors.

79.    For example, one of FE-11's job responsibilities was to create reports covering the entirety of the patient population of Elevance members to see how the plans were performing. These reports included Medicaid-claim-processing reporting. FE-11 confirmed that in mid to late March 2024, she identified a large data error regarding Medicaid contracts. Medicaid reporting demonstrated inaccurately short turnaround times when in reality it was much longer. For example, data showed the turnaround time for Medicaid was three days when it should have indicated *33 days*. This resulted in the reports falsely reflecting claims being processed that had not yet been processed. Accordingly, relying on such reports impacted the Company's visibility into cost trends.

80.    FE-11 raised these issues to her direct supervisor Andrew Boyum, who was the head of the reporting department. FE-11 and Boyum then brought the issues to the Vice President of the department, Stephanie Harju, who reported to Qi Zhou, Vice President of Enterprise Quality Strategies and Management. Shortly after FE-11 and her supervisor reported these data errors, the supervisor was fired. Thus, Elevance continued to provide these false reports that reflected unprocessed claims as having been processed to states on a weekly basis.

81.    Similarly, FE-6 reported that her and her cohort of Elevance employees began discussing how reports concerning the Company's cost-savings on Medicaid programs were flawed, and that the calculations from their forecasting never added up. These discussions started

as early as 2022. FE-6 noted that the data was so bad that Company leadership could not defend anything they were doing, and that the flawed data created difficulties impacting the Company's visibility into cost trends.

82. FE-6 reported that she brought concerns to her boss about Integra, a data healthcare firm the Company worked with. When her boss attempted to elevate those concerns, he was fired.

83. FE-11 and FE-6's accounts were further corroborated by Former Employee #13 ("FE-13"), a Senior Reporting Specialist at Elevance from January 2023 to March 2025. FE-13 reported that Medicaid and Medicare claims were not reported correctly, which impacted cost trends. She confirmed that she knew of two employees who were fired between July and September 2024 for reporting concerns about Medicare claim reporting issues. And Former Employee #14 ("FE-14-"), a Senior Director of Strategy and Innovation at Elevance from May 2022 to June 2024, who was responsible for integrating acquired companies' software into Elevance's systems and for reviewing Carelon's and Elevance's existing software to consolidate it onto a cohesive data system, stated that Ratnakar Lavu, the Company's Chief Digital Information Officer and Anil Bhatt, the Global Chief Information Officer, fired employees who raised concerns about data security.

**D.  Armed With Inside Knowledge of Redetermination Outcomes, Defendants Engage in Suspicious Insider Trading**

84. During the Class Period, Boudreaux and Norwood sold large amounts of their personal Elevance stock holdings at suspicious times, collectively pocketing over $28 million in personal financial gains.

85. On July 22, 2024, Boudreaux sold *34,000* shares of Elevance stock, or over 21% of her total beneficially owned shares, between $498.50 and $504.27 per share for *over $17 million in proceeds*. This was just five days after Defendants assured investors that the Company's full-

31

year guidance allowed for the observed changes in acuity mix and utilization rates resulting from redeterminations and that Elevance's new premium rates from the states would be actuarially sound; less than three months later they disclosed that neither was true. Boudreaux has not sold any of her Elevance stock since.

86.     Between April 23, 2024, and April 24, 2024, Norwood sold over **20,000** shares of Elevance stock between $532.68 and $534.74 per share for **over $10.8 million in proceeds, amounting to over $9 million in profits**. This was also just five days after the Company raised its full-year EPS guidance and after Norwood stated that "acuity is in line with what we expected," that "at this point we have visibility into 75% of our Medicaid rates and premiums for 2024," and that "[t]he vast majority of those are in line with our expectations and they're actuarially sound." Norwood has not sold any of her Elevance stock since.

87.     The timing of Boudreaux's and Norwood's sales was even more suspicious given that they were completely out of line with their trading habits prior to the Class Period. In fact, Boudreaux and Norwood had never sold *any* of their personal Elevance stock holdings (except for tax purposes) prior to the Class Period and stopped selling after the Class Period ended.

## VI.    THE TRUTH IS GRADUALLY REVEALED THROUGH TWO CORRECTIVE DISCLOSURES IN JULY AND OCTOBER 2024

88.     Defendants' fraud began to partially unravel on July 17, 2024, when Boudreaux announced during Elevance's second quarter 2024 earnings call that "[a]s a result of redeterminations, our Medicaid membership mix has shifted, resulting in increased acuity." Kaye echoed Boudreaux's remarks, revealing that due to this "shift" in acuity, the Company now expected "second-half utilization to increase in Medicaid" as the Company was "seeing signs of increased utilization across the broader Medicaid population[.]" In response to this news, the price of Elevance shares dropped by $32.21 per share to close at $520.93 per share on July 17, 2024,

32

representing a 5.8% drop on unusually heavy trading volume. The shares continued to trade down on July 18, 2024, falling another $16.21 per share to close at $504.72 per share.

