**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

ERIC MILLER, on behalf of himself and all others similarly situated,

        Plaintiffs,

    v.

ELEVANCE HEALTH, INC., GAIL K. BOUDREAUX, FELICIA F. NORWOOD, MARK B. KAYE, and STEPHEN V. TANAL,

        Defendants.

No. 1:25-cv-00923-JRS-MJD

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CORRECTED CONSOLIDATED CLASS ACTION
<u>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...........................................................................................................iii

PRELIMINARY STATEMENT.................................................................................................. 1

STATEMENT OF FACTS ........................................................................................................... 4

    Elevance and Its Executives.................................................................................................. 4

    Medicaid Overview............................................................................................................... 4

    COVID-19 and the Medicaid Redetermination Process ...................................................... 5

    Elevance Provides an Adjusted EPS Forecast for 2024........................................................ 7

    Q1 2024 Results and Forecast Update ................................................................................. 8

    Q2 2024 Results and Forecast Update ................................................................................. 9

    Q3 2024 Results and Forecast Update ............................................................................... 10

    Full-Year 2024 Financial Results........................................................................................11

    Company Insiders Fail to Profit from the Alleged Fraud ....................................................11

    The Amended Complaint ................................................................................................... 12

ARGUMENT................................................................................................................................ 12

I.      The Amended Complaint Does Not Allege an Actionable False or Misleading Statement................................................................................................................................ 14

      A.     The Reform Act's Safe Harbor Provision Bars This Entire Case. ........................ 14

      B.     Elevance's Comments on the Adjusted EPS Forecast Are Non-Actionable Opinions Under *Omnicare*. .................................................................................... 19

      C.     The Amended Complaint Challenges Non-Actionable Puffery. ........................... 20

II.    The Amended Complaint Fails to Demonstrate a Strong Inference of Scienter. .............. 20

      A.     Defendants' Trading Is Not Suspicious in Amount or Timing............................. 21

            1.     Ms. Boudreaux's Rule 10b5-1 Trade Is Not Suspicious. .......................... 21

            2.     Ms. Norwood's Trade Is Not Suspicious. ................................................. 24

3. The Amended Complaint Ignores That Defendants Kaye and Tanal Did Not Trade. .................................................................................................. 25

B. Plaintiffs' Anonymous Former Employee Allegations Do Not Establish That Defendants Knew That Elevance Could Not Achieve the 2024 Forecast............. 26

C. The Cogent and More Compelling Inference Is Non-Fraudulent. ........................ 29

III. Plaintiffs' Section 20(a) Claim Fails. .................................................................................... 30

CONCLUSION ............................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appvion Inc. Ret. Savings & Emp. Stock Ownership Plan v. Buth*,
99 F.4th 928 (7th Cir. 2024) ...................................................................................13

*Chew v. Moneygram Int'l, Inc.*,
Case No. 18-cv-7537, 2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) .....................26

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
388 F. Supp. 2d 932 (S.D. Ind. 2005) ....................................................................22

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ......................................................................13, 17, 26

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) .....................................................................................17

*Cornielsen v. Infinium Cap. Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ..................................................................................14

*Eisenstadt v. Centel Corp.*,
113 F.3d 738 (7th Cir. 1997) ..................................................................................20

*Gaines v. Guidant Corp.*,
Case No. 1:03-cv-00892-SEB-WL, 2004 WL 2538374
(S.D. Ind. Nov. 8, 2004).........................................................................................20

*In re Gildan Activewear, Inc. Sec. Litig.*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009).....................................................................22

*Higginbotham v. Baxter Int'l Inc.*,
495 F.3d 756 (7th Cir. 2007) ......................................................................21, 25, 26

*Hunter v. Elanco Animal Health Inc.*,
Case No. 1:20-cv-01460-SEB-MG, 2022 WL 3445173
(S.D. Ind. Aug. 17, 2022)....................................................................................4, 17

*Hunter v. Elanco Animal Health Inc.*,
Case No. 20-cv-01460-SEB-MG, 2023 WL 6295487
(S.D. Ind. Sept. 27, 2023) ..................................................................................13, 19

*Katz v. Household Int'l, Inc.*,
91 F.3d 1036 (7th Cir. 1996) ..................................................................................30

*Kuebler v. Vectren Corp.*,
412 F. Supp. 3d 1000 (S.D. Ind. 2019), *aff'd*, 13 F.4th 631 (7th Cir. 2021) ...........................13

*Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd sub nom. In re Lululemon Sec. Litig.*, 604 F. App'x 62 (2d Cir. 2015)...................................................................................23

*Malin v. XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009)......................25

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .................................................................................................22

*Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*,
Case No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022) .........................................14, 17

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)...............................................................................................................2, 19

*Pension Trust Fund For Operating Eng'rs v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ............................................................................................23, 24

*Plumbers & Pipefitters Local Union v. Zimmer*,
673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd sub nom. Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012)...............................................................................................................................25

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ............................................................................................13, 21

*Rodriguez v. Gigamon Inc.*,
325 F. Supp. 3d 1041 (N.D. Cal. 2018) .............................................................................22, 23

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ...................................................................................................25

*Searls v. Glasser*,
64 F.3d 1061 (7th Cir. 1995) ...................................................................................................20

*In re Skechers USA, Inc. Sec. Litig.*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020).......................................................................................24

*In re Supreme Indus., Inc. Sec. Litig.*,
Case No. 17-cv-143 (PS) (MGG), 2018 WL 2364931 (N.D. Ind. May 23, 2018) .................................................................................................26

*In re Supreme Indus. Inc. Sec. Litig.*,
Case No. 17-cv-143-PPS/MGG, 2019 WL 1436022 (S.D. Ind. Mar. 29, 2019)....................13

*In re Take–Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................2, 14, 21

*Trahan v. Interactive Intelligence Grp., Inc.*,
    308 F. Supp. 3d 977 (S.D. Ind. 2018) .................................................................15

*Vallabhaneni v. Endocyte, Inc.*,
    Case No. 14-cv-01048-TWP-MJD, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016)................ *passim*

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ..........................................................................25

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)........................................................................15, 16

*Wade v. Wellpoint, Inc.*,
    740 F. Supp. 2d 994 (S.D. Ind. 2010) .................................................................17

*Wade v. WellPoint, Inc.*,
    892 F. Supp. 2d 1102 (S.D. Ind. 2012) ..........................................................17, 23

*Water Island Event-Driven Fund, LLC v. Tribune Media Co.*,
    39 F.4th 402 (7th Cir. 2022) ............................................................................17

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus.*
    *Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184
    (7th Cir. May 9, 2022) ...................................................................................14

*Woolgar v. Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)..................................................................24

**Statutes**

15 U.S.C. § 78j(b)..............................................................................................12

15 U.S.C. § 78u-4(b)(1)(B)..................................................................13, 14, 20, 30

15 U.S.C. § 78u-5 ......................................................................................2, 15, 16

**Rules**

17 C.F.R. § 240.10b-5(b)......................................................................................12

17 C.F.R. § 240.10b5-1(c) ...............................................................................22, 23

Fed. R. Civ. P. 9(b) ...................................................................................................................14, 29

Fed. R. Civ. P. 11(b) ........................................................................................................................30

H.R. Conf. Rep No. 104-369 (1995).........................................................................................14, 15

S. Rep. No. 104-98 (1995) ................................................................................................................15

## PRELIMINARY STATEMENT

This is not a securities fraud case. Not in any real sense. The Amended Complaint does not assert that Elevance Health, Inc. ("Elevance" or the "Company") or its senior executives engaged in any of the commonly litigated types of conduct that mislead investors and result in viable securities fraud claims.[1] Plaintiffs for example do not allege that Elevance falsely reported the number of insurance policies the Company sold in 2024 or the amount of revenue or profit it generated from selling those policies. Nor do Plaintiffs argue that Elevance used improper accounting techniques or questionable sales tactics to artificially inflate its 2024 financial results. And Plaintiffs do not contend that Elevance concealed some percolating regulatory issue or dispute that later resulted in the Company paying large fines or penalties.

