**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| ERIC MILLER, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>      -v-<br><br>ELEVANCE HEALTH, INC., GAIL K. BOUDREAUX, FELICIA F. NORWOOD, MARK B. KAYE and STEPHEN V. TANAL,<br><br>    Defendants. | No. 1:25-cv-923<br><br>The Honorable James Russell Sweeney, II<br><br>Magistrate Judge Mark J. Dinsmore<br><br><br>CLASS ACTION |

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ........................................................................... 1

II.    STATEMENT OF FACTS ............................................................................... 4

      A.      Elevance's Medicaid Business.................................................................... 4

      B.      Defendants Misled Investors As Redeterminations Wreaked Havoc On The Company ...................................................................................................... 6

      C.      Investors Learn The Truth .......................................................................... 8

III.   ARGUMENT.................................................................................................... 9

      A.      The Complaint Sufficiently Alleges That Defendants' Statements Were False And Misleading.................................................................................. 10

            1.      The Complaint Alleges Actionable Statements Of Past Or Present Fact That Are Not Protected By The Safe Harbor........................................... 10

            2.      The Forward-Looking Statements Are Also Actionable ......................... 13

            3.      Defendants' False And Misleading Statements Are Not Opinion Statements Or Are Actionable Opinions Under *Omnicare*...................... 17

            4.      Defendants' Misleading Statements Are Not Puffery .............................. 19

      B.      The Complaint Alleges A Strong Inference Of Scienter ...................................... 20

            1.      Defendants Spoke With Actual Knowledge Or Recklessness................... 21

            2.      The Core Operations Doctrine Further Supports Scienter........................ 26

            3.      Defendants Had Motive To Mislead Investors ........................................ 27

      C.      Defendants' Proffered Scienter Theory Is Not Credible...................................... 29

IV.   CONCLUSION................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">Cases</span>

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ...................................................................................16

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*,
   99 F.4th 928 (7th Cir. 2024) .................................................................................10

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) ...............................................................13, 14, 15, 16

*Busic v. Orphazyme A/S*,
   2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ........................................................26

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
   2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ....................................................28, 29

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) .................................................................................17

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
   388 F. Supp. 2d 932 (S.D. Ind. 2005) ....................................................................28

*City of Sterling Heights Gen. Emps' Ret. Sys. v. Hospira, Inc.*,
   2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...........................................................14

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
   8 F.4th 592 (7th Cir. 2021) ...................................................................................14

*Eisenstadt v. Centel Corp.*,
   113 F.3d 738 (7th Cir. 1997) .................................................................................20

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023), *dismissing certiorari as improvidently granted*, 604 U.S.
   4 (2024)..................................................................................................................16

*Flynn v. Exelon Corp.*,
   2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) .........................................................21

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................28

*Fryman v. Atlas Fin. Holdings, Inc.*,
   2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ..............................................18, 27, 28

ii

*Gaines v. Guidant Corp.*,
 2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) .................................................................20

*In re Gildan Activewear, Inc. Sec. Litig.*,
 636 F. Supp. 2d 261 (S.D.N.Y. 2009)..........................................................................28

*Gimpel v. Hain Celestial Grp., Inc.*,
 156 F.4th 121 (2d Cir. 2025) .......................................................................................21

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
 63 F.4th 747 (9th Cir. 2023) ..................................................................................10, 17

*Hedick v. Kraft Heinz Co.*,
 2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ...............................................................20

*Hennessy v. Penril Datacomm Networks, Inc.*,
 69 F.3d 1344 (7th Cir. 1995) .......................................................................................14

*Higginbotham v. Baxter Intern, Inc.*,
 495 F.3d 753 (7th. Cir. 2007) ......................................................................................29

*Hunter v. Elanco Animal Health, Inc.*,
 2022 WL 3445173 (S.D. Ind. Aug 17, 2022) ..........................................................14, 17

*Hunter v. Elanco Animal Health Inc.*,
 2023 WL 6295487 (S.D. Ind. Sep. 27, 2023) ..............................................................18

*Jones v. Corus Bankshares, Inc.*,
 701 F. Supp. 2d 1014 (N.D. Ill. 2010) .........................................................................25

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
 601 U.S. 257 (2024).............................................................................................10, 12

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
 437 F.3d 588 (7th Cir. 2006) ..................................................................................23, 25

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
 513 F.3d 702 (7th Cir. 2008) .............................................................................10, 12, 24

*Malin v. XL Cap. Ltd.*,
 499 F. Supp. 2d 117 (D. Conn. 2007)...........................................................................29

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
 540 F.3d 1049 (9th Cir. 2008) .....................................................................................28

*Moak v. Roszak*,
 2006 WL 2413698 (N.D. Ill. Aug. 17, 2006) ...............................................................21

*National Elevator Industry Pension Fund v. Conagra Brands, Inc.*,
  2022 WL 1449184 (7th Cir. May 9, 2022) ..............................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..............................................................................................17, 18

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
  895 F.3d 933 (7th Cir. 2018) ......................................................................................28

*Phoenix Ins. Co. v. ATI Phys. Therapy, Inc.*,
  690 F. Supp. 3d 862 (N.D. Ill. 2023)..........................................................................24

*Plumbers & Pipefitters Local Union v. Zimmer*,
  673 F.Supp.2d 718 (S.D. Ind. 2009)...........................................................................29

*Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017).........................................................................24

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018) ......................................................................28

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ......................................................................................29

*Ross v. Career Educ. Corp.*,
  2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)...............................................................21

*Schleicher v. Wendt*,
  529 F. Supp. 2d 959 (S.D. Ind. 2007) ..........................................................21, 22, 23, 26

*Searls v. Glasser*,
  64 F.3d 1061 (7th Cir. 1995) ......................................................................................20

*Seeks v. Boeing Co.*,
  752 F. Supp. 3d 992 (N.D. Ill. 2024) .........................................................10, 17, 19, 20

*Shah v. Zimmer Biomet Holdings, Inc.*,
  348 F. Supp. 3d 821 (N.D. Ind. 2018) ........................................................13, 14, 15, 16

*Silverman v. Motorola, Inc.*,
  2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) .............................................................27

*In re Skechers USA, Inc. Sec. Litig.*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020)..........................................................................28

*In re Take-Two Interactive Sec. Litig*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..........................................................................28

iv

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..............................................................................................21, 27

*Vallabhaneni v. Endocyte, Inc.*,
  2016 WL 51260 (S.D. Ind. Jan. 4, 2016) ...........................................................19, 28

*Van Noppen v. InnerWorkings, Inc.*,
  136 F. Supp. 3d 922 (N.D. Ill. 2015) ........................................................................28

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ...................................................................................29

*Wade v. WellPoint, Inc.*,
  740 F. Supp 2d 994 (S.D. Ind. 2010) ........................................................................17

*Wade v. WellPoint, Inc.*,
  892 F. Supp. 2d 1102 (S.D. Ind. 2012) .....................................................................17

*Water Island Event-Driven Fund, LLC v. Tribune Media Co.*
  39 F.4th 402 (7th Cir. 2022) .....................................................................................17

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
  495 F. Supp. 3d 622 (N.D. Ill. 2020) ........................................................................17

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023) ......................................................................17

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) .......................................................................28

**STATUTES**

15 U.S.C. § 78u-4(b)(1) .....................................................................................................10

15 U.S.C. §78u-5(c)(1) ......................................................................................................13

15 U.S.C. § 78u-5(c)(1)(A)(i) ...........................................................................................14

Section 10(b) of the Exchange Act ................................................................................9, 30

PSLRA .......................................................................................................................*passim*

**OTHER AUTHORITIES**

Rule 10b-5...........................................................................................................................19

Rule 10b-5(b).......................................................................................................................12

Rule 175...............................................................................................................................14

v

Lead Plaintiff[1] respectfully submits this memorandum of law in opposition to Defendants'[2] Motion to Dismiss the Corrected Consolidated Class Action Complaint ("Motion"). ECF No. 63.

## I.    PRELIMINARY STATEMENT

This securities action arises from Defendants' false and misleading statements to investors regarding the financial health of Elevance and its Medicaid business. During the Class Period (April 18, 2024 to October 17, 2024), Defendants told investors that their 2024 financial guidance *already* accounted for the explosion in Medicaid costs that the Company faced because the redetermination process had shifted Medicaid membership from low- to high-cost members. Defendants also told investors that their Medicaid rate negotiations with states accounted for the ballooning Medicaid costs and were "actuarially sound." These are statements of present or historical fact, which were materially misleading because Defendants' guidance and rate negotiations did not remotely account for the impact of the redetermination process due to *inter alia* crippling data deficiencies, which Defendants knew or recklessly disregarded. Premised on data they knew was outdated (but unbeknownst to investors), Defendants also misleadingly told investors to expect *double-digit* earnings per share (EPS) growth in 2024. Defendants' misstatements wrongly portrayed Elevance as a company positioned to enjoy continued growth and downplayed the negative impact of the redetermination process.