89.     Yet despite these revelations, Defendants continued to double down on their misleading assurances to investors. For example, Boudreaux reiterated that "[w]e have prudently maintained our full year outlook," and Kaye confirmed that "the full year outlook does allow for both this shift in acuity and increased utilization in the second half of the year[.]" He further noted that "we are closely monitoring acuity and cost trends, notably in Medicaid and are working collaboratively with states to ensure rates remain actuarially sound." Norwood continued this sentiment, claiming that "we have visibility into nearly all of our Medicaid premium for 2024" and "fully expect our rates to remain actuarially sound." Boudreaux and Kaye both explicitly reiterated their "at least $37.20" EPS guidance.

90.     Analysts were comforted by Defendants' reaffirmation of their double-digit earnings growth projection. For example, while Deutsche Bank expressed surprise that Elevance did not warn investors earlier of the increase in acuity and utilization—and noted that competitors had issued such warnings—they nonetheless accepted Defendants' assurances that "the full-year outlook already accounted for increased utilization and rate timing mismatch." And UBS noted that "the full year outlook does account for both the shift in acuity as well as the increased utilization."

91.     The full truth was finally revealed on October 17, 2024, when Boudreaux announced during the Company's third quarter 2024 earnings call that "third quarter adjusted diluted earnings per share w[as] $8.37, which was below our expectations, primarily due to elevated medical costs in our Medicaid business." She further revealed that Elevance's rate

33

increases, despite being "the highest in the past decade," were "inadequate to cover 2024 cost trends that we now expect to be *3 times to 5 times historical averages*."

92.     The market was shocked. Securities analysts following Elevance expressed alarm, remarking that "the magnitude of the revision that's implied there is alarming, particularly given that we're at the end of the membership impacts from redetermination." Other analysts expressed confusion over Elevance's failure to disclose these issues earlier, asking "[w]hy is that happening so late in the [redetermination] process?" Others expressed "surprise" about the scale of Defendants' miss and its complete attribution to Medicaid redeterminations.

93.     Defendants' October 17, 2024 disclosures caused Elevance's stock price to plummet, falling $52.61 per share, or roughly 10.6%, from a closing price of $496.96 on October 16, 2024 to a closing price of $444.35 on October 17, 2024 on extremely heavy trading volume. The stock continued to trade down in the following days, dropping another $13.58 per share to close at $430.77 per share on October 18, 2024 and another $8.51 per share to close at $422.26 per share on October 21, 2024 (the next trading day). The stock has not recovered since:

34



## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

94.    The Class Period begins on April 18, 2024, when Defendants announced the Company's financial results for the first quarter of 2024. Throughout the Class Period, Defendants made false and misleading statements and omissions concerning (i) the negotiated premium rates and the incorporation of the explosion in Medicaid costs that had resulted from the redeterminations into those rates; (ii) the actuarial soundness of the rates Elevance negotiated with the states; (iii) the redetermination process and the performance of Elevance's Medicaid business; and (iv) Defendants' guidance for Elevance's financial performance, including earnings in 2024. As set forth below, Defendants' statements and omissions were materially false and misleading because they knew that redeterminations had already negatively impacted the Company's Medicaid business, that Medicaid costs had increased dramatically, and that their 2024 guidance

35

and rate negotiations with the states did not factor in these increased costs, including because they relied on historical, inaccurate data that did not incorporate the increased costs.

> **A.    Materially False and Misleading Statements and Omissions That Guidance and Premium Rates Incorporated Increased Medicaid Costs Due to Redeterminations**

95.    Defendants repeatedly assured investors that Elevance's financial outlook for 2024, as well as the Medicaid premium rates they negotiated with state governments, incorporated the increased Medicaid costs that had resulted from the redetermination process. These statements of present and/or historical fact were materially false and misleading and omitted to state material facts necessary to make them not misleading.

96.    On June 12, 2024, during the Goldman Sachs Global Healthcare Conference, ~~Haytaian~~Tanal was asked about Medicaid utilization trends in the second quarter, and whether such trends impacted Elevance's guidance for 2024. In response, ~~Haytaian~~Tanal stated, "[i]n Medicaid, . . . *a range of outcomes is assumed in our guidance*." He further stated that Elevance had "*planned*" for "*a lot of shifts happening in the risk pool*[.]" He then stated, with regard to acuity, there was "*nothing outside of the bounds of what we expected and guided for*, so feeling still comfortable there."

97.    The statements set forth above in ¶96 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time these statements were made that (i) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (ii) their 2024 guidance and rate negotiations with the state partners did not account for the massive increase in Medicaid costs that

36

Elevance faced, including because Defendants knew those relied on inaccurate data that did not reflect the observed increased costs. Alternatively, these statements were materially misleading half-truths because they omitted these material facts.

98.    On July 17, 2024, Elevance held its second quarter (Q2) 2024 earnings conference call, which was led by Boudreaux, Kaye, and Norwood.