Instead, the Amended Complaint alleges a lowered forecast. In particular, Plaintiffs assert that: (i) in January 2024, Elevance provided investors with a full-year adjusted earnings per share ("Adjusted EPS") forecast of greater than $37.10;[2] (ii) in April 2024, Elevance increased its Adjusted EPS forecast to greater than $37.20; (iii) in July 2024, Elevance affirmed its Adjusted EPS forecast at greater than $37.20; and (iv) in October 2024, Elevance lowered its Adjusted EPS forecast to approximately $33.00 due to a greater-than-anticipated increase in costs in its Medicaid business. That's it. That's the big fraud.

Congress, however, expressly barred stockholders from bringing lowered forecast (and even missed forecast) cases like this when it adopted the safe harbor provision of the Private

---

[1]    "Amended Complaint" refers to the Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed by Lead Plaintiffs on November 17, 2025. (ECF No. 60.)

[2]    Earnings per share ("EPS") is a Generally Accepted Accounting Principles ("GAAP") measurement. Adjusted EPS is a non-GAAP measurement that removes certain non-recurring items from EPS to assist investors in making year-over-year comparisons. Per SEC rules, Elevance provides investors with a reconciliation showing the difference between its EPS and Adjusted EPS results. (*See* ECF No. 62-1 at 3–5, 9, 13.)

1

Securities Litigation Reform Act of 1995 (the "Reform Act").  To encourage issuers to provide investors with financial forecasts (or projections or guidance), the Reform Act's safe harbor provides that forward-looking statements accompanied by meaningful cautionary risk disclosures are not actionable as matter of law.  *See* 15 U.S.C. § 78u-5.  Elevance's Adjusted EPS forecast is, by definition, forward-looking.  And each time Elevance provided its Adjusted EPS forecast, it shared with investors a series of detailed and specific risks that could cause the Company to lower or fall short of its forecast.  Those risks expressly included that the post-COVID-19 Medicaid redetermination process could cause the Company to lose customers, incur more costs, and become less profitable.  The Court should dismiss this action because Plaintiffs' lowered forecast case falls squarely within both the intent and the plain language of the Reform Act's safe harbor.

The Amended Complaint also alleges that certain commentary Elevance executives shared with the market when providing or updating the Adjusted EPS forecast was similarly false or misleading (*e.g.*, "We also feel very good that we're executing on the guidance").  But the forecast-adjacent comments cited in the Amended Complaint are just as forward looking and just as protected by the Reform Act safe harbor as the forecast itself.  They are also non-actionable opinion statements under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), and immaterial corporate puffery under settled Seventh Circuit law.

Finally, even if Plaintiffs can somehow sidestep the safe harbor, *Omnicare*, and the puffery doctrine, Plaintiffs do not come close to pleading the "strong inference" of scienter mandated by the Reform Act.  Under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, to survive a motion to dismiss, Plaintiffs' inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. 308, 309 (2007).  Here, Plaintiffs proffer statements from anonymous former employees to suggest

that in 2024, Elevance was seeing rising costs in its Medicaid business. But none of these anonymous former employee allegations (which must be heavily discounted under Seventh Circuit law) shows that Elevance knew it could not achieve its Adjusted EPS forecast when it was issued or affirmed. Indeed, none of the former employees are alleged to have had any interaction with senior leadership or any involvement in preparing or tracking the Adjusted EPS forecast.

Plaintiffs also rely on two stock sales, one by CEO Gail Boudreaux and the other by Executive Vice President Felicia Norwood, to suggest that Defendants had a financial motive to artificially inflate the stock price. But insider stock sales must be suspicious in amount or timing to give rise to a "strong inference." Ms. Boudreaux (who retained 80% of her Elevance holdings) conducted one sale pursuant to a Rule 10b5-1 trading plan that she adopted on the second day of the Class Period – immediately after the Company's Q1 2024 earnings release and six full months before the Company lowered its Adjusted EPS forecast due to increased costs in the Medicaid business. Ms. Norwood's sale also occurred shortly after Elevance announced Q1 2024 earnings and at a price that was $25 per share below the Company's peak share price during the Class Period. It is well-settled that stock sales pursuant to Rule 10b5-1 plans, far in advance of an alleged corrective disclosure, and/or well below the peak class period share price are not suspicious.

The only cogent and compelling inferences arising from the facts alleged in the Amended Complaint are non-fraudulent. Elevance issued an Adjusted EPS forecast early in 2024, lowered that forecast after Q3 2024 when Medicaid costs proved larger than anticipated due to two unprecedented events (the COVID-19 pandemic and the suspension of the Medicaid redetermination process), and then met its lowered Adjusted EPS forecast at the end of 2024. Those actions reflect a company promptly revising its forecast throughout the year and as it learns new information, not securities fraud.

3

## STATEMENT OF FACTS

*Elevance and Its Executives*

Elevance is one of the leading healthcare companies in the United States and, among other things, provides health insurance coverage to approximately 47 million individuals or "medical members." (ECF No. 62-2 at 3.)[3]  The Company offers private healthcare plans to both individuals and employers and participates in government-sponsored Medicare and Medicaid programs. *Id.* In 2024, Elevance reported $175.2 billion in revenue and $9.3 billion in adjusted operating gain (*i.e.*, profit). (ECF No. 62-3 at 4; ECF No. 62-21 at 3.)  Headquartered in Indianapolis, Elevance employs approximately 104,200 associates in the United States and around the world.  ECF No. 62-3 at 3.

The Individual Defendants are Elevance's senior officers.  Gail Boudreaux is the Chief Executive Officer and has served in that role for eight years. (ECF No. 60 at 15, ¶ 26.)  Mark Kaye is the Chief Financial Officer and has held that role since November 2023. *Id.*, ¶ 28.  Felicia Norwood has led Elevance's Government Health Benefits division since June 2018. *Id.*, ¶ 27. Stephen Tanal served as Vice President, Investor Relations from February 2021 to November 2024 and then as Chief Financial Officer, Government Health Benefits since February 2025. *Id.*, ¶ 29.

*Medicaid Overview*

"Medicaid provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults and people with disabilities."[4]  Both the individual states and the federal government fund Medicaid. *Id.*  To deliver Medicaid services to

---

[3]    On a motion to dismiss in a securities class action, courts may consider the complaint, documents attached or incorporated by reference, and public disclosure documents filed with the SEC. *Hunter v. Elanco Animal Health Inc.*, Case No. 1:20-cv-01460-SEB-MG, 2022 WL 3445173, at *2 n.3, 10 n.6 (S.D. Ind. Aug. 17, 2022).

[4]    "Medicaid," *available at* medicaid.gov/medicaid.

qualifying individuals, states enter into contracts with insurance companies like Elevance. (ECF No. 60 at 16, ¶ 32.) Between 2020 and 2024, Elevance contracted to provide Medicaid and other services to between 23 and 27 states or territories. (ECF No. 62-2 at 4; ECF No. 62-4 at 3–4; ECF No. 62-5 at 4; ECF No. 62-6 at 3; ECF No. 62-7 at 3–4.)

A Medicaid contract between a state and Elevance specifies a fixed premium for each eligible individual within that state. (ECF No. 60 at 16, ¶ 32.) Once the contract is agreed, Elevance covers the cost of providing medical services to Medicaid recipients. If an individual requires Medicaid services that cost less than the premium, Elevance earns a profit. If an individual requires Medicaid services that cost more than the premium, Elevance incurs a loss. *Id.* at 17, ¶ 34.

*COVID-19 and the Medicaid Redetermination Process*

To ensure that Medicaid is provided only to eligible individuals, the states undertake an annual "redetermination" process in which they analyze their Medicaid population to determine which individuals remain eligible to participate and which individuals no longer satisfy the income and resources criteria. *Id.* at 18, ¶ 36.[5] In March 2020, in response to the COVID-19 pandemic, the federal government prohibited states from engaging in the redetermination process and removing individuals from the Medicaid program. *Id.* ¶ 37.