Investors were deceived. The truth started to partially emerge on July 17, 2024, when Defendants revealed that Medicaid member utilization would increase in the second half of 2024. Even then, however, Defendants doubled down on their misrepresentations, assuring investors that this utilization shift and associated increase in costs was already baked into Elevance's financial

---

[1] Lead Plaintiff consists of Stichting juridisch eigenaar Achmea IM Liquid Asset Funds, Stichting Bewaarder Achmea Beleggingspools, and Stichting Bewaarder Syntrus Achmea Beleggingspools (collectively, "Plaintiff").

[2] Defendants are Elevance Health, Inc. ("Elevance" or the "Company"), Gail K. Boudreaux ("Boudreaux"), Felicia F. Norwood ("Norwood"), Mark B. Kaye ("Kaye"), and Stephen V. Tanal ("Tanal").

guidance and rate negotiations. The truth was fully revealed on October 17, 2024, when Defendants slashed Elevance's EPS guidance by 10% and attributed it to drastically elevated Medicaid costs. These disclosures shocked the market, caused Elevance's stock price to plummet, and wiped-out billions of dollars of shareholder value.

During COVID, Congress placed a moratorium on the "redetermination" process, whereby states would evaluate the eligibility of Medicaid recipients and disenroll those who had fallen out of eligibility. During the moratorium, Elevance experienced a massive boom in revenue as it continued to receive fixed payments for Medicaid enrollees even when they were no longer eligible or used no Medicaid benefits. In other words, the redetermination moratorium caused Elevance's costs to decline while its revenues could only increase—a financial windfall for the Company.

Congress lifted the moratorium in March 2023 after the pandemic ended. Elevance's competitors sounded the alarm, warning their shareholders that the redetermination process would negatively impact their Medicaid businesses. Not Defendants. Instead, Defendants assured investors that Elevance's financial health was sound and that their financial guidance and rate negotiations accounted for the acuity shift causing increased Medicaid costs.

In reality, Defendants knew that the redetermination process hurt Elevance's Medicaid business by causing exploding costs (and declining revenue) that were not accounted for in Elevance's guidance or rate negotiations. Multiple former Elevance employees (FEs) provided firsthand reports of internal "town hall" meetings where Company executives made clear that the impact of redeterminations was more severe than they publicly revealed. One FE reported that Boudreaux (CEO) was so concerned about the negative financial impact of the redetermination process that she concocted a "soft-landing strategy" and directed Elevance employees to push disenrolled members into other Elevance insurance products. Another FE specifically noted the

2

contradiction between Defendants' negative internal statements and their bullishly positive public statements to investors. Other FEs described crippling deficiencies with Elevance's Medicaid data that resulted in Defendants reporting deficient Medicaid costs during rate negotiations and failing to incorporate the exploding costs into their 2024 financial guidance.

In response to the well-pled allegations of the Complaint (which are accepted as true on this Motion), Defendants mischaracterize the facts, belittle and ignore the firsthand reports provided by their former employees, and insist that they did not make a single misleading statement or, if they did, claim it was without scienter so they still must escape liability.

Defendants are wrong. *First*, Defendants mischaracterize the Complaint as solely alleging forward-looking misstatements. But Defendants ignore that the alleged misstatements concern current or historical facts. Defendants represented to investors that their financial guidance and rate negotiations already accounted for the acuity and cost trends resulting from the redetermination process. These statements about current or past facts were untrue when made. FEs reported that Elevance was losing low-acuity, low-utilization, and therefore low-cost—and high profit—members and that Boudreaux pursued a "soft landing strategy" to try to lessen the impact of the shift in acuity mix caused by the redeterminations. *E.g.*, ¶¶58-59, 61-63.[3] FEs also reported that Defendants knowingly failed to incorporate the drastic shift in acuity and utilization into Elevance's financial guidance and rate negotiations because the Company's Medicaid reporting data was severely outdated and deficient. *See* ¶¶70-78.

*Second*, Defendants' attacks on the alleged misstatements that include forward-looking elements also fail. The PSLRA safe harbor only insulates forward-looking statements

---

[3] Unless otherwise specified, citations to "¶__" or the "Complaint" are to the Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 60), and "DB at __" are to Defendants' Motion to Dismiss the Corrected Consolidated Class Action Complaint (ECF No. 63).

accompanied by meaningful cautionary language or not made with actual knowledge of the statements' misleading nature. Here, Defendants' forward-looking statements were accompanied by the same boilerplate cautionary language that courts routinely reject as insufficient and were made with actual knowledge of their false and misleading nature.

*Third*, Defendants' scienter challenges are meritless. Defendants assert that the Complaint lacks details regarding the FEs so their reports must be discounted or ignored. This is wrong. The Complaint sufficiently alleges details establishing each FE's personal knowledge, including for example facts regarding each FE's employment, work roles and responsibilities, and provides details corroborating their personal knowledge and experience. Defendants also dispute the Complaint's insider trading allegations, claiming there is nothing "unusual" about insider selling by Boudreaux (CEO) or Norwood (EVP and President of Gov. Health Benefits). But during the Class Period, Boudreaux and Norwood each sold massive amounts of their personal Elevance stock holdings worth millions at highly suspicious times—even though they had *never* sold stock prior to the Class Period. These unusual and suspicious insider sales support and confirm the Complaint's scienter allegations.

In the end, Defendants try to blame "the COVID-19 pandemic itself" for their misleading assurances to investors. This does not withstand scrutiny. The pandemic was over and the moratorium lifted before the Class Period. Plus, Defendants told investors that the very events they now try to rely on as an excuse—COVID and the resumption of redeterminations—had *already been* accounted for in their financial guidance, when they knew it had not. That is a violation of the securities laws, not an innocent mistake. Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Elevance's Medicaid Business

Elevance is a for-profit medical insurance company. One of the Company's largest

business lines is providing Medicaid coverage for states, which generated $56.6 billion (over one third) of the Company's 2023 operating revenue. ¶31; DB at 29; *see also* ECF No. 62-2 at 8.

Elevance's Medicaid business generates revenue by charging state governments a fixed rate or premium for each covered member. ¶3. Elevance assumes responsibility for the cost of covered care supplied to each member—whether or not those costs exceed the fixed rate paid by the states. When the cost incurred for a patient's care comes in below the fixed rate, Elevance makes a profit. Conversely, when a patient's insured costs exceed the rate, Elevance suffers a loss. *Id.* The cost is determined by the level of care a patient requires (or "acuity") and the patient's use (or "utilization") of their benefits. *Id.* Medicaid members who are higher acuity or higher utilization give rise to higher costs, while lower acuity/utilization members cost the Company less to insure and thereby generate higher profits for Elevance. *Id.*

Prior to COVID, states would undertake an annual "redetermination" process, whereby they determined which Medicaid members were no longer eligible for coverage and removed them from the Medicaid rolls. ¶¶4, 36. Medicaid members often lose their eligibility because their income increases or they gain employment that provides them with separate insurance. ¶¶4, 35.

During the COVID pandemic, the Federal Government issued a moratorium on redeterminations, which meant that no existing Medicaid members could be disenrolled. ¶4. As a result, existing Medicaid members who fell out of eligibility during the pandemic—often people who were healthier or had gained new employment with private healthcare benefits—remained on the Medicaid rolls. These members gave rise to no costs, but Elevance was still getting paid for them. *Id.* The Company's revenues soared as a result. In 2022, total operating revenue increased by 14% to approximately $156 billion, and operating gains for the year rose 12.9% to $8.5 billion. ¶5. Elevance's stock price skyrocketed by over 200%. ¶¶5, 40.

On March 31, 2023, Congress lifted the moratorium on Medicaid redeterminations after COVID ended. ¶42. Elevance's competitors sounded the alarm: Centene Corporation forecasted a higher Medicaid expense ratio to account for "temporary dislocation between rates and acuity." ¶¶8, 46. UnitedHealth Group warned that it expected redeterminations to shift its Medicaid membership to higher acuity members and, accordingly, to lower profitability. ¶8.