99.    During the Q2 2024 earnings call, Kaye stated:

a.    "With respect to our *outlook*, *we are closely monitoring acuity and cost trends, notably in Medicaid* and are working collaboratively with states to ensure *rates remain actuarially sound*. We are, however, expecting second half utilization to increase in Medicaid, and as a result, anticipate our full year benefit expense ratio will end the year in the upper half of our initial guidance range. Nonetheless, we *expect to achieve our full year adjusted diluted earnings per share guidance of at least $37.20*."

b.    "*[T]he full year outlook does allow for both this shift in acuity and increased utilization in the second half of the year*, including the rate timing mismatch that Felicia [Norwood] spoke to."

100.    Kaye's statements set forth above in ¶99 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time these statements were made that (i) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (ii) their 2024

37

guidance and rate negotiations with the state partners did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Alternatively, these statements were materially misleading half-truths because they omitted these material facts.

101.    During the Q2 2024 earnings call, Norwood stated: "We *fully expect our rates to remain actuarially sound*, but we acknowledge *the potential for a short-term, disconnect between the timing of our rates in the emerging acuity in our populations, and that's certainly been reflected in our updates for the year*."

102.    Norwood's statement set forth above in ¶101 was an untrue statement of material fact and/or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time this statement was made that (i) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (ii) their 2024 guidance and rate negotiations with the state partners did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Alternatively, this statement was a materially misleading half-truth because it omitted these material facts.

**B.    Materially False and Misleading Statements and Omissions Made Concerning Elevance's Medicaid Business and the Redetermination Process**

103.    Defendants also made false and misleading statements concerning the then-current performance of Elevance's Medicaid business and the effects (or lack thereof) of the redetermination process. These statements were false and misleading because the vast majority of

38

disenrolled members at that time had been valuable low-acuity, low-utilization members, and redeterminations thus would have an outsized impact on MLR and would dramatically increase costs.

104.    On April 18, 2024, Elevance hosted its first quarter (Q1) 2024 earnings conference call, which was led by Boudreaux, Kaye, and Norwood.

105.    During the Q1 2024 earnings call, Bourdeaux stated "[i]n the first quarter, our *Medicaid business performed in line with our expectations*. We estimate that *nearly 90% of our members have had their eligibility redetermined*."

106.    Boudreaux's statement set forth above in ¶105 was an untrue statement of material fact and/or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time this statement was made that (i) redeterminations were already negatively impacting Elevance's Medicaid business; (ii) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (iii) the guidance and expectations did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Alternatively, this statement was a materially misleading half-truth because it omitted these material facts.

107.    Also during the Q1 2024 earnings call, Norwood was asked by a senior equity research analyst at Jefferies, "I think you said 90% of members have now been redetermined. I wondered if you could give us some view of kind of how you expect that to gate out over the next

39

several quarters? And then from a risk pool and rate adequacy standpoint, could you update on how that looks now that the membership is whittling down?" Norwood responded:

   a. "In terms of *where we are today* with respect to *the acuity and mix of that membership, the acuity is in line with what we expected*."

   b. "Frankly, *right now, we're at a point where our Medicaid business is actually tracking very much in line with our expectations*. As you referenced, we believe that about *90% of our members have had their eligibility redetermined*."

   c. "[W]e're going to *make sure that we go through this process with a lot of discipline and rigor, understand the mix of our membership and the leavers versus stayers as we go through this process*."

108.    Norwood's statements set forth above in ¶107 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time these statements were made that (i) redeterminations were already negatively impacting Elevance's Medicaid business; (ii) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (iii) Defendants' guidance and expectations did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Alternatively, these statements were materially misleading half-truths because they omitted these material facts.

40

109.   During the same Q1 2024 earnings call, Kaye stated:

a.   "Let me start maybe with the margins, and let me bring it up to the health benefits business segment to talk about first. So in terms of health benefits, *the margins this quarter were very much in line with our expectations. It puts us squarely on track to achieve our guidance for the full year of an increase between 25 and 50 basis points*."

b.   "Over the long term, *Medicaid continues to normalize . . . and it is performing as expected*. On DCP for 2024, if we look out through the end of the year, we anticipate remaining in the mid- to upper 40s range given *Medicaid membership is expected to decline to within our guidance range of 8.8 million to 9.2 million members*."

110.   Kaye's statements set forth above in ¶109 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time these statements were made that (i) redeterminations were already negatively impacting Elevance's Medicaid business; (ii) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (iii) Defendants' guidance and expectations did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Alternatively, these statements were materially misleading half-truths because they omitted these material facts.

C.    **Materially False and Misleading Statements and Omissions Concerning Rate Premiums**

111.    Defendants also made false and misleading statements and omissions throughout the Class Period concerning the Medicaid rate premiums Defendants negotiated with state governments. These statements of present and/or historical fact were materially misleading and omitted to state material facts necessary to make them not misleading.