The suspension of the redetermination process had a positive financial impact on Elevance and other insurers because it increased the number of individuals in the program, many of whom did not utilize or require significant medical services. *Id.* at 18–19, ¶¶ 38–40. Long before the start of the Class Period, Elevance disclosed to investors both the positive impact and that the positive impact was temporary and would end when the Medicaid redetermination process

---

[5]    The process is also sometimes referred to as "recertification" or "reenrollment."

resumed:

- "[O]ur Medicaid membership continued to grow as a result of the temporary suspension of eligibility recertification in response to the COVID-19 pandemic." (ECF No. 62-5 at 3; *see* ECF No. 62-6 at 4–5.)

- "The increase in medical membership in our Government Business segment was driven by organic growth in our Medicaid business due to the temporary suspension of eligibility recertification efforts in our markets in response to the COVID-19 pandemic . . . ." (ECF No. 62-6 at 6; *see* ECF No. 62-5 at 5.)

- "Medicaid membership increased primarily due to organic growth in existing markets due to the temporary suspension of eligibility recertification during the COVID-19 pandemic . . . ." (ECF No. 62-6 at 7.)

- "Operating revenue increased primarily due to higher premium revenue as a result of membership growth in our Medicaid business driven by the temporary suspension of eligibility recertification efforts during the COVID-19 pandemic . . . ." (ECF No. 62-6 at 8; *see* ECF No. 62-5 at 6.)

Congress lifted the moratorium on Medicaid redeterminations through the Consolidated Appropriations Act of 2023 (the "Appropriations Act"). (ECF No. 60 at 20, ¶ 42.) Elevance disclosed in its Form 10-K for 2022 that the Appropriations Act had been adopted and permitted states to remove individuals no longer eligible for Medicaid beginning on April 1, 2023, stating that "[w]hen recertifications resume, we expect a decline in our Medicaid membership." (ECF No. 62-4 at 5, 10.)

Elevance repeated and updated this disclosure in its subsequent filings as states began their redetermination processes, highlighting four key issues: (1) that the redetermination process commenced on April 1, 2023; (2) that, since the redetermination process began, Elevance "experienced a decline in [its] Medicaid membership;" (3) that Elevance expected some number individuals to re-enroll in Medicaid or move to other Elevance insurance products; and (4) that, beginning in mid-2024, CMS instructed that the redeterminations must be completed by December

31, 2025.  (ECF No. 62-8 at 3; ECF No. 62-9 at 3–5; ECF No. 62-10 at 3; ECF No. 62-11 at 3; ECF No. 62-12 at 3; ECF No. 62-2 at 5–7.)

Elevance's SEC filings also disclosed a variety of other risks associated with Elevance's provision of Medicaid services.  For example, Elevance warned:

> If we fail to appropriately predict, price for and manage healthcare costs, the profitability of our products and services could decline, which could materially adversely affect our business, cash flows, financial condition and results of operations.

(ECF No. 62-4 at 7.)  Elevance specifically noted that "[e]xisting Medicaid contract rates are often established by the applicable state, and our actual costs may exceed those rates.  Many factors, including those discussed above, may cause actual costs to exceed those estimated and reflected in our Commercial premiums and Medicare and Medicaid bids."  *Id.*

*Elevance Provides an Adjusted EPS Forecast for 2024*

On January 24, 2024, Elevance announced its financial results for Q4 and full year 2023.  (ECF No. 62-13.)  During the investor earnings call that same day, Elevance noted that its Adjusted EPS results for 2023 represented "the sixth consecutive year in which [Elevance] grew adjusted diluted earnings per share within or above [its] 12% to 15% long-term target growth rate . . . ."  (ECF No. 62-14 at 4.)  Elevance also provided its financial forecast for 2024.  (ECF No. 62-13.)  The Company projected Adjusted EPS of $37.10, a 12% increase over 2023 and at the low-end of the average growth rate from the prior six years.[6]  *Id.*  In discussing the forecast, Elevance's CFO commented:

> We are pleased to provide initial guidance for adjusted diluted earnings per share of greater than $37.10, reflecting growth of at least 12% year-over-year . . . .

---

[6]    Elevance provided investors with a forecast for ten different metrics, including total operating revenue, medical loss ratio, adjusted operating gain, and operating cash flow.  (ECF No. 62-1 at 5–7.)

> The momentum in our commercial health benefits . . . businesses is partially offset by the Medicaid membership headwinds included in our guidance. We anticipate total medical membership to end 2024 in the range of 45.8 million to 46.6 million down approximately 750,000 year-over-year at the midpoint. Medicaid membership is expected to end the year in the range of 8.8 million to 9.2 million members, with attrition driven by the net loss of approximately 930,000 members associated with changes in our footprint discussed on our third quarter earnings call and ongoing eligibility redeterminations.

(ECF No. 62-14 at 6.)   Elevance also disclosed that, through the redetermination process, approximately 70% of the Company's members lost their coverage for administrative reasons (rather than for being ineligible under the income and resource limits). *Id.* at 5. Elevance was pursuing an "extensive renewal campaign" to educate those members and help them reenroll in Medicaid or another Elevance health product. *Id.* at 5, 6. The Company cautioned, however, that it was seeing "elongated" timelines between the loss of Medicaid coverage and reenrollment in other products. *Id.* at 14.[7]

*Q1 2024 Results and Forecast Update*

On April 18, 2024, Elevance announced positive financial results for Q1 2024 and, as a result, bumped its Adjusted EPS forecast from $37.10 to greater than $37.20. The Company reiterated that it was working to reach members who lost Medicaid coverage in the redetermination process to help them understand their options. (ECF No. 62-15 at 6.) Elevance cautioned, however, that "a majority of members who have lost coverage for administrative reasons have not yet returned." *Id.* In addition, Elevance disclosed that, due to the Medicaid redetermination

---

[7]     In issuing its forecast, Elevance cautioned investors that the bump in its Medicaid business caused by the suspension of the redetermination process likely would dissipate in 2024. (ECF No. 62-14 at 15 ("Our outlook for 2024 does assume a normalization of Medicaid margins . . . ."); *id.* at 16 ("Medicaid is normalizing, but continues to perform well.").)

process, the Company had already experienced state-specific increases in utilization. *Id.* at 11.[8]

On June 12, 2024, Elevance discussed its Q1 2024 results and hedged expectations regarding utilization and acuity (*i.e.*, costs). (ECF No. 62-16 at 6–7.) During the Goldman Sachs Global Healthcare Conference, Elevance explained that:

> [I]n Medicaid, there's certainly trend occurring. But when you peel it back, it really has a lot to do with the acuity mix shift underneath that. So it's really a change in the population. As folks, I think, in the room would likely know, we've had pretty significant attrition through redeterminations that's occurred over the last couple of quarters. We had some footprint changes as well in Q1. And so that's really what's driving it. On a sort of same member basis, there really isn't much to call out in terms of trend. It's an acuity mix shift dynamic that is occurring in Medicaid.

*Id.* In sum, Elevance told investors that the Medicaid redetermination process was leaving the Company with a Medicaid member population that was utilizing more medical services than before and as such increasing Elevance's overall costs.

*Q2 2024 Results and Forecast Update*

On July 17, 2024, Elevance announced positive financial results for Q2 2024 and that the Company was maintaining its full-year Adjusted EPS forecast at greater than $37.20. (ECF No. 62-17.) Once again, Elevance disclosed that it was proactively reaching out to members who lost Medicaid coverage for administrative reasons in the redetermination process and helping those members reenroll or move to another Elevance product. (ECF No. 62-18 at 5–6.) Further, Elevance disclosed that the Medicaid business experienced increased acuity in Q2 2024, that the Company was closely monitoring acuity and cost trends, and that Elevance expected utilization and costs to increase over the second half of 2024. *Id.* at 7.

---

[8]    "Utilization" refers to the extent to which Elevance's Medicaid customers are using medical services. Higher utilization means higher costs for Elevance and lower profits. Utilization is sometimes used interchangeably with "acuity."