In contrast to their competitors, Defendants downplayed the negative impact of redeterminations, reassured investors that Elevance's Medicaid business was performing well, and claimed their financial guidance already accounted for the acuity shift due to redeterminations.

**B.      Defendants Misled Investors As Redeterminations Wreaked Havoc On The Company**

Defendants issued three main categories of misstatements. ***First***, Defendants falsely assured investors that the ballooning Medicaid costs due to redeterminations was already factored into their financial guidance and rate negotiations. ¶95. For example, on June 12, 2024, Tanal told investors that Elevance had "planned" for "shifts happening in the risk pool," that the "states are recognizing" and "seeing" the cost increases with regard to their rate negotiations with Elevance, and that, on the acuity shift to higher cost Medicaid members, there was "nothing outside of the bounds of what we expected and guided for." ¶96.

***Second***, Defendants misleadingly asserted that the Medicaid premiums Elevance had negotiated with the states were "actuarially sound"—a term of art in the insurance industry meaning that the fixed rates would cover costs incurred by insured individuals. For instance, on April 18, 2024, Boudreaux assured investors that based on Defendants' "visibility into 75% of our Medicaid premiums … [t]hey're actuarially sound." ¶112. And on July 17, 2024, Kaye confirmed that "we are closely monitoring acuity and cost trends, notably in Medicaid and are working collaboratively with states to ensure rates remain actuarially sound." ¶99(a).

**Third**, Defendants misleadingly told investors that Elevance's Medicaid business was performing well, in line with expectations, and they expected **double-digit** growth in EPS in 2024. ¶¶9, 120. For example, Boudreaux told investors on April 18, 2024, that they should expect **increased** EPS in 2024 of $37.20—representing a **12% year-over-year growth** as compared to 2023. Boudreaux similarly noted during the same call that "[i]n the first quarter, our Medicaid business performed in line with our expectations[,]" (¶105), and that "in terms of the acuity and the mix, everything, we have visibility into 75% of our Medicaid premiums. . . . So overall, we feel things are lining up." ¶112. Even after they were forced to admit to increases in acuity and utilization costs on July 17, 2024, Boudreaux and Kaye reiterated their "at least $37.20" EPS guidance. ¶¶99(a), 127.

Defendants' statements were materially misleading. In fact, Defendants knew that Elevance's guidance did not remotely account for the massive cost hikes and acuity shifts due to the redeterminations and resulting disenrollments. They also knew that Elevance's Medicaid reporting data was severely outdated and did not account for the redetermination process. Indeed, FEs confirmed that, internally, Defendants acknowledged the negative impact that redeterminations were having on Elevance's Medicaid business. For example, one FE reported that while Kaye assured investors that the Medicaid business was performing well on Elevance's April 18, 2024 Q1 2024 earnings call, his statement contradicted internal statements made by Boudreaux informing employees that the Company was losing many more Medicaid members than they had expected. ¶61. Other FEs recalled internal Company meetings where Boudreaux discussed a "soft landing" plan to try to save Elevance from exploding costs and declining revenues by pushing disenrolled members into other plans. ¶¶58-59, 61-62.

FEs also reported that Elevance's Medicaid data was woefully deficient. *See generally*

7

¶¶68-83. For example, FEs recounted that the Company's data was plagued by a significant lag time in Medicaid reporting, with information being delayed by eight months. ¶¶75, 77. FEs also recounted that these issues hindered Defendants' negotiations with the states, with one reporting difficulty negotiating rates with Massachusetts and New York, while another listed several states that did not want to work with Elevance due to the obsolete data. ¶¶70, 76. Still another FE recalled data deficiencies resulting in an eight-month investigation. ¶71. According to one FE, these problems led to a three-day meeting where Elevance executives flew in from across the country to discuss the inaccurate data Elevance had been providing to the states—confirming Defendants' actual knowledge of the data issues. ¶71. FEs also recounted meetings where they raised the immediate and drastic increase to Elevance's MLR (*i.e.*, its benefits expense ratio) to their leadership. For example, FE-2 recounted meetings with Greg Thompson, who reported directly to Boudreaux and Kaye, where Elevance's rising MLR was attributed to exploding costs caused by redeterminations. ¶¶56-57.

At the same time Defendants concealed the truth from investors, Boudreaux and Norwood made suspiciously large stock sales, even though neither executive had *ever* sold *any* Elevance stock prior to the Class Period. ¶¶19, 84-87, 138, 139, 142, 146.

C.      **Investors Learn The Truth**

Investors started to learn the partial truth regarding the impact of redeterminations during Elevance's earnings call on July 17, 2024, when Defendants disclosed that "the Medicaid membership mix has shifted, resulting in increased acuity," and utilization. ¶88. This news caused Elevance's stock price to drop 5.8% on July 17, 2024, from $553.14 to $520.93 per share, and continue to trade down to close at $504.72 per share on July 18, 2025. *Id*.

Yet, Defendants continued to conceal the full extent of Elevance's problems by doubling-down on their misrepresentations, boasting that they "prudently maintained our full-year outlook"

and that "acuity and costs trends" had "certainly been reflected in our updates for the year." ¶¶15, 89. While analysts were initially surprised about the increase in acuity and utilization, they were relieved by Defendants' assurances that the full-year outlook accounted for this trend. ¶¶15, 90.

On October 17, 2024, Defendants stunned analysts and investors by disclosing that Elevance had missed quarterly EPS expectations and had to slash full-year 2024 EPS by more than 10% to "approximately $33" instead of the $37.20 they had repeatedly touted throughout the Class Period. ¶153. Boudreaux announced that the miss was "primarily due to elevated medical costs in our Medicaid business"—the very costs Defendants had assured investors during the Class Period were already incorporated in their financial guidance and premium rate negotiations. ¶91. Defendants also admitted that the Medicaid rate increases they negotiated were "inadequate to cover 2024 cost trends that we now expect to be *3 to 5 times higher than historical averages*." ¶16. When questioned by analysts, Defendants confirmed that the dramatic cost increases were caused by "higher overall membership acuity" from redeterminations. *Id*. Analysts were shocked at the news, writing that "the magnitude of the revision that's implied there is alarming, particularly given that we're at the end of the membership impacts from redetermination," and questioning why it was "happening so late in the [redetermination] process." ¶92.

Defendants' October 17, 2024 disclosures caused Elevance's stock price to plummet, falling $52.61 per share, or roughly 10.6%, from $496.96 on October 16, 2024, to close at $444.35 on October 17, 2024. ¶93. The stock continued to fall, dropping another $13.58 to close at $430.77 on October 18, 2024, and another $8.51 to close at $422.26 on October 21, 2024. *Id*.

## III.   ARGUMENT

To state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security;

9

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Seeks v. Boeing Co.*, 752 F. Supp. 3d 992, 1013 (N.D. Ill. 2024) (quoting *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024)). Defendants' Motion seeks dismissal of the Complaint based only on the first two of these elements.

> **A.    The Complaint Sufficiently Alleges That Defendants' Statements Were False And Misleading**

A plaintiff successfully pleads that a statement was materially false or misleading if she "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Courts should not "impute the strong inference standard of scienter to the element of falsity;" the PSLRA "do[es] not require a 'strong inference of fraud.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Even statements that are technically or literally true can be misleading if they "omit[] material fact[s]" because "half-truths" are actionable under 10b-5(b). *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).

> **1.    The Complaint Alleges Actionable Statements Of Past Or Present Fact That Are Not Protected By The Safe Harbor**

The PSLRA's safe harbor applies only to "'forward-looking' statements—predictions or speculations about the future." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*"). Statements about past or present facts are not protected by the safe harbor and are not subject to the safe-harbor-related pleading requirements.

***Misstatements of Past or Present Facts***. Defendants ignore that several alleged misstatements fall squarely into the past/present fact category. For example, Defendants told investors that the redetermination-related acuity and utilization shift that Elevance had experienced was "***nothing outside of the bounds of what we expected and guided for***" (¶96) and their "full

10

year outlook *does* allow for [the] shift in acuity and increased utilization." ¶99(b).[4] Likewise, Defendants represented that the "disconnect between the timing of our rates in the emerging acuity in our populations ... [has] ***certainly been reflected*** in our updates for the year." ¶101. These statements assured investors that the acuity trends resulting from redeterminations that had ***already occurred*** had also ***already been*** accounted for in Defendants' financial guidance and rate negotiations, which are plainly matters of historical or present fact.