112.    During the Q1 2024 earnings call, Boudreaux was asked by a Deutsche Bank equity analyst: "on Medicaid . . . can you talk about where you think we are in the kind of where in, I guess, in the calendar and the mix of rate determinations versus acuity mix and kind of—I guess I'm trying to get a sense for how far behind do you think the kind of the rate repricings are versus the changes in acuity mix from redeterminations." Boudreaux responded "we think *things are quite aligned at this point*. *So in terms of the acuity and the mix, everything, we have visibility into 75% of our Medicaid premiums*. We've had very constructive discussions with our states. *So overall, we feel things are lining up. They're actuarially sound*, and our conversations are ongoing. So *I feel very good about our Medicaid business*, just to sort of put a finer point on that."

113.    Boudreaux's statement set forth above in ¶112 was an untrue statement of material fact and/or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time this statement was made that (i) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (ii) the rates Elevance negotiated with the states did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not

42

include the increased costs. Indeed, Defendants later *admitted* that these rates were insufficient to cover the 3-5x increase in costs. Alternatively, this statement was a materially misleading half-truth because it omitted these material facts.

114.    During the same Q1 2024 conference call, Kaye stated: "Not looking necessarily to comment on a single businesses margin, but *you could expect Medicaid margins to normalize given we already have line of sight*, and you heard Felicia [Norwood] talk about this, *into approximately 75% of the Medicaid premiums for 2024 and that we are comfortable with the actuarial soundness of the rates that we are seeing*."

115.    Kaye's statement set forth above in ¶114 was an untrue statement of material fact and/or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time this statement was made that (i) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (ii) the rates Elevance negotiated with the states did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Indeed, Defendants later *admitted* that such rates were insufficient to cover the 3-5x increase in costs. Alternatively, this statement was a materially misleading half-truth because it omitted these material facts.

116.    Also during the Q1 2024 conference call, Norwood stated: "And I will also say that at this point, *we have visibility into 75% of our Medicaid rates and premiums for 2024*. The vast majority of those are *in line with our expectations and are actuarially sound*. As you know, we

43

have ongoing conversations with our state partners as we go throughout this process and we expect those rates to continue to be actuarially sound."

117.    Norwood's statement set forth above in ¶116 was an untrue statement of material fact and/or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time this statement was made that (i) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (ii) the rates Elevance negotiated with the states did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Indeed, Defendants later ***admitted*** that such rates were insufficient to cover the 3-5x increase in costs. Alternatively, this statement was a materially misleading half-truth because it omitted these material facts.

118.    Then, during the Global Healthcare Conference, ~~Haytaian~~Tanal reiterated that as of April, Elevance had "***visibility into 75% of our Medicaid premium for the year***. And we've talked about broadly ***actuarially sound rates*** being very comfortable with what we are seeing on that block. I would say that remains the case."

119.    ~~Haytaian's~~Tanal's statement set forth above in ¶118 was an untrue statement of material fact and/or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time this

44

statement was made that (i) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (ii) the rates Elevance negotiated with the states did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Indeed, Defendants later **_admitted_** that such rates were insufficient to cover the 3-5x increase in costs. Alternatively, this statement was a materially misleading half-truth because it omitted these material facts.

> **D.      Materially False and Misleading Statements and Omissions Regarding Elevance's Financial Guidance**

120.    Finally, Defendants made false and misleading statements and omissions concerning Elevance's financial guidance. Specifically, Defendants increased Elevance's 2024 EPS guidance to $37.20 at the start of the Class Period—a greater than 12% growth rate from 2023—and assured investors throughout the Class Period that they were "confident" in this "prudent" guidance. These statements and omissions were false and misleading because redeterminations had already caused massive increases in costs that Elevance's negotiated rate premiums could not counteract, thus driving down earnings significantly.

121.    During the April 18, 2024 Q1 earnings call, Boudreaux touted the Company's "solid start to the year," and announced that Defendants had "**_increased our guidance for adjusted earnings per share by $0.10 to be greater than $37.20_**."

122.    Boudreaux's statements set forth above in ¶121 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time these

statements were made that (i) redeterminations were already negatively impacting Elevance's Medicaid business; (ii) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (iii) Defendants' guidance did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Alternatively, these statements were materially misleading half-truths because they omitted these material facts.

123. On May 31, 2024, during the Sanford C. Bernstein Strategic Decisions Conference, Boudreaux:

    a. Touted Defendants' purported "very disciplined execution of our strategic initiatives" in 1Q 2024 that "gave us confidence to be able to *raise our full-year guidance to greater than $37.20*, which equates to a little bit *more than a 12% growth rate*."

    b. Stated: "*we also feel very good that we're executing on the guidance*" in Medicaid.

    c. Assured investors that "*we are very confident in the adjusted EPS guidance* that we shared with you and *very confident in the medical cost ratio* as well as we think about the way we positioned our business, feel very good about that."

    d. Stated: "But again, [we] feel very comfortable around our *overall guide on medical loss ratio, medical benefit ratio for the year*. So I guess my headline here is nothing new to really talk about pretty consistent with what we've already said."

124. Boudreaux's statements set forth above in ¶123 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, and Lead

Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time these statements were made that (i) redeterminations were already negatively impacting Elevance's Medicaid business; (ii) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (iii) Defendants' guidance did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Alternatively, these statements were materially misleading half-truths because they omitted these material facts.