*Q3 2024 Results and Forecast Update*

On October 17, 2024, Elevance announced its financial results for Q3 2024. The Company reported profits that were substantial, but less than the Company was expecting. (ECF No. 62-19.) As a result, Elevance lowered its Adjusted EPS forecast to approximately $33.00. During the investor call, Elevance explained that:

> We are navigating a challenging and dynamic operating environment and have reduced our full year outlook to prudently reflect these challenges. Given third quarter results and our expectation that timing disconnects between Medicaid rates and acuity currently facing the industry will continue, we have reduced our outlook for adjusted diluted earnings per share to approximately $33 . . . .
>
> The issues impacting the Medicaid business are time bound and our state partners are working constructively with us on rate renewals. We're confident that rates will ultimately reflect the underlying acuity of our members, albeit on a lag, as States often use data that is more than a year old in setting rates. These short term headwinds are a byproduct of the large scale and unprecedented mix shifts associated with the end of the [COVID-19] public health emergency.

(ECF No. 62-20 at 4.)[9] Elevance further emphasized that the "Medicaid cost trend [was] developing worse than expected" and the Company "experienced accelerated cost trends in Medicaid throughout the third quarter." *Id.* at 6, 9. Elevance noted that the cost trends arose from "one of the largest and unprecedented mix shifts we've seen in Medicaid," meaning that the Company's post-redetermination Medicaid members were showing far higher acuity and utilization rates than ever before. *Id.* at 9.

---

[9]    The "time bound" issue is that Elevance's fees for Medicaid members are negotiated in advance, but its costs for those members become known only as those members use medical services over the course of the year. When Elevance experiences higher costs in a given year, it can use those higher costs to negotiate with the states for higher premiums in the following year.

*Full-Year 2024 Financial Results*

Following the end of Plaintiffs' Class Period, which arbitrarily concludes on October 16, 2024, Elevance announced its financial results for Q4 and full year 2024.  Elevance reported operating revenue of approximately $175 billion, operating gain of nearly $8 billion, and operating margin of 4.5%.  These results were broadly in line with Elevance's performance over the prior three years:

|  | **Operating Revenue** | **Operating Gain** | **Operating Margin** | **Diluted EPS** |
|---|---|---|---|---|
| 2021 | $136.9 billion | $7.5 billion | 5.5% | $24.73 |
| 2022 | $155.7 billion | $8.4 billion | 5.4% | $24.81 |
| 2023 | $170.2 billion | $8.5 billion | 5.0% | $25.22 |
| 2024 | $175.2 billion | $7.9 billion | 4.5% | $25.68 |

Elevance reported Adjusted EPS of $33.04 for full year 2024, in line with the October guidance of approximately $33.00.  (ECF No. 62-21.)

*Company Insiders Fail to Profit from the Alleged Fraud*

Two Individual Defendants engaged in trades during the Class Period.  Ms. Boudreaux held 160,709 shares of Elevance common stock prior to the start of the Class Period.  (ECF No. 62-27.)  On July 22, 2024, Ms. Boudreaux sold 34,000 shares – approximately 20% of her holdings – pursuant to a Rule 10b5-1 trading plan she adopted on April 19, 2024, the second day of the Class Period and immediately following the conclusion of the quarterly blackout period in Elevance's insider trading policy.  (*See* ECF No. 62-22 at 5, 9.)  The July 22 trade occurred during the next open trading window following Elevance's announcement of its Q2 2024 results on July 17, 2024.  (*See* ECF No. 60 at 34–35, ¶ 85.)

Ms. Norwood held 40,098 shares of Elevance common stock prior to the start of the Class Period.  (ECF No. 62-26.)  On April 23, 2024, Ms. Norwood exercised stock options, increasing her holdings by 7,516 shares, and then sold 20,310 shares, for a net decrease in her holdings of 12,794 shares.  The sale prices were between $532.68 and $534.74 per share, ECF No. 60 at 35,

11

¶ 86, which is at least $28 per share lower than Elevance's peak Class Period closing price of $562.29 on September 3, 2024.  (ECF No. 62-23.)  Ms. Norwood did not engage in any other transactions.

The Amended Complaint does not allege that Mr. Kaye and Mr. Tanal sold stock during the Class Period.

*The Amended Complaint*

When Elevance lowered its Adjusted EPS forecast in October 2024, the Company's stock price declined from $496.96 to $444.35.  (ECF No. 60 at 12–13, 58–59, ¶¶ 17, 154.)  Plaintiffs responded by filing this suit alleging that Defendants violated the federal securities laws because they somehow knew in January and April 2024 that the Company would, in October 2024, need to lower its Adjusted EPS forecast due to increased costs in Q3 2024 arising from the Medicaid redetermination process.  Plaintiffs rely primarily on a handful of unidentified alleged former employees who (a) largely rehash Elevance's public disclosures, (b) had no interactions with Elevance management, and (c) had no role in setting, tracking, or updating the Adjusted EPS forecast.

## **ARGUMENT**

Section 10(b) of the Securities Exchange Act of 1934 provides that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations" as the SEC may prescribe.  15 U.S.C. § 78j(b).  SEC Rule 10b-5 provides that, in connection with the purchase or sale of any security, "[i]t shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To plead

12

a viable claim, a plaintiff must allege facts showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Appvion Inc. Ret. Savings & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024) (citing *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)).

Congress and the Seventh Circuit have "erected barriers" to meritless securities fraud claims because such actions have been long subject to abuse. *See id.* at 950; *see also City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (the Reform Act "altered the landscape of federal securities fraud litigation"); *Hunter v. Elanco Animal Health Inc.*, Case No. 20-cv-01460-SEB-MG, 2023 WL 6295487, at \*10 (S.D. Ind. Sept. 27, 2023) (noting that the "Seventh Circuit commands greater pre-complaint investigations" and that securities actions are not intended to provide broad insurance against market losses); *In re Supreme Indus. Inc. Sec. Litig.*, Case No. 17-cv-143-PPS/MGG, 2019 WL 1436022, at \*1 (S.D. Ind. Mar. 29, 2019) (observing that Congress passed the "onerous" Reform Act "in response to perceived abuses in which issuers of securities would be sued based on little more than a significant drop in their stock prices after announcing bad news," and with the goal of discouraging "fraud by hindsight" claims) (citations omitted).

One such barrier is the heightened pleading requirement. *Kuebler v. Vectren Corp.*, 412 F. Supp. 3d 1000, 1003 (S.D. Ind. 2019), *aff'd*, 13 F.4th 631 (7th Cir. 2021). A securities fraud plaintiff must "specify each statement alleged to have been misleading," the "reasons why the statement is misleading," and "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is

13

formed." 15 U.S.C. § 78u-4(b)(1)(B).[10]  With respect to scienter, the Reform Act mandates that a plaintiff "state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).  To qualify as strong, the inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309.

## I.    THE AMENDED COMPLAINT DOES NOT ALLEGE AN ACTIONABLE FALSE OR MISLEADING STATEMENT.

The Amended Complaint contains 14 paragraphs purporting to identify false or misleading statements.  (*See* ECF No. 60 at 39–51, ¶¶ 96, 99, 101, 105, 107, 109, 112, 114, 116, 118, 121, 123, 125, 127.)  All challenged statements involve Elevance providing, discussing, or in some way assessing its Adjusted EPS forecast for 2024.  As a matter of settled law, none of the challenged statements can form the basis for a securities fraud claim under Section 10(b).

### A.    The Reform Act's Safe Harbor Provision Bars This Entire Case.

The Reform Act's safe harbor for forward-looking statements is a second barrier that Congress erected to limit abusive securities litigation.  When debating the Reform Act, Congress recognized that securities class actions were deterring issuers from providing investors with management projections and forecasts – companies feared massive liability if they provided the market with their best estimate of future performance but ultimately failed to achieve that performance for any reason.  *See* H.R. CONF. REP NO. 104-369 at 42 (1995) ("Abusive litigation severely affects the willingness of corporate managers to disclose information to the

---

[10]    Section 10(b) claims sound in fraud and for that reason also must satisfy the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  *See Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019).  That includes the "who, what, when, where, and how" of the fraud alleged with "precision and some measure of substantiation." *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 634 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022) (citations omitted).

marketplace."); S. REP. NO. 104-98 at 16 (1995) ("Fear that inaccurate projections will trigger the filing of a securities fraud lawsuit has muzzled corporate management."). And, as former SEC Chairman Richard Breeden testified, management projections and forecasts are critically important to investors. H.R. CONF. REP NO. 104-369 at 43 ("Understanding a company's own assessment of its future potential would be among the most valuable information shareholders and potential investors could have about a firm."). Congress accordingly added a safe harbor provision to the Reform Act "to encourage issuers to disseminate relevant information to the market without fear of open-ended liability." *Id.* at 32; *see also* S. REP. NO. 104-98 at 5 ("To reduce this chill on voluntary disclosures by issuers, [the Reform Act] creates a carefully tailored safe harbor for forward-looking statements.").