The facts alleged also establish that these past/present statements were misleading. Defendants knew that the acuity and cost data underlying their financial guidance was severely outdated and did not remotely account for the acuity trends resulting from the redetermination process. Indeed, FEs reported that the data deficiencies plaguing Elevance—including up to eight-month delays in reporting—were well known to Company leadership and prevented Defendants from incorporating the acuity and utilization shift into Elevance's rate negotiations or financial guidance. ¶¶70-78. At the same time, Defendants knew that the acuity shift and ballooning costs were so significant that, for example, Boudreaux had to internally devise a "soft-landing strategy" to try to address them. ¶¶12, 58-59, 61-62. Thus, the facts alleged in the Complaint establish that Defendants knew or recklessly disregarded that their rate negotiations and financial guidance did not account for the acuity shift and exploding Medicaid costs—contrary to their assurances to investors. At minimum, these statements were misleading half-truths, as Defendants claimed their financial guidance accounted for current acuity trends when Defendants knew that the guidance was premised on stale and outdated data. It is no surprise then that Defendants had to materially revise down their guidance in October 2024, when the data finally reflected the true impact of the redeterminations.

---

[4] Defendants do not substantively address these two statements in their brief, relegating them to mere lists of cites.

Another statement regarding current or past fact is Boudreaux's April 18, 2024 representation that "[i]n the first quarter, our Medicaid business performed in line with our expectations." ¶105.[5] No part of this statement is forward-looking; it discussed a fiscal quarter that had already been completed. And it is adequately alleged as a misleading half-truth (¶¶68-83, 105, 107, 109) because Defendants omitted the negative impact of redeterminations on Elevance's Medicaid business and the fact that Defendants' results were based on stale data that was known to be severely outdated. *See Macquarie*, 601 U.S. at 263 ("Rule 10b-5(b) "bars … half-truths.").

***"Mixed" Misstatements.*** Relatedly, "mixed" statements that contain both forward-looking and past/present elements are "not entitled to the safe harbor with respect to ***the part of the statement[s] that refers to the present***." *Tellabs III*, 513 F.3d at 705. Thus, when Kaye told investors that "[w]ith respect to our outlook, ***we <u>are</u> closely monitoring acuity and cost trends***, notably in Medicaid and are working collaboratively with states to ensure rates ***remain*** actuarially sound[,]" his statement fell outside of the safe harbor with respect to Elevance's ***present*** actions, such as "closely monitoring acuity and cost trends." ¶99; *contra* DB at 18. This statement was misleading because "Elevance's membership tracking data was in shambles and could not be relied upon," a fact which was known to Defendants and confirmed by multiple FEs. ¶68; *see also* ¶¶70-83. Kaye's statement was also false because he told investors that the Company's rates would "remain actuarially sound[,]" which speaks directly to the present actuarial soundness of those rates at the time the statement was made. "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Tellabs III*, 513 F.3d at 705 (finding statements that sales were "still going strong" not protected by safe harbor).

The other statements Defendants contend are forward-looking are also a "mix[]" of present

---

[5] Defendants do not argue that Boudreaux's statement in ¶105 fails to meet the pleading standard for falsity.

and future. *See*, *e.g.*, ¶¶101 ("We fully expect our rates to **remain** actuarially sound[.]"), 109 ("Medicaid **continues** to normalize . . . and it **is performing as expected**");[6] 107 ("In terms of where we are today with respect to the acuity and mix of that membership, the acuity **is in line** with what we expected" and "right now, we're at a point where our Medicaid business is actually **tracking very much in line** with our expectations."), 109 ("[I]n terms of health benefits, the margins this quarter **were** very much in line with our expectations. It **puts us squarely on track** to achieve our guidance for the full year."), 112 ("[T]hings are quite aligned at this point."), 123 ("we're executing on the guidance"). Those portions of the alleged misstatements do not qualify for safe-harbor protection and are adequately alleged to be misleading in the Complaint.

### 2.      The Forward-Looking Statements Are Also Actionable

The Complaint does allege certain misstatements that are properly understood as partially forward-looking, including Defendants' 2024 earnings projections. Contrary to Defendants' mischaracterizations, however, the PSLRA safe harbor does not render forward-looking statements *per se* inactionable. The statute provides that such statements are actionable when "made with actual knowledge," and not "accompanied by meaningful cautionary statements." 15 U.S.C. §78u-5(c)(1). Courts routinely find similar forward-looking statements actionable. *See, e.g.*, *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (projections statements not protected by safe harbor at pleadings stage). Indeed, "statements made with actual knowledge of their falsity are not protected by the safe harbor, or otherwise the statute would legalize knowing intentional misconduct." *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 841 (N.D. Ind. 2018) (statements regarding projected future growth actionable).[7] Here, Defendants'

---

[6] Tellingly, Defendants **omit** the relevant past tense language from this statement in their brief. *See, e.g.*, DB at 18.

[7] The Court should reject Defendants' invitation to unnecessarily re-litigate Congress's intent in drafting the PSLRA. *See* DB 14-16. The law is well-settled that the PSLRA does not absolutely bar **any type** of forward-looking statement, including the statements Plaintiff alleges here. But even if the Court were to engage in such an exercise, the Seventh

cautionary language was inadequate, and their statements were made with actual knowledge of falsity.

*Inadequate Cautionary Language*. To satisfy the first prong of the safe harbor, forward-looking statements must be "accompanied by ***meaningful cautionary statements*** identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i) (emphasis added). Here, Defendants' forward-looking statements were not accompanied by meaningful cautionary language.[8]

As a threshold matter, "the safe harbor [is] not available when defendants point[] to cautionary language which was issued prior to the illegally concealed facts and remained unchanged despite material changes in the company's condition." *Shah*, 348 F. Supp. 3d at 841 (citing *Asher*, 377 F.3d at 730-31). Here, four of the six documents that Defendants cite as cautionary warnings ***pre-date*** the Class Period by months or years. *See* ECF Nos. 62-4 (2022 10K), 62-5 (2021 10K), 62-6 (2020 10K), 62-14 (Q4 2023 Earnings Call Transcript).[9] The other two examples merely refer to the same language that was in Elevance's pre-Class Period annual reports. ECF Nos. 62-15 (Q1 2024 Earnings Call Transcript), 62-18 (Q2 2024 Earnings Call

---

Circuit has offered guidance on this issue, noting in *Asher* that the safe harbor "is the result of a compromise between legislators who did not want any safe harbor (or, indeed any new legislation), and those who wanted a safe harbor along the lines of the old Rule 175 ... that did not require any cautionary statements but just required the projection to have a reasonable basis." 377 F.3d at 722. Contrary to Defendants' claim, if Congress had "sought to eliminate … the exact case" Plaintiff brings here (DB at 16), it would ***not*** have included explicit exceptions to the safe harbor.

[8] Defendants do not argue that the misstatements are immaterial. Thus, *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, is irrelevant and has no bearing on Defendants' arguments. 8 F.4th 592, 595 (7th Cir. 2021).

[9] Plaintiff objects to Defendants' assertion that the Court can take judicial notice of documents that are neither cited nor referred to in the Complaint for purposes of the truth of the statements themselves. ECF Nos. 62-1, 62-3, 62-5, 62-6, 62-7, 62-8, 62-9, 62-13, 62-14, 62-21, 62-23, 62-25, 62-26, 62-27. At the motion to dismiss stage, use of judicial notice for such purposes is inappropriate, even when the documents at issue are SEC filings. *City of Sterling Heights Gen. Emps' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *11-12 (N.D. Ill. Feb. 13, 2013) (citing *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995)). *Hunter v. Elanco Animal Health, Inc.*, cited by Defendants (DB at 4 n.3.), does not address judicial notice of documents that are not referenced in the complaint, and is therefore inapposite. 2022 WL 3445173 (S.D. Ind. Aug. 17, 2022).

Transcript). *See* DB at 16-18.[10] The safe harbor is not available for these warnings.