125. On July 17, 2024, Elevance issued a news release regarding its 2Q 2024 financial results and operations, which was attached to and incorporated in a Form 8-K filed with the SEC. The Form 8-K quoted Boudreaux as stating: "***We have prudently maintained our full-year outlook***."

126. Boudreaux's statement set forth above in ¶125 was an untrue statement of material fact and/or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time this statement was made that (i) redeterminations were already negatively impacting Elevance's Medicaid business; (ii) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (iii) Defendants' outlook did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs.

Alternatively, this statement was a materially misleading half-truth because it omitted these material facts.

127.    On July 17, 2024, during the Q2 2024 earnings call, Boudreaux stated that Defendants "have **reaffirmed our full-year adjusted diluted earnings per share guidance** of at least $37.20 **which represents 12% growth** year-over-year"; claimed to have "**prudently** maintained our full year outlook"; and stated "**nearly all of our members have had their eligibility redetermined** since the process resumed last year."

128.    Boudreaux's statements set forth above in ¶127 were untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. As detailed above, and Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein, former Elevance employees reported that Defendants knew at the time these statements were made that (i) redeterminations were already negatively impacting Elevance's Medicaid business; (ii) Elevance's Medicaid costs were exploding given that redeterminations were resulting in a dramatic shift towards higher cost patients; and (iii) Defendants' guidance did not did not account for the massive increase in Medicaid costs that Elevance faced, including because Defendants knew those relied on inaccurate data that did not include the increased costs. Alternatively, these statements were materially misleading half-truths because they omitted these material facts.

## VIII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

129.    Defendants each acted with scienter in that they knew that their public statements set forth above were materially false and misleading when made and omitted material facts necessary to make the statements not misleading. The facts set forth herein, considered collectively, demonstrate a strong inference that Defendants each knew facts making the

48

statements they made materially false and misleading. In conjunction with and in addition to the facts set forth above, which Lead Plaintiff repeats, incorporates, and realleges as if fully set forth herein, Defendants' scienter is further evidenced by the facts summarized below.

130.    First, Defendants were carefully monitoring the Medicaid redetermination process, and knew that the Company's Medicaid costs were exploding due to the dramatic shift towards higher cost (higher acuity/higher utilization) patients resulting from the redetermination process. They also knew that their 2024 guidance/outlook and their Medicaid premium rate negotiations did not and could not account for the explosion in Medicaid costs faced by Elevance, including because they were premised and relied on inaccurate data that did not include the cost increases. These facts are confirmed by the independent and mutually corroborating reports supplied by many of Elevance's *own* former employees set forth above in ¶¶56-83.

131.    Further, and in any event, Defendants themselves repeatedly ***admitted***, including during public conference calls that as of April 2024 they had 75% visibility into their 2024 Medicaid premium rates. Defendants also proclaimed that they knew that their state partners had, by the start of the Class Period, conducted redeterminations on 90% of Elevance's Medicaid members and that, as of July 17, 2024, had completed eligibility redeterminations for "nearly all" of Elevance's Medicaid members. With 75% visibility into the new premium rates the Company would receive and 90% of redeterminations completed, Defendants knew the premiums the Company was collecting would not come close to covering their costs, even if the costs were on the low end of the three to five times multiple range of historical averages.

132.    Defendants also discussed at internal town hall meetings the losses in Medicaid memberships, which presented a risk to Elevance's Medicaid business. The risk that Medicaid redeterminations posed to the Company was so great that Defendants referred to their ability to

49

maintain Medicaid members or to transition them to their commercial-based insurance as the Company's "soft-landing" or "backstop" plan.

133. Relatedly, Defendants knew the premiums they were negotiating would not come close to covering Elevance's exploding Medicaid costs and that their financial guidance could not be achieved, including because they knew that their rate negotiations and guidance relied on inaccurate data that did not include the increased Medicaid costs experienced by Elevance. This was also confirmed by multiple former Elevance employees, as set forth above at ¶¶56-83.

134. Former employees specifically noted the contradiction between Defendants' statements to investors and their internal statements within the Company. For example, FE-4 reported that on the April 18, 2024 Q1 earnings call, Kaye stated that the Medicaid business was performing well, but that this contradicted statements made by Boudreaux at an internal meeting on February 28, 2024, when she informed employees in attendance that the Company was losing many more people from its Medicaid rolls than they expected.

135. Second, Elevance's Medicaid business is a core business segment, as its Medicaid members constituted nearly a quarter of the Company's entire membership in its Health Benefits segment from 2021 to 2023, and the Health Benefits segment accounted for 87% of the Company's revenue in 2023.

136. Moreover, the redetermination process was a major focus of Defendants, investors, and securities analysts during the Class Period. For example, Defendants repeatedly spoke about this process and analysts repeatedly asked about it throughout the entire Class Period.