The Reform Act's safe harbor provides that "in any private action arising under [the Securities Exchange Act of 1934] that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, a person . . . shall not liable with respect to any forward-looking statement, whether written or oral, if and to the extent that" the forward-looking statement is:

- "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or" ("Prong 1")

- "immaterial; or" ("Prong 2")

- "plaintiff fails to prove that the forward-looking statement…was made with actual knowledge. . . that the statement was false or misleading" ("Prong 3")

15 U.S.C. § 78u-5(c)(1). The three prongs of the safe harbor are written in the disjunctive, meaning that a forward-looking statement is not actionable if any of the three options apply. *Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 988 (S.D. Ind. 2018); *In re Vivendi, S.A.*

*Sec. Litig.*, 838 F.3d 223, 245–46 (2d Cir. 2016).   The safe harbor defines forward-looking statements as including "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations . . . (C) a statement of future economic performance . . . ; [and] (D) any statement of the assumptions underlying or relating to any statement described [above]."  15 U.S.C. § 78u-5(i)(1).

Here, Plaintiffs bring the exact case Congress sought to eliminate with the Reform Act safe harbor.  The Amended Complaint's core allegation is that Elevance's Adjusted EPS forecast was false and misleading.  (*See* ECF No. 60 at 39–47, 49, ¶¶ 96, 99, 101, 107, 109, 112, 114, 116, 118, 123.)  The Adjusted EPS forecast (issued in January 2024, tweaked in April 2024, and lowered in October 2024) is forward-looking and falls squarely within the safe harbor definition as a "statement containing a projection of . . . earnings," a "statement of the plans and objectives of management for future operations," and a "statement of future economic performance."  15 U.S.C. § 78u-5(i)(1).

Elevance's Adjusted EPS forecast was accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  *Id.* § 78u-5(c)(1).  For example, Elevance disclosed that higher revenue and membership in its Medicaid business was driven by suspension of the redetermination process during COVID-19 and therefore was temporary in nature.  (*See, e.g.*, ECF No. 62-6 at 8; ECF No. 62-5 at 6.)  Elevance further disclosed that an unanticipated increase in costs, particularly in the Medicaid business, could adversely impact its financial performance:

- "If we fail to appropriately predict, price for and manage healthcare costs, the profitability of our products and services could decline, which could

16

materially adversely affect our business, cash flows, financial condition and results of operations."  (ECF No. 62-4 at 7.)

- "Existing Medicaid contract rates are often established by the applicable state, and our actual costs may exceed those rates.  Many factors, including those discussed above, may cause actual costs to exceed those estimated and reflected in our Commercial premiums and Medicare and Medicaid bids." *Id.* at 7.

- "There are various risks associated with participating in Medicare and Medicaid programs, including dependence upon government funding and the timing of payments, compliance with government contracts and increased regulatory oversight."  *Id.* at 9.

The Adjusted EPS forecast is not actionable under Prong 1 of the Reform Act safe harbor because it is a forward-looking statement accompanied by meaningful cautionary risk disclosures.  *See Water Island Event-Driven Fund, LLC v. Tribune Media Co.*, 39 F.4th 402, 405 (7th Cir. 2022) (statements concerning the likelihood of consummating a merger transaction are forward-looking and protected by the Reform Act safe harbor); *Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, Case No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022) (affirming dismissal of projections case on safe harbor grounds); *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (finding merger synergy projections not actionable under the safe harbor because "the Securities Exchange Act does not demand perfection from forecasts, which are inevitably inaccurate"); *Boeing Co.*, 711 F.3d at 758 (Projected product release date was not actionable under Reform Act safe harbor because "[n]o prediction – even a prediction that the sun will rise tomorrow – has a 100 percent probability of being correct.  The future is shrouded in uncertainty.  If a mistaken prediction is deemed a fraud, there will be few predictions, including ones that are well grounded, as no one wants to be held hostage to an unknown future.").[11]

---

[11]    *See also Elanco*, 2022 WL 3445173, at *20 (dismissing case where projections were missed due to global dynamics triggered by COVID); *Wade v. Wellpoint, Inc.*, 740 F. Supp. 2d 994, 1012 (S.D. Ind. 2010) (dismissing case following lowered forecast); *Wade v. WellPoint, Inc.*, 892 F. Supp. 2d 1102, 1138 (S.D. Ind. 2012) (same).

17

The analysis is no different for the commentary Elevance provided when issuing, updating or discussing the Adjusted EPS forecast.  For example, Plaintiffs challenge statements such as:

- "With respect to our outlook, we are closely monitoring acuity and cost trends, notably in Medicaid . . . .  We are however expecting second half utilization to increase in Medicaid, and as a result, anticipate our full year benefit expense ratio will end the year in the upper half of our initial guidance range. Nonetheless, we expect to achieve our full year adjusted diluted earnings . . . ." (ECF No. 60 at 40, ¶ 99);

- "we acknowledge the potential for a short-term disconnect between the timing of our rates and the emerging acuity in our populations, and that's certainly been reflected in our updates for the year," *id.* at 41, ¶ 101; and

- "if we look out through the end of the year, we anticipate remaining in the mid- to upper 40s range given Medicaid membership is expected to decline to within our guidance range of 8.8 million to 9.2 million members."  *Id.* at 44, ¶ 109.

These statements all use words such as "expect," "will," and "anticipate" to signal that they are forward-looking.  They meet the Reform Act definition of forward-looking statement, which expressly covers "any statement of the assumptions underlying or relating to" a forecast.  They are accompanied by meaningful cautionary risk disclosures because, on each earnings call cited in the Amended Complaint, Elevance expressly referred investors to the risk factors contained in the Company's SEC filings.  (*See* ECF No. 62-14 at 4; ECF No. 62-15 at 5; ECF No. 62-18 at 5.)

Separately, the Adjusted EPS forecast and the forecast-adjacent statements cited in the Amended Complaint are not actionable under Prong 3 of the Reform Act safe harbor because Plaintiffs do not allege facts showing that any person had "actual knowledge" that the Company did not believe it could achieve the Adjusted EPS forecast when it was issued, tweaked or affirmed. *See* Section II.B., *infra*, at 26–28 (discussing confidential witness allegations in scienter context).

### B. Elevance's Comments on the Adjusted EPS Forecast Are Non-Actionable Opinions Under *Omnicare*.

A number of statements that Plaintiffs challenge are mere opinions (in addition to being forward-looking statements). (*See* ECF No. 60 at 54–60, ¶¶ 138, 144, 145, 148, 152, 153, 155, 159.) For example, Plaintiffs cite the following:

- "We fully expect our rates to remain actuarially sound . . . ." *Id.* at 41, ¶ 101.

- "[W]e believe that about 90% of our members have had their eligibility redetermined." *Id.* at 42–43, ¶ 107.

- "[W]e think things are quite aligned at this point." *Id.* at 45, ¶ 112.

- "So I feel very good about our Medicaid business, just to sort of put a finer point on that." *Id.*

- "And we've talked about broadly actuarially sound rates being very comfortable with what we are seeing on that block. I would say that remains the case." *Id.* at 47, ¶ 118.

- "[W]e also feel very good that we're executing on the guidance." *Id.* at 49, ¶ 123.