Defendants' purported warnings also were not meaningful. To qualify as meaningful, cautionary language must "put[] an investor on notice of the danger of the investment" and "be substantive and tailored to the specific predictions made in the allegedly misleading statement." *Shah*, 348 F. Supp. 3d at 841 (cleaned up). "'[B]oilerplate' warnings won't do; cautions must be tailored to the risks that accompany the particular projections." *Asher*, 377 F.3d at 732. "Statements along the lines of 'all businesses are risky' or 'the future lies ahead' come to nothing other than caveat emptor (which isn't enough)." *Id.* at 733. The language Defendants quote from Elevance's 2023 Form 10-K is also found **verbatim** in the Company's 2022, 2021, and 2020 Form 10-Ks, and near identical language is present in the Company's annual reports going back to 2018. *Compare* DB at 16-17 (quoting ECF No. 62-4 at 7, 9), *with* ECF Nos. 64-1 at 2-3, 64-2 at 2-3, 64-3 at 2-3, 64-4 at 2-3.[11]

In *Asher*, the Seventh Circuit similarly analyzed purported cautionary language that "remained fixed even as the risks changed"—once the undisclosed risk materialized internally, the company "left both its forecasts and cautions as is," and closed entire plants while the company's "cautions continued without amendment." 377 F.3d at 734. The Seventh Circuit found that the PSLRA did not bar the misstatements because the company "omitted important variables from the

---

[10] Elsewhere (but absent from their discussion of the PSLRA safe-harbor), Defendants reference pre-Class Period disclosures that (i) the redeterminations process had recommenced, (ii) Elevance had "experienced a decline in [its] Medicaid membership," (iii) the process to re-enroll disenrolled members was "elongated," and (iv) Defendants expected the Medicaid business to "normaliz[e]" in 2024. DB at 6-8. Even if the Court were to consider these statements (which it should not because Defendants failed to argue that it should), they do not meaningfully inoculate Defendants' misstatements. For example, Elevance's disclosure that it had experienced a decline in Medicaid membership suggests that disenrollment was purely a past issue, even though the negative impact of the redeterminations continued to resound within the Company. And such language does not warn against the risk that the members being disenrolled from Elevance's Medicaid programs were mostly low-cost members that were highly profitable to Elevance.

[11] Defendants elsewhere refer to language in 2024 1Q and 2Q Form 10-Qs regarding the potential risks of a delay between Elevance changing annual premium rates and governmental approval of those changes (*see* ECF Nos. 62-10 at 3, 62-11 at 3), however Plaintiff does not allege that a delay was the reason for falsity.

cautionary language and so made projections more certain than its internal estimates at the time warranted." *Id.* Like in *Asher*, Defendants recycled the same cautionary language for **years** and failed to update it to warn of the new, tangible obstacles facing Elevance during the Class Period.

Furthermore, Defendants' purported warnings spoke "entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021). Indeed, Defendants never warned that Elevance **was already experiencing** exploding costs not accounted for in its guidance and rate premiums. On the contrary, they expressly assured investors that such risks **had not** materialized. *See, e.g.*, ¶¶96 (there was "**nothing outside of the bounds of what we expected and guided for**" with respect to acuity), 112 (rates were "**actuarially sound**" in light of "**acuity and the mix**"). Instead, Defendants made boilerplate warnings about hypothetical risks to the Medicaid business, and the non-controversial and uncontested fact that Medicaid membership was inflated during the moratorium and would decrease thanks to redeterminations. *See, e.g.*, ECF Nos. 62-4 at 7 ("**If** we fail to appropriately predict, price for and manage costs, the profitability of our products and services **could** decline"), *id.* (factors including contract rates "**may** cause actual costs" to increase), 62-10 at 3 (identifying "drivers of medical cost trends that **can** cause variance from our estimates"). These are not meaningful cautionary statements because they are "akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *Shah*, 348 F. Supp. 3d at 842. Further, Defendants spoke of "purely hypothetical" risks when in fact the risks "had already transpired." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023), *dismissing certiorari as improvidently granted*, 604 U.S. 4 (2024).

Defendants' authorities are inapposite. *National Elevator Industry Pension Fund v.*

16

*Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022) actually supports Plaintiff's position—the district court (whose decision the Seventh Circuit affirmed) found that it could not "conclude on the pleadings that these cautionary statements were meaningful enough to shield accompanying forward-looking statements from liability" because the "statements are not specifically tailored to the company's business, but instead simply warn of general risks applicable to any business." *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 657 (N.D. Ill. 2020). Similarly, in *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, the district court dismissed the plaintiffs' first amended complaint on scienter grounds, and the Seventh Circuit noted that "the fact that a prediction *may* prove untrue does not justify representing as true a prediction that one knows, to a reasonable certainty, is false." 711 F.3d 754, 759 (7th Cir. 2013) (emphasis in original). *Boeing* did not stand for the proposition that any statement containing a prediction is insulated from liability under the safe harbor without further qualification. *Contra* DB at 17.[12]

   ***Actual Knowledge***. To avoid repetition, facts showing Defendants' actual knowledge are detailed below in the section addressing scienter. *See* Section III.B.1, *infra*. However, allegations of actual knowledge for falsity purposes are subject to the lenient "plausibility" standard. *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 880 (N.D. Cal. 2023) (citing *Glazer*, 63 F.4th at 766).

> **3.    Defendants' False And Misleading Statements Are Not Opinion Statements Or Are Actionable Opinions Under *Omnicare***

---

[12] Additionally, neither of the two *Wade v. WellPoint, Inc.* opinions cited by Defendants relied on a finding that the alleged misstatements had been accompanied by meaningful cautionary language. *See* 740 F. Supp. 2d 994, 1012 (S.D. Ind. 2010) (noting that the court "need not reach" the question of cautionary language); 892 F. Supp. 2d 1102, 1126 (S.D. Ind. 2012) (addressing defendants' arguments regarding scienter and loss causation). Defendants' remaining cases are distinguishable on their facts. *See Water Island Event-Driven Fund, LLC v. Tribune Media Co.* 39 F.4th 402, 406 (7th Cir. 2022) (alleged misstatements exclusively concerning anticipated future merger, cautionary language warning of precise risks that could delay or prevent the merger); *Elanco*, 2022 WL 3445173, at *8, 20 (defendants added new cautionary language during the class period warning of precise risks responsive to alleged misstatements).

Under *Omnicare* and Seventh Circuit law, an opinion is actionable where (i) "the speaker did not hold the belief professed," (ii) it "contain[s] supporting facts which were untrue," *or* (iii) it omits "material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement itself." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *9 (N.D. Ill. Apr. 18, 2022) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).

Many of the statements that Defendants contend are opinions contain no language that qualify them as statements of opinion.[13] *Compare* DB at 19, *with* ¶¶107 ("our Medicaid business is ***actually tracking*** very much in line with our expectations."), 112 ("[W]e have visibility into ***75% of our Medicaid premiums***…. ***They're actuarially sound***."), 152 (Elevance is "***closely monitoring*** acuity and cost trends, notably in Medicaid and are ***working collaboratively*** with states to ***ensure rates remain actuarially sound***"). Each of these statements "expresses certainty about a thing," and is therefore a statement of fact. *Omnicare*, 575 U.S. at 183.

The remaining statements Defendants claim are inactionable opinions contain embedded false facts that fall under the *Omnicare* exception. For instance, statements that Defendants "fully expect our rates to remain actuarially sound" (¶101) and were "very comfortable with what we are seeing" regarding "actuarially sound rates" (¶118) assert that Elevance's rates were in fact actuarially sound (when they were not). Likewise, Boudreaux's assertion that "we also feel very good that we're executing on the guidance[,]" (¶123), embeds an assertion that Elevance was actually meeting its guidance for Medicaid, which it was not.[14] Even if these statements did not

---

[13] Defendants also cite to a number of paragraphs that do not contain any alleged misstatements at all. *See* DB at 19 (citing to ¶¶138, 145, 148, 153, 155, 159).

[14] This case therefore differs from *Elanco*, which involved statements that did not include any embedded false facts. 2023 WL 6295487, at *17 n.9 (addressing pure opinion statements that defendants "feel very good" about nebulous topics such as "underlying demand," "the fundamentals of Elanco's business," "market shares, underlying fundamentals of the market[,] and growth").

contain false factual assertions, the Complaint sufficiently alleges that Defendants had actual knowledge that their rates were in fact not actuarially sound, *see* Section III.B.1, *infra*, and they therefore did not hold the honest belief that their rates would be actuarially sound or that Elevance was meeting its Medicaid guidance.[15] Thus, Defendants' statements are actionable.

Finally, Defendants' statements that they were monitoring the acuity shift and saw "nothing outside of the bounds of what we expected and guided for" (¶¶96, 99, 107, 112-118) also are actionable. A reasonable investor would have understood Defendants to have inquired into or known of current and accurate data showing the acuity, utilization, and cost of insuring its Medicaid members. But FEs reported that Elevance's Medicaid data reporting was incapable of tracking those metrics and suffered from months' long delays. *See infra* § III.B.1.