137. Third, suspicious insider stock sales by Boudreaux and Norwood during the Class Period further contribute to the already strong inference of scienter.

50

138.    Specifically, at the same time Defendants were issuing materially false and misleading statements and omissions to investors—but before the truth was revealed—Boudreaux sold 34,000 shares of her Elevance common stock at artificially inflated prices between $498.50 and $504.27 per share. Boudreaux's sales generated illegal insider trading proceeds of *over $17 million*, enabling her to nearly double her total compensation from Elevance in 2024, as set forth below:

| Date | Action | No. of Shares | Price per Share | Amount |
|---|---|---|---|---|
| 7/22/2024 | Open market sale | 1,100 | $498.50 | $548,350.00 |
| | | 20,779 | $500.36 | $10,396,980.44 |
| | | 6,621 | $501.40 | $3,319,769.40 |
| | | 2,250 | $502.23 | $1,130,017.50 |
| | | 1,000 | $503.67 | $503,670.00 |
| | | 2,250 | $504.27 | $1,134,607.50 |
| **TOTAL** | | | | **$17,033,394.84** |

139.    Boudreaux had been Elevance's CEO since 2017 and, prior to the Class Period, had never sold a single share of Elevance common stock in the open market other than tax-related sales for the vesting of previously granted restricted stock. Then on April 19, 2024, just one day after Defendants issued their false and misleading statements that fraudulently propped up the Company's stock price, Boudreaux adopted a 10b5-1 trading plan for the very first time, indicating an intention to sell shares.

140.    The suspicious timing of Boudreaux's adoption of her 10b5-1 plan indicates that she wanted to cash in while her shares were artificially inflated by Defendants' materially misleading statements and omissions. As a result, Boudreaux's adoption of the plan at the time itself violated Elevance's insider trading policy dated August 29, 2023 (the "Insider Trading Policy"), which mandates that:

[A] Rule 10b5-1 Plan must be entered into at a time when the person entering into the plan is not aware of material nonpublic information. Once the plan is adopted, the person must not exercise any influence over the amount of securities to be traded, the price at which they are to be traded or the date of the trade.

51

141.    Under the Insider Trading Policy and pursuant to the SEC's mandated cooling-off period that prevents a director or officer from trading within a certain period of time after adopting or modifying a 10b5-1 trading plan, Boudreaux would not be able to sell shares until the later of 90 days after adoption of the plan or two business days following the disclosure of the Company's next financial results in a 10-Q or 10-K. Because of this cooling-off period, Boudreaux was incentivized to, and did, prop up the artificially inflated price of Elevance stock through the Company's July 17, 2024 10-Q filing and Q2 2024 earnings call by continuing to mislead investors and not fully disclosing truthful information.

142.    On July 22, 2024—the first trading day following the expiration of the cooling-off period—Boudreaux dumped 21% of her direct shareholdings (as of the date of sale) at artificially inflated prices for a windfall of over $17 million.

143.    Norwood's insider trading activity is also indicative of scienter. Norwood made the following transactions in Elevance stock during the Class Period:

| Date | Action | No. of Shares | Price per Share | Amount |
|------|--------|--------------:|----------------:|-------:|
| 4/23/2024 | Exercised call options | 5,473 | $238.27 | $(1,304,051.71) |
| | Open market sale | 14,011 | $533.73 | $7,478,091.03 |
| | | 100 | $534.74 | $53,474.00 |
| 4/24/2024 | Exercised call options | 2,043 | $238.27 | $(486,785.61) |
| | Open market sale | 2,765 | $532.14 | $1,471,367.10 |
| | | 3,434 | $532.68 | $1,829,223.12 |
| **TOTAL** | | | | **$9,041,317.93** |

144.    Norwood's insider selling was similarly unusual and suspicious. For example, Norwood sold her shares between April 23 and 24, 2024, after Defendants issued several misleading statements and omissions concerning the actuarial soundness of the premium rates Elevance was negotiating with states and after Norwood personally assured investors that "our

Medicaid business is actually tracking very much in line with our expectations" and that rates were "actuarially sound."

145.   Norwood's sales were not made pursuant to a Rule 10b5-1 trading plan, further confirming that the sales were opportunistic and not part of any pre-arranged process. Indeed, the options Norwood exercised would not expire until July 2, 2028, yet she exercised those options that were not going to expire for another four years and immediately proceeded to sell the underlying shares in the open market, without the benefit of a 10b5-1 trading plan. The timing and circumstances in which these sales took place are unusual in that Norwood never made any sales prior or subsequent to the Class Period, other than to satisfy tax liabilities in relation to the vesting of previously granted restricted stock.

146.   The magnitude of these sales supports a strong inference of scienter. These sales represented approximately 45% of Norwood's entire shareholdings as of April 24, 2024. The transactions constituted a significant windfall, yielding Norwood proceeds of more than $9 million, almost 1.5 times her total compensation for fiscal year 2024.