In *Omnicare*, the Supreme Court found that opinions do not qualify as a "statement of material fact" for purposes of liability under the Securities Act of 1933 (which does not require scienter). There are three limited exceptions where an opinion may be deemed actionable as a false statement of material fact: (1) where a plaintiff can show that the speaker did not honestly hold the opinion when stated; (2) where the statement contains an embedded factual representation which is in itself false; and (3) where a statement "omits material facts about the issuer's inquiry into or knowledge" serving as a basis for the opinion, and those facts "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 183–86, 189.[12] Here, Plaintiffs do not

---

[12] Seventh Circuit courts have applied *Omnicare* when analyzing Section 10(b) claims under the Securities Exchange Act of 1934. *See, e.g.*, *Elanco*, 2023 WL 6295487, at *17; *Vallabhaneni v. Endocyte, Inc.*, Case No. 14-cv-01048-TWP-MJD, 2016 WL 51260, at *15–16 (S.D. Ind. Jan. 4, 2016).

allege facts showing that any of these limited exceptions apply; Elevance's opinion statements are not actionable.  (*See* ECF No. 60 at 54–60, ¶¶ 138, 144, 145, 148, 152, 153, 155, 159.)

### C.    The Amended Complaint Challenges Non-Actionable Puffery.

Plaintiffs also challenge forecast-adjacent statements that qualify as generic statements of corporate optimism or mere puffery.  (*See id.* at 45, 48–51, 58, ¶¶ 112, 121, 123, 125, 127, 152.) For example, the Amended Complaint cites the following statements:

- "[W]e think things are quite aligned at this point. . . .  So overall, we feel things are lining up. . . .  So I feel very good about our Medicaid business." *Id.* at 45, ¶ 112.

- "[S]olid start to the year."  *Id*. at 48, ¶ 121.

- The "very disciplined execution of our strategic initiatives . . . gave us confidence to be able to raise our full-year guidance to greater than $37.50 . . . .  [W]e also feel good that we're executing on the guidance . . . . [W]e are very confident in the adjusted EPS guidance . . . and very confident in the medical cost ratio as well as we think about the way we positioned our business, feel very good about that. . . .  But again, we feel very comfortable around our overall guide on medical loss ratio, medical benefit ratio for the year."  *Id*. at 49, ¶ 123.

Puffery, however, is not actionable as a matter of law in the Seventh Circuit.  *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997); *Gaines v. Guidant Corp.*, Case No. 1:03-cv-00892-SEB-WL, 2004 WL 2538374, at *18 (S.D. Ind. Nov. 8, 2004).  Such statements are best described as "a promotional phrase used to champion the company but . . . devoid of any substantive information." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).  Plaintiffs' claims based on the statements in paragraphs 112, 121, 123, 125, 127, and 152 of the Amended Complaint must be dismissed.

### II.    THE AMENDED COMPLAINT FAILS TO DEMONSTRATE A STRONG INFERENCE OF SCIENTER.

As noted above, the Reform Act requires dismissal of a securities class action complaint unless Plaintiffs allege particularized facts giving rise to "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  In this context, scienter means an "intent to deceive," manipulate or defraud

investors.  *See Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 756, 756 (7th Cir. 2007).  An inference of scienter is strong if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  When conducting the weighing analysis required by *Tellabs*, the court must take into account plausible opposing inferences, including any nonculpable explanations for a defendant's conduct.  *Endocyte*, 2016 WL 51260, at *18.

Here, Plaintiffs allege two scienter theories.  First, Plaintiffs assert that Defendants had motive and opportunity to commit fraud because two senior Elevance executives sold stock during the Class Period.  (ECF No. 60 at 53–56, ¶¶ 137–46.)  Second, Plaintiffs argue that certain "former employee" or confidential witness allegations demonstrate that Defendants knew that the Company could not achieve the Adjusted EPS forecast at the time the forecast was issued, tweaked or affirmed.  *Id*. at 52–53, ¶¶ 130–34.  Under settled Seventh Circuit law, Plaintiffs do not come close to demonstrating the required strong inference of scienter under either theory.

### A.    Defendants' Trading Is Not Suspicious in Amount or Timing.

Plaintiffs allege that Ms. Boudreaux and Ms. Norwood engaged in stock sales during the Class Period and therefore had a financial motive to inflate Elevance's stock price and deceive investors.  *Id*. at 53–56, ¶¶ 137–46.  Trading by insiders during the class period does not by itself give rise to an inference of scienter.  *Endocyte*, 2016 WL 51260, at *18.  "Instead, a sale of stock must be suspicious in scope and timing to support an inference of scienter."  *Id.*  All inferences must be considered in weighing whether stock sales are suspicious, which requires an examination of the context including prior trading practices, whether other managers made sales, and whether insiders retained their holdings.  *See Pugh*, 521 F.3d at 695.

### 1.    Ms. Boudreaux's Rule 10b5-1 Trade Is Not Suspicious.

Ms. Boudreaux's sale of 34,000 shares of Elevance stock on July 22, 2024 is not suspicious for multiple reasons.  (*See* ECF No. 62-24.)  First, prior to this transaction, Ms. Boudreaux owned

160,709 shares of Elevance stock.  This means that in July 2024 she sold 21% of her holdings and retained 79%.[13]  This fact dramatically undercuts an inference of scienter – it is not plausible (let alone cogent or compelling) that a fraudster would knowingly hold (and suffer a significant financial loss on) the vast majority of his or her stock holdings.  *See Endocyte*, 2016 WL 51260, at *19 ("[R]etention of significant holdings of stock during the class period weighs against an inference of scienter."); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 950–51 (S.D. Ind. 2005) ("The fact that [insiders] retained significant holdings also weighs against any inference of scienter."); *see also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1057 (N.D. Cal. 2018) (sales of 37% of a defendant's holdings are not indicative of scienter); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (allegation that defendant sold 37% of total stock holdings insufficient to show scienter); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (stock sales of 22.5% of holdings did not create strong inference of scienter).

Second, Ms. Boudreaux's sale was, as Plaintiffs concede, made pursuant to a Rule 10b5-1 trading plan she adopted on April 19, 2024.  (ECF No. 60 at 54, ¶¶ 139–40.)  Rule 10b5-1(c) provides that "a person's purchase or sale is not on the basis of material nonpublic information if the person making the purchase or sale demonstrates that:  (A) Before becoming aware of the information, the person had:  . . . (3) Adopted a written plan for trading securities."  17 C.F.R. § 240.10b5-1(c).  Stock sales made pursuant to valid Rule 10b5-1 trading plans are not suspicious

---

[13]     According to Elevance's 2024 Proxy, dated March 29, 2024, Ms. Boudreaux also held unexercised options that represented 187,077 shares of Elevance, all of which were exercisable as of March 2024 at exercise prices ranging from $232.04 to $469.03 (*i.e.*, below Elevance's share price at any point during the Class Period ).  (*See* ECF No. 62-25 at 3.)  In other words, when Ms. Boudreaux adopted her Rule 10b5-1 plan in April 2024, she could have sold 347,786 shares (her 160,709 common shares plus the additional 187,077 shares available upon exercise of her stock options).  Ms. Boudreaux's sale of 34,000 represents less than 10% of shares available for sale at that time.

as a matter of law. *Wade*, 892 F. Supp. 2d at 1137 (finding trades made pursuant to a Rule 10b5-1 trading plan were neither suspicious nor unusual enough to support a strong inference of scienter); *Gigamon*, 325 F. Supp. 3d at 1056 ("[A]utomatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter."); *Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014), *aff'd sub nom. In re Lululemon Sec. Litig.*, 604 F. App'x 62 (2d Cir. 2015) ("Trades made pursuant to a Rule 10b5-1 trading plan do not give rise to a strong inference of scienter.").