### 4.    Defendants' Misleading Statements Are Not Puffery

Although "[s]tatements that are vague or non-specific 'puffery' are generally not actionable under Rule 10b-5[,] . . . [t]his rule, . . . is not limitless." *Seeks*, 752 F. Supp. 3d at 1016. Whether a statement is actionable or simple puffery must be considered in "the context in which the statement was made" and a court must "look to the significance the reasonable investor would place on the withheld or misrepresented information." *Id.* (internal quotations and citation omitted). The *Seeks* court found that statements such as "the 737 MAX is safe" and "the 737 MAX is a safe airplane" were actionably false because "the context in which the statements were made conveys sufficient facts about how Boeing came to its conclusions such that they could be material." *Id.* at 1017. Just as investors in *Seeks* "might have been looking to Boeing to affirm that the 737 MAX was a safe plane" (*id.*), Elevance investors looked to Defendants to affirm that

---

[15] *Vallabhaneni v. Endocyte, Inc.* is therefore inapposite, as that court found the alleged statements to be inactionable not because they were statements of opinion, but because of the failure to plead facts to support the allegation that the defendants had knowledge of contrary facts. 2016 WL 51260, at *15–16 (S.D. Ind. Jan. 4, 2016).

earnings would not be negatively impacted by redeterminations. *See*, *e.g.*, ¶¶40, 42-45, 54.

Also like *Seeks*, the statements that Defendants argue are mere puffery contained sufficient objectively verifiable facts such that reasonable investors would have relied on them, especially given the context in which the statements were made. For instance, Boudreaux told investors that "we think things are quite aligned at this point. So in terms of the acuity and the mix, everything, ***we have visibility into 75% of our Medicaid premiums***…. So overall, we feel things are lining up. ***They're actuarially sound*.**" ¶112. Whether or not Elevance's Medicaid premiums were "actuarially sound" is an objective metric and term of art in the insurance industry that reasonable investors would have relied on. The same is true for other statements that Defendants say are mere puffery.[16] *Compare* DB at 20, *with* ¶121 (Elevance had "increased our guidance for adjusted earnings per share by $0.10 to be greater than $37.20.") *and* ¶123 (the Company had "confidence to be able to raise our full-year guidance to greater than $37.20, which equates to a little bit more than a 12% growth rate" and was "very confident in the adjusted EPS guidance that we shared with you and very confident in the medical cost ratio").[17]

**B.    The Complaint Alleges A Strong Inference Of Scienter**

A complaint pleads scienter by alleging facts that "constitute strong circumstantial evidence of conscious misbehavior ***or*** recklessness." *Hedick v. Kraft Heinz Co.*, 2021 WL

---

[16] Defendants broadly argue that several other statements are inactionable puffery but neither quote nor substantively address those statements. Regardless, those statements also conveyed sufficient facts about how Defendants reached their conclusions, thereby rendering the statements actionable. *See* ¶¶125 ("We have prudently maintained our full-year outlook."), 127 (Defendants "reaffirmed our full-year adjusted diluted earnings per share guidance of at least $37.20 which represents 12% growth year-over-year."), 152 (referring to misstatements alleged in earlier paragraphs, including ¶127, which is addressed *supra*, and ¶99, where Kaye stated that Defendants "expect to achieve our full year adjusted diluted earnings per share guidance of at least $37.20").

[17] None of Defendants' cited cases concern statements that were "subject to objective verification," like Elevance's statements here. *E.g., Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (involving statements that the company was "recession-resistant" and "would maintain a 'high' level of disposition gains"); *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 741 (7th Cir. 1997) (discussing statements that "the bidding process continues to go very well" and "very smoothly"); *Gaines v. Guidant Corp.*, 2004 WL 2538374, at *18 n.46 (S.D. Ind. Nov. 8, 2004) (new drug was "a quantum leap in the treatment of AAA" and "the best-in-class treatment").

3566602, at *11 (N.D. Ill. Aug. 11, 2021). The standard is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007) ("*Tellabs II*"). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" and need only be "cogent and at least as compelling as any opposing inference." *Id*. at 324. Thus, a tie between inferences is resolved in favor of Plaintiff. Courts must "constantly assum[e] … plaintiff's allegations to be true." *Id.* at 326-27. Motive allegations strengthen the inference but their absence "is not fatal." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *11 (N.D. Ill. Oct. 30, 2012).

Defendants challenge Plaintiff's scienter allegations by mischaracterizing the Complaint as alleging two separate and distinct theories of scienter: insider sales and actual knowledge. This strawman argument ignores that Defendants' insider sales and the facts showing their knowledge or recklessness are components of one cohesive theory of scienter. Courts regularly reject attempts by defendants to "isolate the pleadings" concerning scienter. *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *11 (N.D. Ill. Apr. 21, 2021); *Moak v. Roszak*, 2006 WL 2413698, at *5 n.4 (N.D. Ill. Aug. 17, 2006) (motive and opportunity strengthen the scienter inference); *Gimpel v. Hain Celestial Grp., Inc.*, 156 F.4th 121, 145-46 (2d Cir. 2025) (where "[p]laintiffs' motive allegations weigh in favor of scienter, the circumstantial evidence need not be as great").

### 1.      Defendants Spoke With Actual Knowledge Or Recklessness

Defendants knew or recklessly disregarded that the redetermination process had already caused Elevance's Medicaid expenses to explode. They also knew that this materially negatively impacted the financial health of the Company and was not counteracted by rates or accounted for in their financial guidance. Indeed, FE-3 reported that Boudreaux was so concerned about the adverse impact of the redetermination process that she concocted a "soft-landing strategy." ¶59. This establishes Boudreaux's direct knowledge. *See Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972

21

(S.D. Ind. 2007) (scienter found "where the defendants either knew or had access to information showing that their public statements were not accurate.").

Defendants also knew or recklessly disregarded that Elevance was losing many more Medicaid members than previously anticipated. FE-5 recounted a monthly meeting in early 2024 where it was discussed that many more people were disenrolled than the Company had planned for, and FE-8 reported that redeterminations caused Elevance to lose half of its market share. ¶¶62, 65. Other FEs noted the contradiction between Defendants' public statements and their internal statements. For example, FE-4 reported that Boudreaux informed employees at an internal meeting on February 28, 2024, that the Company was losing many more people from Medicaid than expected (¶61)—but noted that Kaye's assurance to investors shortly thereafter that the Medicaid business was performing well contradicted Boudreaux's internal, non-public statements. *Id.*; ¶109(b) (stating that "Medicaid continues to normalize … and it is performing as expected").

Defendants also knew or recklessly disregarded severe deficiencies in Elevance's Medicaid data, including that the data used for rate negotiations with states and Elevance's financial guidance did not reflect the impact of the acuity shift and exploding Medicaid costs—contrary to their representations to investors. For example, FE-9 recounted that Elevance executives attended a meeting in August 2023—which FE-9 personally led—regarding an investigation into the inaccurate data Elevance had been providing to the states. ¶71. FE-4 reported that Defendants could not properly report member-level Medicaid payment data because Elevance's data "lumped together" direct provider payments. ¶75. FE-6 revealed that Elevance's Medicaid data that tracked utilization and costs suffered from ***eight-month delays*** and that this lag caused inaccuracies in revenue reporting and claims payments. ¶77. FE-6 further reported instances where employees reviewed members' cost profiles only to realize those "members" ***were no longer enrolled*** in any

Medicaid plan. *Id*. FEs consistently report that employees raised these data issues to Elevance's leadership—which indisputably included Defendants—and were promptly fired in response. ¶¶80-83.

Defendants also knew or recklessly disregarded that redeterminations caused the acuity mix of Elevance's Medicaid membership to shift significantly, resulting in a spike in Elevance's MLR (benefits expense ratio). FEs reported that it was well known within the Company that the members lost were not using their benefits at all, and that losing these low-cost members left the Company with a greater proportion of high-cost members. ¶61. FE-2 recounted meetings with Greg Thompson, who reported directly to Boudreaux and Kaye, where Elevance's rising MLR was attributed to the exploding costs caused by redeterminations. ¶¶56-57. FE-6 explained that Defendants internally expected that Elevance would lose more healthy, low acuity members when redeterminations re-started. ¶63. Indeed, FE-7 explained that once redeterminations began again, member utilization (and costs) increased substantially. ¶64.