147.   Fourth, the Individual Defendants had another powerful financial motive to conceal the truth regarding Elevance's troubled Medicaid business and their misleading financial guidance. As noted above in ¶41, the Individual Defendants' compensation packages were heavily weighted towards stock-based incentives, including valuable stock options, RSUs, and PBRSUs. Thus, rather than acknowledge that the Company's EPS guidance for 2024 needed to be reduced, the Individual Defendants were incentivized to deceive investors by maintaining their growth projections and increasing guidance in April 2024 despite increased Medicaid expenses that had negatively impacted profits dating all the way back to the second quarter of 2024.

53

## IX.    LOSS CAUSATION

148.    Defendants' materially false and misleading statements and omissions alleged herein at ¶¶94-128 artificially inflated and/or maintained the artificial inflation in the price of Elevance's stock. The artificial inflation in Elevance's stock price was removed when the conditions and risks misstated, concealed, and omitted by Defendants were revealed to the market and/or materialized. The information was disclosed to the market through a partial corrective disclosure on July 17, 2024 and the full truth was finally revealed on October 17, 2024. These corrective disclosures reduced the amount of inflation in the price of Elevance's publicly traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

149.    Specifically, on July 17, 2024, during Elevance's Q2 2024 earnings call, Boudreaux revealed to the market that "[a]s a result of redeterminations, our Medicaid membership mix has shifted, resulting in increased acuity." Kaye further disclosed that Elevance was "seeing signs of increased utilization across the broader Medicaid population," and that the Company was now "expecting second-half utilization to increase in Medicaid." Norwood also acknowledged that there was "potential for a short-term disconnect between the timing of our rates and the emerging acuity in our populations."

150.    In response to this news, Elevance's common stock price fell on a heavy trading volume of 4.19 million shares from a closing price of $553.14 on July 16, 2024, to a closing price of $520.93 on July 17, 2024. This $32.21 single-day per-share drop represented 5.8% of Elevance's stock price, and the decline caused Lead Plaintiff and Class members to suffer losses as the artificial inflation in Elevance's stock price was partially removed.

151.    Analysts noted that the news was "surprising," and that Elevance "appeared to be caught off guard by changes in the Medicaid market, where [UnitedHealth and Centene] warned investors in May."

152. Defendants' July 17, 2024 disclosures partially corrected their prior materially false and misleading statements and omissions about the cause behind the removal of members from Elevance's Medicaid rolls, the impact of Medicaid redeterminations on the Company's business, the actuarial soundness of Elevance's Medicaid premiums, and the status of Elevance's renegotiations of Medicaid premiums with states. But despite these revelations, Defendants continued to mislead investors, causing Elevance's stock price to remain artificially inflated. For instance, Boudreaux told investors during the July 17, 2024 Q2 earnings call that Elevance was "prudently maintain[ing] our full year outlook," while Kaye commented that "we are closely monitoring acuity and cost trends, notably in Medicaid and are working collaboratively with states to ensure rates remain actuarially sound." As explained in ¶¶94-128 above, Defendants' statements were materially false and misleading and omitted to state material information necessary to make them not misleading.

153. Then, on October 17, 2024, Elevance held its Q3 2024 earnings call, where Boudreaux revealed that the Company's "third quarter adjusted diluted earnings per share was $8.37, which was below our expectations, primarily due to elevated medical costs in our Medicaid business." She further revealed that Elevance had reduced its full-year outlook for adjusted diluted EPS from $37.20 to "approximately $33." These revelations occurred despite the Company reiterating its EPS guidance just three months earlier.

154. As a result of these disclosures, the price of Elevance common stock plummeted $52.61 per share, or 10.6%, on a heavy trading volume of 8.29 million shares from a closing price of $496.96 on October 16, 2024, to a closing price of $444.35 on October 17, 2024. This decline caused Lead Plaintiff and Class members to suffer losses as the artificial inflation in Elevance's

55

stock price was further removed, and quantified the full extent of Defendants' materially false and misleading statements and omissions.

155.    Analysts reacted negatively to Elevance's disclosures. For example, an analyst from Wells Fargo remarked that "the magnitude of the revision that's implied there is alarming, particularly given that we're at the end of the membership impacts from redetermination." Similarly, an analyst from Nephron Research commented that "I'm still confused as to what's causing this big acceleration in this trend. Why is that happening so late in the [redetermination] process?"

156.    Analysts and financial press uniformly tied Elevance's stock drop to the Medicaid disclosures. For example, *The Wall Street Journal* reported that Elevance's miss "was largely caused by pressure in its Medicaid business, which Chief Executive Gail Boudreaux called an 'unprecedented challenge,'" adding that the healthcare cost trend in Medicaid was running "at three to five times the usual rate." *Bloomberg* similarly emphasized that the forecast revealed a "dire situation for Medicaid insurers," sending shares of Elevance and peers sharply lower.

157.    The declines in Elevance's stock price were a direct and proximate result of the truth that Defendants misrepresented and concealed being revealed to investors. The timing and magnitude of Elevance's stock price declines negate any inference that the economic losses and damages suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or Elevance-specific facts unrelated to Defendants' fraudulent conduct.