Plaintiffs attempt to negate the significance of the Rule 10b5-1 plan by alleging that Ms. Boudreaux adopted the plan while in the possession of material non-public information. (ECF No. 60 at 54, ¶ 140.)  The Amended Complaint, however, is entirely conclusory and unsupported on this point.  There are no allegations, particularized or otherwise, showing what material non-public information Ms. Boudreaux could possibly have been in possession of on April 19, 2024 – the day after Elevance publicly released its full earnings report for Q1 2024 and filed a comprehensive Form 10-Q.  Plaintiffs also suggest that Ms. Boudreaux's Rule 10b5-1 trading plan was somehow improper because it called for a trade to be made on the first available date after the required 90-day cooling off period.  *See* 17 C.F.R. § 240.10b5-1(c)(1)(i).  Plaintiffs do not attempt to explain how complying with a statutory cooling-off period makes a trade suspicious.

Finally, Ms. Boudreaux entered into her Rule 10b5-1 trading plan on April 19, 2024, which was **three months** before the first alleged corrective disclosure cited in the Amended Complaint (Elevance's July 2024 earnings release where it reaffirmed its Adjusted EPS forecast but cautioned that it was seeing increased Medicaid costs) and **six months** before the second alleged corrective disclosure (Elevance's October 2024 earnings release that lowered the Adjusted EPS forecast). Stock sales months in advance of a corrective disclosure are not suspiciously timed for purposes of the scienter analysis.  *See Pension Trust Fund For Operating Eng'rs v. Kohl's Corp.*, 895 F.3d

23

933, 940 (7th Cir. 2018) (stock sales 14 and 23 months prior to corrective disclosure not suspicious); *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 235 (S.D.N.Y. 2020) ("[S]tock sales are not indicative of scienter when they are 'more than two months before the announcement' in question."); *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 525 (S.D.N.Y. 2020) (sale that preceded corrective disclosure by approximately five months did not suggest scienter); *In re Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (lapse of "approximately four months between these substantial sales and the revelation of the alleged falsity[ ] inescapably attenuates any inference of scienter").

### 2. Ms. Norwood's Trade Is Not Suspicious.

Plaintiffs' attack on Ms. Norwood's trade fares no better.  Like Ms. Boudreaux, Ms. Norwood retained the majority of her Elevance holdings.  At the start of the Class Period, Ms. Norwood held 40,098 shares of Elevance common stock.  (ECF No. 62-26.)  In April 2024, Ms. Norwood exercised stock options that increased her holdings to 47,614 and then sold 20,310 shares.  These transactions resulted in a net decrease in her holdings of 31.9% (not the 45% alleged in the Amended Complaint).[14]

Second, Ms. Norwood's trades took place on April 23 and April 24, 2024 – five days after Elevance publicly reported its financial results for Q1 2024, **three months** before the first alleged corrective disclosure (the July 2024 earnings release) and **six months** before the second alleged corrective disclosure (the October 2024 earnings release).

Finally, Ms. Norwood sold her shares at prices ranging from $532.68 to $534.74.  Elevance's stock price closed higher than Ms. Norwood's highest sales price on 60 days during the

---

[14]    Ms. Norwood held unexercised options that represented 44,387 shares of Elevance, all of which were exercisable as of March 2024 at exercise prices ranging from $238.27 to $469.03.  (ECF No. 62-25 at 4.)  Adding those more than doubles her holdings available for sale, meaning Ms. Norwood's sale of 20,310 shares was just 24% of her holdings.

Class Period. (*See* ECF No. 62-23.) The peak closing price during the Class Period was $562.29 on September 3, 2024. *Id.* Stock sales are not suspicious where the insider sells well below the peak market price and does not appear to maximize profits. *See, e.g.*, *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 154–55 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (finding that sales when stock price was low during class period were not suspicious); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094 (9th Cir. 2002) (finding sales made when the price would continue to rise during the class period were not suspicious); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (noting that there is no strong inference of scienter when insiders "miss the boat" by selling at share prices between $53 and $56 when the share price ultimately rises to $73).

### 3. The Amended Complaint Ignores That Defendants Kaye and Tanal Did Not Trade.

The Amended Complaint conveniently ignores entirely that the other two Individual Defendants – Messrs. Kaye and Tanal – did not sell any shares, which weighs against a finding of scienter. The inference of scienter is strongly undermined where named defendants – the officers who allegedly were artificially inflating the company's share price – do not sell stock or otherwise attempt to personally profit from the purported fraud. *Higginbotham*, 495 F.3d at 759 ("One possible inference is that the *absence* of sales by other managers who would have been in the know (had news of the fraud reached HQ) implies that nothing was thought to be out of the ordinary.").[15]

---

[15] Plaintiffs also allege that scienter can be inferred because Defendants sought to increase their compensation derived from "stock options, restricted stock units ('RSUs'), and performance-based restricted stock units ('PBRSUs')." (ECF No. 60 at 20, 56, ¶¶ 41, 147.) Courts regularly find that generic motives held by all corporate officers and directors are insufficient to establish a strong inference of scienter. *Plumbers & Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009), *aff'd sub nom. Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012).

**B.      Plaintiffs' Anonymous Former Employee Allegations Do Not Establish That Defendants Knew That Elevance Could Not Achieve the 2024 Forecast.**

Plaintiffs' second scienter theory is that the allegations attributed to twelve anonymous individuals characterized as former Elevance employees show that Defendants had actual knowledge in April 2024 at the start of the Class Period that the Company could not achieve its full year 2024 Adjusted EPS forecast because of rising costs associated with the Medicaid redetermination process. (ECF No. 60 at 52–53, ¶¶ 130–34.) The former employee allegations on their face do not come close to showing such "actual knowledge."

As a threshold matter, the Seventh Circuit has long disfavored the use of anonymous former employee allegations in securities class action cases. *Boeing Co.*, 711 F.3d at 759 (confidential witnesses "may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent—a gimmick for obtaining discovery costly to the defendants and maybe forcing settlement or inducing more favorable settlement terms"); *Higginbotham*, 495 F.3d at 757 ("It is hard to see how information from anonymous sources could be deemed "'compelling'" or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."). As such, courts are required to apply a "heavy discount" to anonymous former employee allegations. *See Chew v. Moneygram Int'l, Inc.*, Case No. 18-cv-7537, 2024 WL 4346522, at *19 (N.D. Ill. Sept. 30, 2024); *In re Supreme Indus., Inc. Sec. Litig.*, Case No. 17-cv-143 (PS) (MGG), 2018 WL 2364931, at *9 (N.D. Ind. May 23, 2018).

Here, Plaintiffs' former employee allegations are largely meaningless. At best, giving Plaintiffs the benefit of every doubt, the former employees allege that: (i) Elevance tracked the Medicaid redetermination process, (ECF No. 60 at 25–30, 52 ¶¶ 56–67, 130); (ii) Elevance lost members and revenue as a result of the Medicaid redetermination process, *id.* at 25–26, 52–53,

26

¶¶ 57, 131–32; (iii) costs and acuity/utilization were rising, *id.* at 53, 57–59, ¶¶ 133, 148–57; (iv) Elevance was attempting to re-enroll patients in Medicaid or move them to other Elevance products, *id.* at 26–27, ¶ 58–60; and (v) the redetermination process was negatively impacting Elevance's Medicaid business, *id.* at 25–30, ¶¶ 56–67.  Elevance, however, disclosed these facts before, during and after the Class Period:

- between 2020 and 2022, "[o]perating revenue increased primarily due to higher premium revenue as a result of membership growth in our Medicaid business driven by the temporary suspension of eligibility recertification efforts during the COVID-19 pandemic, acquisitions and new expansions, as well as membership growth in our Medicare business," (ECF No. 62-6 at 8; *see* ECF No. 62-5 at 6); and

- since the redetermination process began, Elevance "experienced a decline in [its] Medicaid membership;" (3) that Elevance "expect[ed] growth in our commercial plans, including through the Public Exchanges, as members who do not qualify for redetermination exit the Medicaid program in our 14 commercial states and seek coverage elsewhere." (ECF No. 62-8 at 3; *see* ECF No. 62-9 at 3; ECF No. 62-4 at 5, 10; ECF No. 62-10 at 3; ECF No. 62-11 at 3; ECF No. 62-12 at 3; ECF No. 62-2 at 5, 7.)

The former employees say no more than what Elevance itself told the market.  For that reason alone, the anonymous former employee allegations do not support a strong inference of scienter.