***Defendants' Arguments Fail***. Defendants' scienter challenges are meritless. ***First***, Defendants argue that former employee allegations are necessarily disfavored. DB at 26. Not so. Courts in the Seventh Circuit routinely credit allegations from former employees when complaints provide sufficient corroborating details that the witnesses "have actual knowledge of, or access to, the information underlying their statements." *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("*Tellabs I*"), *overruled on other grounds by Tellabs II,* 551 U.S. at 314 (former employee allegations must merely "support the probability that a person in the position occupied by the source would possess the information alleged"). Indeed, "the Seventh Circuit clarified that ... the detail of the allegations, numerosity of sources, corroboration, and whether the sources are 'persons who from the description of their jobs were in a position to know

23

at first hand the facts to which they are prepared to testify'" are the factors that determine the weight that should be afforded to former employees' statements. *Phoenix Ins. Co. v. ATI Phys. Therapy, Inc.*, 690 F. Supp. 3d 862, 889-90 (N.D. Ill. 2023). Here, the Complaint specifies each FE's job title, duties, dates of employment, and the bases for their knowledge. ¶¶56-83. And the multiple FE accounts are consistent with each other and are thus mutually corroborating. *Tellabs III*, 513 F.3d at 711 (scienter corroborated by multiple witnesses).

***Second***, Defendants grossly mischaracterize the FE reports as having alleged "no more than what Elevance itself told the market." DB at 27. Defendants' claim simply disregards the FE reports about internal meetings, Defendants' contradictory public versus internal messages, and retaliation against employees who raised issues with Elevance's Medicaid data. ¶¶58-63, 80-83, 134. *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551-52 (S.D.N.Y. 2017) (improper "tone at the top" of the company supports strong inference of scienter).

***Third***, Defendants' cursory efforts to undermine the substance of the FE reports fail. DB at 26-29. Defendants rely on cherry-picked excerpts of the Complaint and ignore the detailed statements each FE provided and the specific facts identifying the bases for their knowledge.[18] For example:

- FE-1 did not merely speculate as to "common knowledge" within Elevance but rather made observations based on ***her own*** work "with Medicaid members in regions six and seven in Colorado." ¶39. This account is based on her direct, firsthand experience within Elevance. *Contra* DB at 27.

- FE-3, 4, and 5 reported what Defendants and other Elevance executives said during internal meetings they personally ***attended***. These reports are unrelated to their work responsibilities. ¶¶58-62. Defendants do not and cannot argue otherwise. *See* DB at 28.

- FE-6, a Senior Director of Population Health Strategy at Elevance from October 2017 to November 2024 working on "Value Based Programs," including those with Medicaid components, recounted in detail the precise flaws in the Medicaid reporting

---

[18] Defendants do not dispute the bases for, or veracity of, the well-pled statements of FE-13 and FE-14.

data that she uncovered (eight-month delays), why that limited insight into cost trends (because Defendants "continued to make projections based off of [that data]"), who knew about it (Bryony Winn, former President of Health Solutions and current president of Carelon Health), and the retaliation that happened when her boss escalated the issues (he was fired). ¶¶63, 72, 77, 81-82. That FE-6 did not provide exact dates and times of meetings does not render her account of the data flaws unreliable. *Contra* DB at 28.

- FE-7 was a Director of Medicaid & Dual Eligible Growth Strategy and thus had first-hand knowledge that the corporate finance team tracked redeterminations. ¶¶64, 66; *contra* DB at 28.

- FE-9 ***led*** the "three-day meeting where Elevance executives flew in from across the country to discuss the inaccurate data that Elevance had been providing to the states"—a quintessential example of ***direct experience***. ¶71; *contra* DB at 28.

- FE-10's "responsibilities included responding to complaints from providers and on claim rejection challenges," where she personally observed instances of Elevance's late payments in the course of her job responsibilities. ¶73; *contra* DB at 28.[19]

***Finally***, Defendants assert that the FEs were not alleged to have "worked with, reported to, or interacted with any of the Individual Defendants," or do not demonstrate that Defendants "knew or believed ... that the Adjusted EPS forecast could not be achieved." DB at 29. That is factually incorrect and inconsistent with the law. Multiple FEs, including FE-3, 4, and 5, reported personally attending meetings with Defendants, including where Boudreaux told employees about the massive loss of Medicaid members and Elevance's "back stop" strategy to recoup losses from redeterminations. ¶¶58, 61, 62. Allegations supported by witnesses' reports need only be pled with sufficient detail to determine the FE's own knowledge of the facts they reported. *Tellabs I,* 437 F.3d at 596. Here, the allegations are consistent and corroborate that Defendants knew, or were at least reckless in not knowing, that their statements to investors were misleading. *Id.*

---

[19] Defendants dismiss FE-11's report that Elevance's Medicaid data incorrectly demonstrated 3-day turnaround times when, in reality, the turnaround time was 33-days, as a mere "typographical error in a single report." DB at 28. But FE-11 recounted identifying "a large data error" impacting multiple reports—that she tried to correct by raising to her supervisor (who was then fired after raising it to his supervisor)—causing them to "falsely reflect[] claims being processed that had not yet been processed," which "impacted the Company's visibility into cost trends." ¶79. At best, Defendants raise a factual dispute which is not appropriate for dismissal at the pleadings stage. *See, e.g.*, *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1022 (N.D. Ill. 2010).

## 2.     The Core Operations Doctrine Further Supports Scienter

"Officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 974 (S.D. Ind. 2007). Elevance's Medicaid business was a "core operation." As Defendants admit, Medicaid was 33% of the Company's revenue. DB at 29 n.16. And, as was revealed when Defendants admitted they completely missed their EPS guidance, the redeterminations process materially impacted Elevance's Medicaid business and the entire Company's 2024 financial performance. ¶¶91, 153, 156. Allegations that the misrepresentations concerned a core operation further strengthen the strong inference of scienter.

Defendants assert in a footnote that Medicaid is "not Elevance's core operation" (DB at 29 n.16) but cite no authority for the proposition that a Company can have only one "core operation," or that the scienter inference is only strengthened where the relevant business sector made up most or all of a Company's revenue. The strong inference of scienter is supported by the fact that Medicaid: (i) made up a significant part of Elevance's revenue, (ii) was discussed at length on every Class Period earnings call, (iii) drove increased operating revenue for Elevance during the moratorium, and (iv) ultimately caused a mass sell-off when the truth about the full impact of redeterminations and related EPS guidance miss was revealed.

Defendants' roles within the Company also strengthen the scienter inference. Defendants do not argue otherwise. Boudreaux is the CEO. ¶26. Norwood is President of Elevance's Government Health Benefits division and head of Elevance's Medicaid business. ¶27. Kaye is the CFO. ¶28. Tanal is a member of Elevance's "executive leadership team." ¶29.[20] It is thus "almost

---

[20] Tanal was responsible for "investor relations programs that support the company's growth strategies." ¶29. That he was responsible for Elevance's growth and spoke about EPS guidance demonstrates knowledge of the anticipated cost increases that the strategies and guidance were supposed to reflect and further supports the strong inference of scienter. *Busic v. Orphazyme A/S*, 2022 WL 3299843, at *23 (N.D. Ill. Aug. 11, 2022) (scienter where executive "answered

26

inconceivable that these defendants were not aware of" the substantial issues facing the Company's Medicaid business, which made up over a full third of revenue—$56.6 billion in 2023 alone. *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at \*14 (N.D. Ill. Sept. 23, 2008) (individual defendants "were all corporate executives" and thus would be aware of operations problems).

### 3.   Defendants Had Motive To Mislead Investors

Motive allegations are not required to find a strong inference of scienter. *Tellabs II*, 551 U.S. at 325. Nevertheless, the Complaint alleges a significant financial motive to defraud investors in the form of highly unusual insider stock sales, which powerfully enhances the scienter inference here. Boudreaux and Norwood both made large sales of Elevance stock during the Class Period that were suspicious in timing and amount and were unprecedented. Boudreaux and Norwood—who sold *zero* shares of the Company pre-Class Period—arranged for large stock sales within days of the false statements on April 18, 2024. ¶¶86, 139-40, 144-45. Boudreaux sold 21% of her holdings for $17 million just days after Defendants were forced to disclose increased utilization in Medicaid membership, but surprisingly simultaneously maintained the full-year outlook and told investors that such outlook already took increased utilization into account. ¶¶85, 138-42. Five days after the start of the Class Period, Norwood sold roughly 45% of the shares she then held for $9 million. ¶146.