## X.    PRESUMPTION OF RELIANCE

158.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material facts that there was a duty to disclose. Due

56

to the importance of Elevance's Medicaid business to the Company's overall health and the impact that shifts in acuity and utilization in those offerings could have on the Company's near-term and long-term financial condition, Defendants' omissions were material.

159. Lead Plaintiff is also entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period, among other things:

    a. Defendants made public misstatements or failed to disclose pertinent facts;

    b. The omissions and misstatements were material;

    c. The Company's common stock traded in an efficient market;

    d. The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

    e. Lead Plaintiff and other members of the Class purchased Elevance common stock between the time Defendants made material misstatements or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misstatements or omitted facts.

160. At all relevant times, the market for Elevance common stock was an efficient market for the following reasons, among others:

    a. Elevance common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b. As a regulated issuer, Elevance filed periodic public reports with the SEC and the NYSE;

    c. Elevance regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  Elevance was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

161.  As a result of the foregoing, the market for Elevance common stock promptly digested current information regarding Elevance from all publicly available sources and reflected such information in the price of Elevance common stock. Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Elevance's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

162.  The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.

163.  To the extent that any of the materially false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

164.  Additionally, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and

58

misleading forward-looking statements because at the time each of those statements were made, Defendants knew the statements were materially false or misleading or omitted to state material facts necessary to make the statements not misleading, or the statements were authorized and/or approved by an executive officer of Elevance who knew that the statements were materially false or misleading when made.

## XII.    CLASS ACTION ALLEGATIONS

165.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of Elevance common stock during the Class Period (the "Class"). Excluded from the Class (an "Excluded Person") are Defendants, the officers and directors of Elevance during the Class Period, the immediate family members of any Excluded Person, the legal representatives, heirs, successors or assigns of any Excluded Person, and any entity in which any Excluded Person has or had a controlling interest.

166.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of September 30, 2024, Elevance had over 232 million shares of common stock outstanding, owned by thousands of investors.

167.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether Defendants violated the Exchange Act;

b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

59

d.  Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

e.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

f.  Whether Defendants' conduct impacted the price of Elevance common stock;

g.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

h.  The extent of damages sustained by Class members and the appropriate measure of damages.

168.  Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from the Defendants' wrongful conduct.

169.  Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

170.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## XIII.  CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of
Section 10(b) of the Exchange Act and SEC Rule 10b-5**

171.  Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

172.  During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Elevance common stock at artificially inflated prices.

173. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchases of Elevance common stock in an effort to maintain artificially high market prices for Elevance common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

174. During the Class Period, Defendants made the false and misleading statements and omissions specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

175. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Elevance's true condition from the investing public and to support the artificially inflated price of Elevance's common stock.

176. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Elevance common stock. Lead Plaintiff and the Class would not have purchased Elevance common stock at the prices they paid, or at all, had they been aware that the market prices for Elevance common stock had been artificially inflated by the Defendants' fraudulent course of conduct.

177.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Elevance common stock during the Class Period.

178.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## <u>COUNT II</u>

### Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act

179.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

180.    The Individual Defendants ~~were~~are the ~~four~~ highest-ranking executive officers of Elevance and/or members of the Company's executive leadership team during the Class Period and acted as controlling persons of Elevance within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Elevance, the Individual Defendants had the power and ability to control the actions of Elevance and its employees.

181.    As set forth above, Elevance and the Individual Defendants each violated Section 10(b) and SEC Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act.

182.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their acquisitions of Celsius securities during the Class Period.

183.     By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.     Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.     Awarding such other and further relief as the Court may deem just and proper.

## XV.  JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

63

Dated: October ~~7~~31, 2025

WILLIAMS LAW GROUP, LLC

*/s/ Joseph N. Williams*
Joseph N. Williams
1101 North Delaware Street
Indianapolis, IN 46202
Tel.: 317-633-5270
joe@williamsgroup.law

*Local Counsel for Lead Plaintiff*
*Achmea/Blue Sky*

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Salvatore J. Graziano
Jeremy Robinson
Thomas Sperber
Kelly Hogan
1251 Avenue of the Americas
New York, NY 10020
Tel.: 212-544-1400
salvatore@blbg.com
jeremy.robinson@blbglaw.com
thomas.sperber@blbglaw.com
kelly.hogan@blbglaw.com

**GRANT & EISENHOFER P.A.**
Karin E. Fisch
James S. Notis
Lauren J. Salamon
Timothy Clark B. Dauz
485 Lexington Avenue
New York, NY 10017
Tel.: 646-722-8500
kfisch@gelaw.com
jnotis@gelaw.com
lsalamon@gelaw.com
tdauz@gelaw.com

*Lead Counsel for Lead Plaintiff*
*Achmea/Blue Sky*

64

**CERTIFICATE OF SERVICE**

I certify that on the ~~7th~~31st day of October 2025, the foregoing was filed

electronically and served upon counsel of record via the Court's ECF filing system.

*/s/ Joseph N. Williams*

65