The former employee allegations suffer from additional defects that undermine credibility and warrant further discounting.  For example, the allegations setting forth the former employees' titles, responsibilities, and sources of information are vague and unclear:

- FE-1 bases her statements on "common knowledge."  (ECF No. 60 at 19, 26–27, ¶¶ 39, 59.)

- FE-2, described as a "Cost of Care Manger" who "worked on" Elevance's Medicaid Products in three states, allegedly states that there was "an internal team that tracked and reported on the redetermination process, which was within the finance department", but there is no allegation that FE-2 served on that team.  Similarly, FE-2 states "Elevance's MLR was discussed in meetings with the leadership teams," but not that FE-2 attended any such meeting or that the leadership teams included any of the Individual Defendants.  *Id.* at 25–26, ¶¶ 56–57.

27

- FE-3, a "Director of Account Management", does not base any statements on information learned in the course of performing their job responsibilities, only on statements during an employee town hall. *Id.* at 26–27, ¶¶ 58–59.

- FE-4, described as "Director of Data Science" and "Staff Vice President of Advanced Analytics," gives no indication whatsoever as to her responsibilities in either of those roles. *Id.* at 27, ¶¶ 60–61.

- FE-5, a "Behavioral Health Team Lead," is alleged to have "oversee[n] a federal grant for Families First and worked with independent contractor physicians to set referrals," responsibilities with no bearing on Medicaid redetermination or tracking Medicaid costs. *Id.* at 27–28, ¶ 62.

- FE-6, a "Senior Director of Population Health Strategy," bases her allegations on meetings for which there is no date or time provided. *Id.* at 28, 31, 32, 33–34, ¶¶ 63, 72, 77, 81–82.

- FE-7, a "Director of Medicaid & Dual Eligible Growth Strategy," states that the corporate finance team tracked Medicaid redeterminations but not does allege that she served as a member of that team or even worked with any members of that team. *Id.* at 28–29, ¶¶ 64, 66.

- FE-8, described as "Director, Customer Care," provides statements that appear to relate solely to behavior health services and cites no basis for statements about Elevance's "behavioral health system" or any allegations as to how that specific system fits into Elevance's larger systems or the Medicaid system. *Id.* at 29, 30, ¶¶ 65, 70.

- FE-9, a "Clinical Quality Program Director," alleges, without basis or support, that "there was manipulation in how data was classified" and that "the Company's Medicaid data grew increasingly unreliable." *Id.* at 29–31, ¶¶ 67, 71.

- FE-10, a "Manager II of Medicaid Operations," describes vague and unenumerated "instances" where Elevance made "late payments" without any particularized detail. *Id.* at 31, ¶ 73.

- FE-11, a "Clinical Reviewer," allegedly worked in the "reporting department" and offers a vague statement that "there were signs" that certain of Elevance's "forecasts" were "ineffective" and identified a typographical error in a single report. *Id.* at 31–33, ¶¶ 74, 79–80.

- FE-12, a "Senior Manager of the Provider Network," whose job responsibilities are omitted, provides no basis for the allegation that certain states did not want to work with Elevance. *Id.* at 32, ¶ 76.

28

The Reform Act, Rule 9(b) and Seventh Circuit precedent require more. Without sufficient description of the former employees' roles, responsibilities, and sources of information, the Court cannot credit the former employee allegations because it cannot determine whether any of former employees were in a position to know the information they purport to allege.

Nowhere in its 183 paragraphs does the Amended Complaint allege that any of the alleged former employees worked with, reported to, or interacted with any of the Individual Defendants. Plaintiffs do not allege that any of the former employees had a role in setting, affirming, or lowering the Adjusted EPS forecast tracking the Company's performance against the Adjusted EPS forecast. And, critically, none of the former employees allege that the Individual Defendants knew or believed at any point in time that the Adjusted EPS forecast could not be achieved. Absent such allegations, the Amended Complaint does not establish scienter and must be dismissed.[16]

### C.    The Cogent and More Compelling Inference Is Non-Fraudulent.

At its core, Plaintiffs' theory is that Elevance – facing the unprecedented events of Congress's suspension of the Medicaid redetermination process at the start of the COVID-19 pandemic and subsequent reinstatement of the process three years later, as well as the COVID-19 pandemic itself – disclosed repeatedly the risks associated with its participation in Medicaid, the uncertainty created by the suspension of the redetermination process, and the likely impact of the resumption of the redetermination process. But then, Plaintiffs contend, Elevance for six months decided to conceal the previously predicted decrease in Medicaid enrollment and knowingly issue

---

[16]    Plaintiffs make a half-hearted attempt to invoke the "core operations" doctrine. (ECF No. 60 at 53, ¶¶ 135–36.) Medicaid is important to Elevance, but certainly not its core operation. *Id.* (conceding that Medicaid members constituted less than 25% of Elevance's total health benefits membership); *see also* ECF No. 62-2 at 8 (showing that the Medicaid business contributed approximately 33% of Company revenue). Moreover, even where the core operation rule applies, "the plaintiff must still allege actual knowledge of the problem by the defendant and cannot rely on allegations of 'some second-hand belief that such knowledge existed.'" *Endocyte*, 2016 WL 51260, at *20.

a false Adjusted EPS forecast.  Then, Plaintiffs' theory goes, Elevance adjusted that forecast upward and then downward.  All to artificially increase Elevance's stock price for six months, while executives held on to the majority of their stock.  This makes no sense.

The far more cogent and compelling inference from the facts alleged in the Amended Complaint is that Elevance recognized and disclosed the risks associated with Medicaid, COVID-19, and the interruption in the Medicaid redetermination process.  Elevance, consistent with its prior practice, used its best judgment to issue financial guidance to its investors and, when Elevance's performance exceeded estimates, it adjusted that guidance upward, and when Elevance's performance fell short of estimates, it adjusted that guidance downward, ultimately reporting full year 2024 Adjusted EPS in line with its October 2024 forecast.  Elevance's conduct – providing good faith financial guidance to investors accompanied by sufficient cautionary language – is precisely what Congress sought to protect when it enacted the Reform Act's safe harbor; it is not securities fraud.

### III.  PLAINTIFFS' SECTION 20(A) CLAIM FAILS.

A control person violation cannot stand when the underlying violation has been dismissed. *Endocyte*, 2016 WL 51260, at *20. ("Because the Plaintiff has failed to adequately plead a violation of Section 10(b), the Section 20(a) claim must also be dismissed.").  As set forth above, Plaintiffs fail to state a claim for a primary violation by Elevance, so the Section 20(a) claim fails.

### CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.[17]

---

[17]    There is a third barrier that Congress enacted to deter baseless securities class actions.  The Reform Act provides that, at the conclusion of a securities case, "the court shall include in the record specific findings regarding compliance by each party and each attorney…with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure" and that the Court "shall" impose sanctions if the Court finds a violation.  *See* 15 U.S.C. § 78u-4(c)(1)-(2); *Katz v. Household Int'l, Inc.*, 91 F.3d 1036 (7th Cir. 1996) (affirming dismissal of earnings forecast case and remanding for mandatory Reform Act sanctions analysis).

Dated: November 18, 2025

**HOGAN LOVELLS US LLP**

By: */s/ William M. Regan*
William M. Regan (admitted *pro hac vice*)
Allison M. Wuertz (admitted *pro hac vice*)
Jacey L. Gottlieb (admitted *pro hac vice*)
Mickaela Fouad (admitted *pro hac vice*)
390 Madison Avenue
New York, New York 10017
Tel: (212) 918-3000
Fax: (212) 918-3100
william.regan@hoganlovells.com
allison.wuertz@hoganlovells.com
jacey.gottlieb@hoganlovells.com
mickaela.fouad@hoganlovells.com

**FROST BROWN TODD LLP**

Kandi Kilkelly Hidde (#18033-49)
Darren A. Craig (#25534-49)
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN 46244-0961
(317) 237-3800 (p)
(317) 237-3900 (f)
khidde@fbtlaw.com
dcraig@fbtlaw.com

*Attorneys for Defendants*

31