Defendants' challenges to Plaintiff's motive allegations fail. ***First***, Defendants argue that the insider sales were not suspicious because, after adding in unexercised stock options (but ignoring the massive tax implications of those options), Boudreaux and Norwood retained 79% and 70% of their holdings. DB at 21-22, 24. This is wrong. Sales of smaller percentages of total holdings can be suspicious and supportive of scienter. *See Fryman v. Atlas Fin. Holdings, Inc.*,

---

questions about the clinical trial data [which] further suggests that he was knowledgeable about and paying close attention to the data and its reception by the FDA").

2022 WL 1136577, at *29-30 (N.D. Ill. Apr. 18, 2022) (sales of 10% and 24-26% of holdings suspicious).[21]

***Second***, Defendants argue that Boudreaux's sales were innocent because they were made pursuant to a 10b5-1 plan. DB at 22-23. This is wrong because Defendants ignore that the 10b5-1 plan was entered into on April 19, 2024, ***one day after the first false statement that started the Class Period*** and, thus, does not present a legitimate defense to the insider selling. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ("Trading plans are not a cognizable defense to scienter allegations on a motion to dismiss where, as here, they were adopted during the Class Period."); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 944 (N.D. Ill. 2015) (giving "no weight" to defendants' reliance on plan entered into during the class period).

***Third***, Defendants assert that sales that take place some months before corrective disclosures are *per se* innocuous. DB at 23-24. This is also wrong. Sales months before corrective disclosures are suspicious when defendants were aware of bad, undisclosed news at the time. *See Atlas Fin. Holdings*, 2022 WL 1136577, at *29 (suspicious sales four months before corrective disclosure); *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *5 (N.D. Ill. Feb. 27, 2018) (suspicious sales two months and eight months before disclosures).[22]

---

[21] Defendants' cases are inapposite. In *Endocyte*, the court found that the plaintiff did not allege "sufficient facts to suggest that the stock sale by only one of Endocyte's officers was 'unusual.'" 2016 WL 51260, (S.D. Ind. Jan. 4, 2016). Here, Lead Plaintiff alleged that neither Boudreaux nor Norwood ***ever*** sold Elevance shares before, and that each earned 40 to 80 times more than the defendant in *Endocyte*. In *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, the plaintiff failed to "provide[] information about the individual defendants' other holdings," and the sales were spread out over 13 months. 388 F. Supp. 2d 932, 951 (S.D. Ind. 2005); *see also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1057 (N.D. Cal. 2018) (sales consistent with prior trading patterns and made pursuant to 10b5-1 plan established one year prior to the fraud); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (sales mostly made outside of class period and were consistent with prior trading patterns); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (sales made prior to key alleged misstatements).

[22] Defendants' cases are inapposite. *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 233-41 (S.D.N.Y. 2020) (no "allegations demonstrating … knowledge as to any fraud" when 10b5-1 plan enacted); *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 523-30 (S.D.N.Y. 2020) (one insider's stock sale proceeds only $1.6 million; the other insider "engaged in similar trading well prior to" class period sale); *In re Take-Two Interactive Sec. Litig*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (sales three months after the false statement); *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 940 (7th Cir. 2018) (sales made 14 and 23 months before the corrective disclosures).

*Fourth*, Defendants attempt to immunize Norwood's sales because she sold at prices about 5% lower than the Class Period high for the stock. DB at 24-25. This is irrelevant. "The fact that [the individual defendant] failed to maximize his profits by perfectly timing his stock sales does nothing to undercut plaintiff's claim of insider selling." *Allstate Corp.*, 2018 WL 1071442, at *5.[23]

*Finally*, Defendants argue that because not all of the Individual Defendants sold shares during the Class Period, the other Individual Defendants could not have had the motive to mislead investors. DB at 25. But courts routinely reject this argument and find scienter even where some defendants sold and some did not. *See, e.g.*, *Allstate Corp.*, 2018 WL 1071442, at *5 (finding scienter for non-selling defendant that was alleged to have knowledge of undisclosed plan).[24]

### C.    Defendants' Proffered Scienter Theory Is Not Credible

Defendants maintain that they used their "best judgement" by adjusting guidance upwards when "performance exceeded estimates" and adjusting downward when "performance fell short of estimates." DB at 30. This is contrary to Plaintiff's allegations (which must be accepted as true) and facially implausible. Defendants gave more than just rosy financial guidance—they asserted that their guidance incorporated cost and acuity shifts caused by the redeterminations. ¶¶120-28. Defendants knew that rate negotiations could not counteract the cost increases, but misled

---

[23] Defendants' cases involve much larger deltas between the sale price and the highest stock price. *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (approximately 26% delta); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094 (9th Cir. 2002) (approximately 44% delta); *see also Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 154-55 (D. Conn. 2007) (sales nearly at the stock's *lowest* price in a 15-trading day period).

[24] Plaintiff also alleges that Boudreaux, Norwood, and Kaye were further incentivized to mislead investors and maintain Elevance's artificially inflated stock price because their compensation was heavily weighted towards stock options, restricted stock units, and performance-based restricted stock units. ¶¶41, 147. Defendants dismiss such allegations as "generic motives held by all corporate officers and directors." DB at 25 n.15. But unlike the allegations in *Plumbers & Pipefitters Local Union v. Zimmer*, 673 F.Supp.2d 718, 747 (S.D. Ind. 2009), where defendants' salaries were tied to the company's performance, Plaintiff here alleged that Defendants were compensated in mostly stock-based incentives—the very same stock that was artificially inflated by Defendants' misstatements. *See* ¶¶94-128, 148. Furthermore, *Higginbotham* is distinguishable because the insider selling there was consistent with prior selling, *see* 495 F.3d at 759 (insiders regularly sold shares "during the average month" and holding that the period when insiders sold "was not an unusual period for managerial sales"), whereas Boudreaux and Norwood had never before engaged in any insider selling despite many years at the Company (and stopped selling after close of the Class Period).

investors while aggressively pushing their "backstop" strategy to stem losses. ¶¶58-59, 132. Meanwhile, Boudreaux and Norwood pocketed millions from insider sales suspiciously timed to profit from Elevance's artificially inflated stock price. ¶¶6, 41, 137-47. Defendants' effort to blame COVID also fails because the alleged fraud occurred after COVID ended and, further, Defendants claimed they had already accounted for the post-COVID redetermination trends in their guidance.

Even taking Defendants at their word, it was at the very least severely reckless to base Elevance's *future guidance* solely on its *past performance*. Defendants could not simply rely on their past good performance and assume that would continue when they knew Medicaid costs were exploding and their guidance and rate negotiations relied on severely outdated and defective Medicaid data. ¶¶8, 46, 151. The more plausible inference is that they knew they could not continue to ride the wave of low acuity, low utilization, and low costs from the moratorium, but wanted to keep investors confident in Elevance's performance while its competitors disclosed the anticipated impact of redeterminations and experienced downswings.[25]

## IV.    CONCLUSION

Plaintiff respectfully requests that the Motion be denied in full (or leave to replead).

Dated: December 18, 2025

<div style="margin-left: 40%;">

**WILLIAMS LAW GROUP, LLC**

*/s/ Joseph N. Williams*
Joseph N. Williams
1101 North Delaware Street
Indianapolis, IN 46202
Tel.: 317-633-5270
joe@williamsgroup.law

*Local Counsel for Lead Plaintiff*
*Achmea/Blue Sky*

</div>

---

[25] Defendants' only basis for challenging Plaintiff's §20(a) control person claim is their incorrect assertion that the predicate §10(b) claim is not adequately pled. DB at 30. Defendants are wrong for all the reasons set forth above.

**GRANT & EISENHOFER P.A.**
Karin E. Fisch (*pro hac vice*)
James S. Notis (*pro hac vice*)
Lauren J. Salamon (*pro hac vice*)
Timothy Clark B. Dauz (*pro hac vice*)
485 Lexington Avenue
New York, NY 10017
Tel.: 646-722-8500
kfisch@gelaw.com
jnotis@gelaw.com
lsalamon@gelaw.com
tdauz@gelaw.com

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano (*pro hac vice*)
Jeremy Robinson (*pro hac vice*)
Thomas Sperber (*pro hac vice*)
Kelly Hogan (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Tel.: 212-544-1400
salvatore@blbglaw.com
jeremy.robinson@blbglaw.com
thomas.sperber@blbglaw.com
kelly.hogan@blbglaw.com

*Lead Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 18, 2025 I presented the forgoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all of the parties.

*/s/ Joseph N. Williams*