UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ERIC MILLER on behalf of himself and all others similarly situated, STICHTING JURIDISCH EIGENAAR ACHMEA IM LIQUID ASSET FUNDS Lead Plaintiff, STICHTING BEWAARDER ACHMEA BELEGGINGSPOOLS Lead Plaintiff, STICHTING BEWAARDER SYNTRUS ACHMEA BELEGGINGSPOOLS Lead Plaintiff, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:25-cv-00923-JRS-MJD |
| ELEVANCE HEALTH, INC., GAIL K. BOUDREAUX, FELICIA F. NORWOOD, MARK B. KAYE, STEPHEN V. TANAL, | ) | |
| Defendants. | ) | |

**Order on Defendants' Motion to Dismiss**

In their Second Amended Complaint, (ECF No. 60), Plaintiffs Eric Miller and others who acquired common stock in Elevance Health, Inc. ("Elevance" or the "Company") between April 18, 2024, and October 16, 2024 (the "Class Period") have sued the Company and four senior executives for securities fraud. Plaintiffs accuse the Company as well as Gail Boudreaux, Felicia Norwood, Mark Kaye, and Stephen Tanal (the "Individual Defendants") of violating Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) & 78(t)(a), by issuing

false and misleading statements to investors regarding the financial health of the Company and its Medicaid business. Plaintiffs also accuse the Individual Defendants of violating Section 20(a) of the Exchange Act.

Invoking the heightened pleading standards of both Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1955 ("PSLRA"), 15 U.S.C. § 78u-4(b), Defendants have moved to dismiss the Second Amended Complaint ("Amended Complaint"). (ECF No. 61.) For the reasons explained below, the Court finds that Plaintiffs have adequately alleged material misrepresentation or omission, as well as scienter. Accordingly, Defendants' Motion to Dismiss, (ECF No. 61), is **denied**.

## I. Factual Background

Elevance is a for-profit, publicly traded provider of health insurance plans, including plans for government-operated Medicaid and Medicare programs. (Am. Compl. ¶ 25, ECF No. 60.) As part of its Medicaid business, Elevance contracts with state governments to provide health services to eligible Medicaid beneficiaries, who are generally patients with limited income. (*Id.* ¶ 3.) State governments pay Elevance a fixed rate for each Medicaid member. (*Id.*) Elevance, in turn, pays network providers for the health services provided to Medicaid members. (*Id.*) Thus, Elevance's cost of providing medical benefits to its Medicaid members is determined by the level of care each patient requires, which is referred to as "acuity," or "utilization." (*Id.*) Elevance's profit margin in its Medicaid business is determined

by the fixed rate per Medicaid member (paid by state governments), minus the costs Elevance pays to provide care for those members. (*Id.*)

The Individual Defendants are senior executives at Elevance. Gail Boudreaux has served as the Company's President and Chief Executive Officer ("CEO") since 2017. (*Id.* ¶ 26.) Felecia Norwood has been the Company's Executive Vice President and President of the Government Health Benefits division since 2018. (*Id.* ¶ 27.) Mark Kaye has served as Elevance's Executive Vice President and Chief Financial Officer ("CFO") since 2023. (*Id.* ¶ 28.) Stephen Tanal was the Company's Vice President, Investor Relations from 2021 to 2024, and has served as CFO of the Government Health Benefits division since February 2025. (*Id.* ¶ 29.)

Before 2020, each state would annually assess the Medicaid eligibility of its constituents and disenroll members who were no longer eligible, which is referred to as the "redetermination" process. (*Id.* ¶ 4.) During the COVID-19 pandemic, the federal government issued a moratorium on states disenrolling members through redeterminations. (*Id.*) As a result, members who lost eligibility remained on the Medicaid rolls, allowing Elevance to continue receiving fixed monthly payments from states for those members, even though many of those members incurred little or no costs for Elevance because they were healthier or had obtained employment-based private insurance. (*Id.*) This resulted in a "windfall" to Elevance, which was extremely profitable while redeterminations were paused, and its stock price surged as a result. (*Id.* ¶¶ 4–5.)

Congress passed legislation directing states to resume the redetermination process beginning on April 1, 2023. (*Id.* ¶ 7.) These redeterminations removed generally healthier and employed people from the Medicaid rolls and shifted the Medicaid membership towards higher acuity and utilization patients, resulting in higher costs for Elevance. (*Id.*)

During the Class Period, Defendants assured investors that Elevance's Medicaid business was performing well, that they had already accounted for rising Medicaid costs in their guidance to investors, and investors could continue to expect double-digit growth in Elevance's earnings. (*Id.* ¶ 50.) During the first quarter ("Q1") earnings call on April 18, 2024, the first day of the Class Period, Gail Boudreaux told investors that Elevance was increasing its earnings per share ("Adjusted EPS") guidance to "greater than $37.20", which represented a double-digit increase from the prior year. (*Id.* ¶ 51.) Defendants also downplayed the significance of the redetermination process on Elevance's Medicaid business, telling investors that their financial guidance and rate negotiations already accounted for the increased costs due to redeterminations. (*Id.* ¶ 52.) On the Q1 earnings call, Felecia Norwood and Mark Kaye told investors that the Company's Medicaid business was "tracking very much in line with our expectations," and "90% of our members have had their eligibility redetermined." (*Id.*) Norwood stated, "in terms of where we are today, with respect to the acuity and mix of membership, the acuity is in line with what we expected." (*Id.*)

Boudreaux, Kaye, and Norwood led a second quarter ("Q2") 2024 earnings call on July 17, 2024. (*Id.* ¶ 98.) During the call, Kaye told investors that the Company was "working collaboratively with states to ensure rates remain actuarially sound."[1] (*Id.* ¶ 99(a).) Kaye acknowledged that the Company expected Medicaid utilization to increase during the second half of 2024, but told investors that "the full year outlook does allow for both this shift in acuity and increased utilization." (*Id.* ¶ 99(b).) Boudreaux told investors that "nearly all of our members have had their eligibility redetermined." (*Id.* ¶ 127.)

Twelve anonymous former employees ("FE"s) reported that, during the Class Period, the Defendants were closely tracking redeterminations and were aware that Medicaid costs were significantly increasing, and that Elevance's Medicaid membership tracking data was riddled with errors. (*Id.* ¶¶ 56–83.) For instance, FE-4 reported that Boudreaux's public statements that the Company's Medicaid business was performing well and nearly all members had their eligibility redetermined were contradicted by private statements during a February 2024 internal meeting where she informed employees that the Company was losing many more people from its Medicaid rolls than expected. (*Id.* ¶ 61.)

During the Class Period on July 22, 2024, Boudreaux sold 34,000 shares of Elevance stock—over 21% of her total owned shares—at prices between $498.50 and $504.27 per share, generating over $17 million in proceeds. (*Id.* ¶ 85.) Norwood sold

[1] According to Plaintiffs, "actuarially sound" is a "term of art in the insurance industry meaning that the fixed rates would cover the costs incurred by insured individuals." (Pls.' Opp'n 6, ECF No. 65.) Defendants do not dispute this definition.

over 20,000 shares on April 23, 2024, and April 24, 2024, at prices between $532.68 and $534.74, generating over $10.8 million in proceeds. (*Id.* ¶ 86.) Boudreaux and Norwood never sold Elevance stock holdings prior to the Class Period, except for tax purposes, and have not sold Elevance stock since the Class Period ended. (*Id.* ¶¶ 85–87.)

During Elevance's Q2 earnings call on July 17, 2024, Boudreaux announced that "[a]s a result of redeterminations, our Medicaid membership mix has shifted, resulting in increased acuity." (*Id.* ¶ 88.) Despite this, Defendants reiterated their Adjusted EPS guidance of "at least $37.20." (*Id.* ¶ 89.) However, on October 17, 2024, during Elevance's third quarter 2024 earnings call, Boudreaux announced that "third quarter adjusted diluted earnings per share w[as] $8.37, which was below our expectations, primarily due to elevated medical costs in our Medicaid business." (*Id.* ¶ 91.) After this disclosure, Elevance's stock price fell significantly. (*Id.* ¶ 93.)

**II. Legal Standard**

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the Amended Complaint. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 n.4 (7th Cir. 2012). The Court accepts well pleaded facts as true and draws all inferences in Plaintiffs' favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). In evaluating scienter, however, the Court must also consider plausible opposing inferences and determine whether the inference of scienter is "cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) ("*Tellabs II*"). The

Court will grant the motion if the factual allegations fail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Complaints alleging false or misleading statements under federal securities law are subject to heightened pleading requirements under the PSLRA. 15 U.S.C. § 78u-4(b)(1); *Back v. Dobrowski*, 559 F.3d 680, 681–82 (7th Cir. 2009). A securities fraud plaintiff must "specify each statement alleged to have been misleading," the "reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the [Amended Complaint] shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Federal Rule of Civil Procedure 9(b) also requires Plaintiffs who allege fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Section 10(b) of the Exchange Act provides that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations" as the Securities and Exchange Commission ("SEC") may prescribe. 15 U.S.C. § 78j(b). SEC Rule 10b-5 provides that, in connection with the purchase or sale of any security, "[i]t shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

To state a claim for securities fraud under Section 10(b) of the Exchange Act, Plaintiffs must allege "(1) a material misrepresentation or omission by the [D]efendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). With respect to scienter, the PSLRA requires Plaintiffs to "state with particularity [the] facts giving rise to a strong inference that [Defendants] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To qualify as "strong," the inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and at least as compelling, thus strong in light of other explanations." *Tellabs II*, 551 U.S. at 324 (2007).

## III. Analysis

Defendants raise two primary arguments in their Motion to Dismiss: First, they argue the Amended Complaint does not allege an actionable false or misleading statement. (Defs.' Br. 14–20, ECF No. 63.) Second, Defendants contend that the Amended Complaint fails to demonstrate a strong inference of scienter. (*Id.* 20–30.)

### A. The Amended Complaint sufficiently alleges that Defendants' statements were false and misleading.

To adequately plead a false or misleading statement under the PSLRA, the Amended Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the [Amended Complaint] shall state with particularity all facts on which that belief is formed." 15

U.S.C. § 78u-4(b)(1). Defendants raise several arguments as to why the Amended Complaint fails to satisfy these requirements. The Court addresses each argument in turn.

*1. The Amended Complaint alleges actionable statements that are not protected by the PSLRA safe harbor.*

Under the PSLRA, liability is subject to the safe harbor provision for forward-looking statements accompanied by meaningful cautionary language, or when a forward-looking statement is made without actual knowledge of its false or misleading nature. 15 U.S.C. § 78u-5(c)(1)(A)–(B). The safe harbor does not protect statements of present or historical fact. *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*"). Where a statement contains both forward-looking and present factual components, the forward-looking component may be protected while the present factual component is not. *Id.*

The parties agree that at least some of Defendants' challenged statements are forward-looking. They disagree, however, about the scope of the PSLRA safe harbor. Defendants contend that because the challenged statements were made in connection with Elevance's Adjusted EPS guidance, they are protected forward-looking statements. (Defs.' Br. 16, ECF No. 63.) Plaintiffs respond that several statements concern present or historical facts and other statements contain both forward-looking and present factual components. (Pls.' Opp'n 10–13, ECF No. 65.)

The Court agrees with Plaintiffs that the safe harbor does not extend categorically to every statement made in connection with a forward-looking prediction.

a. <u>The Adjusted EPS forecasts and statements concerning future expectations are protected.</u>

Elevance's Adjusted EPS forecast is plainly a forward-looking statement. The forecast projected future earnings and therefore falls within the PSLRA's definition of a forward-looking statement. *See* 15 U.S.C. § 78u-5(i)(1). The same is true of statements expressly concerning what Elevance expected or anticipated would occur during the remainder of the year, including statements regarding future Medicaid utilization, membership, margins, and earnings. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (explaining that the Exchange Act "does not demand perfection from forecasts, which are inevitably inaccurate"). These forward-looking statements therefore fall within the PSLRA safe harbor as long as they were accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).

Defendants identify several warnings concerning Elevance's Medicaid business. Elevance disclosed that the increase in Medicaid revenue and membership resulting from the COVID-19-era suspension of redeterminations was temporary. (2021 10-K 8, ECF No. 62-6; 2022 10-K 6, ECF No. 62-5.) Elevance also warned investors that the Company might not accurately predict, price for, or manage healthcare costs, (2023 10-K 7, ECF No. 62-4), that actual Medicaid costs could exceed the rates reflected in its bids, (*Id.*), and that participation in Medicaid involved risks relating to government funding, contractual requirements, and regulatory oversight, (*Id.* at 9).

Plaintiffs contend that these warnings were not meaningful because much of the language predated the Class Period, was repeated for years without material revision, and described Medicaid cost increases as hypothetical risks rather than warning that the risks had already materialized and were not reflected in Elevance's guidance. (Pls.' Opp'n 14–17.) Plaintiffs rely principally on *Asher v. Baxter International, Inc.*, 377 F.3d 727, 732–34 (7th Cir. 2004), which held that cautionary language must be tailored to the risks accompanying the particular projection and noted that warnings that remain unchanged amid changing corporate circumstances do not warrant dismissal at the pleadings stage.

*Asher*, however, does not require a company to predict the exact path or precise event that ultimately causes a projection to fail. Rather, the Seventh Circuit explained that although a firm "need not anticipate all sources of deviations," its cautionary statements must identify the principal or important risks known to management at the time of the forecast. *Id.* at 733–34. Here, Elevance's disclosures specifically identified risks associated with its Medicaid business, including the effects of the resumption in redeterminations, changes in Medicaid membership, and the possibility that the Company would fail to accurately predict, price for, and manage healthcare costs. Those warnings did more than warn generally that Elevance's business was subject to unspecified risks. They identified the particular business segment and the principal sources of risk that Plaintiffs allege ultimately caused the Company's projections to fail. *See id.* at 734 (noting the cautionary statements did not mention the major risks that the complaint alleged came to pass).

The Court therefore concludes that Elevance's cautionary disclosures were sufficient to satisfy the PSLRA safe harbor with respect to the Company's Adjusted EPS forecast and other statements that were genuinely forward-looking. However, that conclusion does not resolve the safe harbor issue for statements that represented present or historical facts.

b. <u>The statements concerning past or present facts are not protected by the safe harbor.</u>

Several of the challenged statements are not forward-looking because they purport to describe Elevance's historical performance. The PSLRA does not protect such statements merely because they were made alongside future guidance. *Tellabs III*, 513 F.3d at 705. The clearest example is Boudreaux's statement during the Q1 2024 earnings call that "[i]n the first quarter, our Medicaid business performed in line with our expectations," and "nearly 90% of our members have had their eligibility redetermined." (Am. Comp. ¶ 105.) This statement concerned a quarter that had already ended. It therefore described historical performance, not future performance, and the safe harbor does not apply.

Moreover, Plaintiffs have identified statements concerning the factors already accounted for in the Company's existing guidance. For example, Kaye stated during the Q2 earnings call that Elevance's "full year outlook does allow for both this shift in acuity and increased utilization in the second half of the year." (*Id.* ¶ 99(b).) Although this statement contained a forward-looking component regarding increased utilization, it also set forth a present factual assertion: that Elevance's existing guidance already accommodated this shift. Consequently, the claim that Elevance's

guidance accounted for future increases in acuity is a statement of present fact not entitled to safe harbor protection. *See Tellabs III*, 513 F.3d at 705 ("The element of prediction . . . does not entitle Tellabs to a safe harbor with regard to the statement's representation concerning current sales.").

Accordingly, the Court will not dismiss Plaintiffs' claims on safe harbor grounds to the extent they are based on statements representing Elevance's current or historical performance or factors that Elevance's existing guidance had already taken into account. Plaintiffs have adequately alleged that these statements were false or misleading when made. According to the Amended Complaint, Defendants knew that the data underlying their assessment of Medicaid acuity and costs were materially outdated, that redeterminations were producing a significant shift towards higher-cost members, and that the resulting increases in Medicaid costs were not reflected in Elevance's guidance. (Am. Compl. ¶¶ 56–83.) At the motion to dismiss stage, these allegations are sufficient to permit Plaintiffs to proceed past the safe harbor issue as to the present and historical statements.

*2. The challenged statements are not all protected opinions.*

Defendants argue that six of the challenged statements are inactionable opinions under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). (Defs.' Br. 19, ECF No. 63.) Plaintiffs respond that some of the statements contain embedded factual representations. (Pls.' Opp'n 18–19, ECF No. 65.)

The Court agrees with Defendants that statements such as "we think things are quite aligned at this point," "I feel very good about our Medicaid business," and that

Defendants were "very comfortable with what we are seeing" are expressions of subjective assessment. (Am. Compl. ¶¶ 112, 118, ECF No. 60.) The Court also agrees that certain statements identified by Defendants as "mere puffery" are better characterized as statements of opinion, and are not actionable. (*See* Defs.' Br. 20, ECF No. 63.)

But the remaining statements are not inactionable opinions. Defendants stated that "[w]e fully expect our rates to remain actuarily sound" and "we believe that about 90% of our members have had their eligibility redetermined." (Am. Compl ¶¶ 101, 107.) Although phrased as opinions, these statements convey factual propositions that the rates were actuarily sound and that approximately 90% of Elevance's Medicaid members had their eligibility redetermined.

Under *Omnicare*, an opinion may be actionable where it contains an embedded factual representation that is false. 575 U.S. at 184. Plaintiffs allege that the factual premises underlying these statements were false and that Defendants possessed information concerning Medicaid acuity, utilization, costs, and data reliability that contradicted the statements. (Am. Compl. ¶¶ 56–83, ECF No. 60.) At the pleading stage, those allegations are sufficient to bring the challenged statements within *Omnicare*'s recognized exceptions.

*3. The Complaint alleges actionable false and misleading statements.*

At this stage, the Court concludes that the Amended Complaint has adequately alleged the following false and misleading statements:

- On June 12, 2024, in response to a question regarding the impact of Medicaid utilization trends on Elevance's guidance for 2024, Tanal stated: "In Medicaid, . . . a range of outcomes is assumed in our guidance," that Elevance had "planned" for "a lot of shifts happening in the risk pool," and there was "nothing outside the bounds of what we expected or guided for." (*Id.* ¶ 96.)
- During the Q1 2024 earnings call on April 18, 2024, Boudreaux stated: "In the first quarter, our Medicaid business performed in line with our expectations. We estimate that nearly 90% of our members have had their eligibility redetermined." (*Id.* ¶ 105.)
- During the same call, Boudreaux stated: "In terms of where we are today with respect to the acuity and mix of that membership, the acuity is in line with what we expected." (*Id.* ¶ 107(a).)
- On the same call, Kaye stated: "[T]he margins this quarter were very much in line with our expectations." (*Id.* ¶ 109(a).)
- On the same call, in response to whether the rates Elevance negotiated with states were actuarially sound, Boudreaux stated: "[I]n terms of the acuity and the mix, . . . we have visibility into 75% of our Medicaid premiums. We've had very constructive discussions with our states. So overall, we feel things are lining up. They're actuarially sound." (*Id.* ¶ 112.)
- During the same call, regarding the relationship between Medicaid rates paid to Elevance by states and premiums for 2024, Norwood stated: "The

vast majority of those are in line with our expectations and are actuarially sound." (*Id.* ¶ 116.)

- During the Q2 2024 earnings call on July 17, 2024, Kaye stated that Elevance was "working collaboratively with states to ensure rates remain actuarily sound." (*Id.* ¶ 99(a).)
- Kaye further stated: "[T]he full year outlook does allow for both this shift in acuity and increased utilization in the second half of the year." (*Id.* ¶ 99(b).)
- During the same call, Norwood stated: "We fully expect our rates to remain actuarially sound, but we acknowledge the potential for a short-term, disconnect between our rates and the emerging acuity in our populations, and that's certainly been reflected in our updates for the year." (*Id.* ¶ 101.)
- On the same call, Boudreaux stated: "[We have] prudently maintained our full year outlook," and "nearly all of our members have had their eligibility redetermined since the process resumed last year." (*Id.* ¶ 127.)

B. <u>The Amended Complaint adequately alleges a strong inference of scienter.</u>

Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the [D]efendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The "required state of mind" is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). The Court considers whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 323.

"The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* The Court therefore must also consider "plausible, nonculpable explanations for the defendant's conduct." *Id.* at 324. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* The Amended Complaint survives "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

The Court finds that the allegations in the Amended Complaint give rise to a strong inference of scienter. Three sets of allegations, considered together, support that inference: *First*, allegations by former employees suggest the Individual Defendants knew or recklessly disregarded the falsity of their statements. *Second*, the Amended Complaint alleges a financial motive to defraud investors in the form of unusual stock sales by two Individual Defendants. *Third*, allegations that the Company's Medicaid business was a "core operation" provide further support for the inference that the executives either knew or recklessly disregarded that their statements were false.

1. *The allegations of twelve former employees support the inference that Individual Defendants knew or recklessly disregarded that their statements were false.*

Plaintiffs first argue that the accounts of the twelve FEs indicate that Defendants knew their statements were false. (Pls.' Opp'n 21–23, ECF No. 65.) Defendants argue that these statements must be disregarded. (Defs.' Br. 27–29, ECF No. 63.)

a. The Court considers the statements of Elevance's former employees.

Generally, the allegations of unnamed confidential sources require a "heavy discount." *City of Livonia Emps.' Ret. Sys. v. Boeing, Co.*, 711 F.3d 754, 759 (7th Cir. 2013). The statements of FEs may be considered, however, where confidential sources are "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify." *Tellabs III*, 513 F.3d at 712. The Court gives more weight to statements of confidential sources when the information is "set forth in convincing detail, with some information, moreover, corroborated by multiple sources." *Id.*

Here, the Amended Complaint sets forth each FE's job title, duties, dates of employment, and the bases for their knowledge. (Am. Compl. ¶¶ 56–83, ECF No. 60.) In addition, many FE accounts are consistent and mutually corroborating. *See Tellabs III*, 513 F.3d at 712. The Court therefore considers the statements of the FEs.

b. The former employees' statements allege that Defendants spoke with actual knowledge or reckless disregard for their statements' falsity.

Plaintiffs allege that the public statements by Individual Defendants were contradicted by private statements to employees. *First*, Defendants made statements concerning the then-current performance of Elevance's business and the effects of the redetermination process. During the Q1 earnings call on April 18, 2024, Boudreaux told investors, "[i]n the first quarter, our Medicaid business performed in line with

our expectations. We estimate that nearly 90% of our members have had their eligibility redetermined." (Am. Compl. ¶ 105, ECF No. 60.) On the same call, Kaye stated, "The margins this quarter were very much in line with our expectations." (*Id.* ¶ 109(a).)

According to FEs, Defendants knew these statements were false. For instance, FE-4 reported that Kaye's statement that the Medicaid business was performing well was contrary to Boudreaux's February 28, 2024, statement during an internal meeting that Elevance was losing many more members than expected through the redetermination process. (*Id.* ¶ 61.) FE-5 corroborates FE-4's report. (*Id.* ¶ 62.) And FE-3 reported that Bordeaux was so concerned about the adverse impact of the redetermination process that she described a "soft-landing" strategy whereby Elevance would push members lost from redeterminations into other commercial plans. (*Id.* ¶ 59.)

*Second*, the Amended Complaint alleges Defendants knew the falsity of their statements that the rates were actuarily sound. On June 12, 2024, Tanal told investors that "a range of outcomes is assumed in our guidance," that Elevance had "planned" for "a lot of shifts in the risk pool," and there was "nothing outside the bounds of what we expected and guided for." During the July 17, 2024, Q2 earnings call, Kaye stated that Elevance was "working collaboratively with states to ensure that rates remain actuarily sound." (Am. Compl. ¶ 99, ECF No. 60.) On the same call, Norwood repeated that claim that Elevance's premium rates were "actuarily sound." (*Id.* ¶ 101.)

But FEs reported that there were serious concerns internally that the acuity mix of Elevance's Medicaid membership was significantly increasing its costs. FE-6 reported that Defendants expected to lose more healthy, low-cost members from redeterminations. (*Id.* ¶ 63.) And FE-7 stated that, once redeterminations began, membership utilizations increased substantially. (*Id.* ¶ 64.)

*Third*, Kaye told investors that the Company's guidance accounted for increased acuity in the second half of 2024. (*Id.* ¶ 99(b).) The Amended Complaint, however, alleges facts supporting an inference that Defendants knew, or recklessly disregarded, that Elevance's Medicaid data was materially deficient. FE-9 personally led a meeting regarding an investigation into inaccurate data that Elevance had been providing to the states. (*Id.* ¶ 71.) FE-6 reported that Elevance's data that tracked utilization and costs suffered from eight-month delays and caused inaccuracies in revenue reporting and claim payments. (*Id.* ¶ 77.) These allegations are relevant not merely because they suggest that Defendants were aware of problems with Elevance's data, but because they support an inference that Defendants knew the data underlying their projections was unreliable. That, in turn, supports an inference that Defendants knew, or recklessly disregarded, that their guidance could not account for the anticipated increase in acuity. *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006) ("*Tellabs I*") (holding a complaint adequately alleged scienter because defendant "had information suggesting that his statements were false"), *vacated on other grounds*, 551 U.S. 308 (2007); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) (explaining that scienter may be inferred where

defendants "either knew or had access to information showing that their public statements were not accurate").

*2. Defendants Boudreaux and Norwood's stock sales support an inference of scienter.*

Plaintiffs contend that Boudreaux and Norwood's unusual stock sales during the Class Period further support an inference of scienter because they supply a motive to mislead investors. (Pls.' Opp'n 27, ECF No. 65.) Although insider trading may be circumstantial evidence of scienter, the sales "must generally be unusual or suspicious" because "executives sell stock all the time." *Pugh*, 521 F.3d at 695. The Court considers "the amount and percentage of overall shares sold, the profit made, the timing of the stock sales and the consistency of the sales with the insider's prior trading history." *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 956 (N.D. Ill. 2003). The stock sales at issue here support an inference of scienter.

*First*, Boudreaux and Norwood each sold meaningful amounts and percentages of their Elevance holdings. Boudreaux sold over 34,000 shares of Elevance stock on July 22, 2024, representing over 21% of her Elevance holdings and generating over $17 million in proceeds. (Am. Compl. ¶ 85, ECF No. 60.) Norwood sold over 20,000 shares between April 23, 2024, and April 24, 2024, representing 31% of her holdings and generating over $10 million in proceeds. (*Id.* ¶ 86.) Defendants contend that the insider sales were not suspicious because Boudreaux and Norwood retained 79% and 69% of their holdings. The Court cannot "scrutinize each allegation in isolation," but must "assess all the allegations holistically." *Tellabs II*, 551 U.S. at 326. For example, sales of smaller percentages of total holdings have been deemed suspicious

when viewed alongside other factors. *See Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-cv-01640, 2022 WL 1136577, at *29–30 (N.D. Ill. Apr. 18, 2022) (finding a sale of 10% of insider's holdings suspicious when defendants had never sold the stock before).

*Second*, the timing of the sales further supports an inference of scienter. Both Norwood and Bordeaux arranged for stock sales within days after the Company issued Adjusted EPS guidance indicating double-digit growth as compared to 2023. (Am. Compl. ¶¶ 139–40, 144–45, ECF No. 60.) Defendants argue that Boudreaux's sales were innocent because they were made pursuant to a 10b5-1 plan. However, the plan was entered into just one day after the start of the Class Period when Elevance issued its Adjusted EPS guidance. (Boudreaux SEC Form 4, ECF No. 62-24.) The trading plan therefore provides little defense to the allegations of scienter. *See Emps.' Ret. Sys. of V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (noting that trading plans entered into during the class period "provide[] no defense to scienter allegations"); *Yates v. Mun. Mortg. &Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (holding that stock plan "does less to shield [defendant] from suspicion because he instituted the plan . . . after the start of the class period"). Defendants' argument that the sales are innocent because they occurred before corrective disclosures is also unconvincing. *See Fryman*, 2022 WL 1136577, at *29 (finding sales suspicious when made four months before corrective disclosure). When an insider sells a significant portion of their holdings before materially adverse information became public, "an inference arises that the insider was 'bailing out' on the basis of material inside information." *Freeman v. Decio*, 584 F.2d 186, 197 n.44 (7th Cir. 1978).

*Third*, Boudreaux and Norwood's lack of prior trading history supports an inference of scienter. *See Fryman*, 2022 WL 1136577, at *29 (finding trades "sufficiently unusual" when "prior to the Class Period, none of these individuals had sold any of [the company's] stock"). The sales were unprecedented, as neither had previously sold Elevance stock other than tax-related sales for the vesting of previously granted restricted stock. (Am. Compl. ¶¶ 139, 145, ECF No. 60.) Here, Defendants offer no explanation that "the sales in question were consistent in timing and amount with a past pattern of sales or circumstances that might reasonably account for this occurrence." *Freeman*, 584 F.2d at 197 n.44.

Defendants' argument that Norwood's sales are innocent because she sold at prices below the Class Period high for the stock is unpersuasive. (Defs.' Br. 24–25, ECF No. 63.) "The fact that [Defendants] failed to maximize [their] profits by perfectly timing [their] stock sale[s] does nothing to undercut [Plaintiffs'] claim of insider selling." *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, No. 16-cv-10510, 2018 WL 1071442, at *5 (N.D. Ill. Feb. 27, 2018).

*3. The core operations doctrine supports an inference of scienter.*

The fact that Medicaid was a significant part of the Company's business supports an inference that the Company's executives are likely to have known their statements were false. "Officers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.' " *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (quoting *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850

(N.D. Ill. 2003)); *Tellabs III*, 513 F.3d at 709 (finding it "exceedingly unlikely" that management did not know that statements about the company's "most important products" were false). Medicaid was certainly an important aspect of Elevance's business—it accounts for approximately 33% of the Company's revenue. (Defs.' Br. 29 n.16, ECF No. 63). Moreover, during the COVID-19-related pause in redeterminations, Elevance's stock price rose by over 200%. (Am. Compl. ¶ 40, ECF No. 60.) And when Elevance eventually lowered its Adjusted EPS guidance on October 17, 2024, Boudreaux attributed the adjustment to "elevated medical costs in our Medicaid business." (*Id.* ¶ 153.) After announcing these increased Medicaid costs, Elevance's stock fell by more than 10%. (*Id.* ¶ 154.)

The above facts, as well as Individual Defendants' roles at the Company, support the inference that Defendants were aware of the substantial issues facing Elevance's Medicaid business. *See Tellabs III*, 513 F.3d at 709 (finding it "very hard to credit" claim that senior management did not know that statements about company's "most important products" were false).

4. *Defendants' innocent explanation is no more cogent than Plaintiff's inference of scienter.*

The scienter inquiry is inherently comparative. *Tellabs II*, 551 U.S. at 323. The Court has carefully reviewed the Amended Complaint and weighed the competing inferences. Ultimately, it would not be unreasonable to infer that Defendants acted with mere carelessness in adjusting Elevance's guidance upward and later falling short of their estimates. (*See* Defs.' Br. 30, ECF No. 63.) But that inference is not *more* plausible or compelling than the inference that they acted recklessly or

intentionally. *See Tellabs II*, 551 U.S. at 324 (inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."). Therefore, Plaintiffs have adequately pleaded Defendants' state of mind.

C. Defendants' argument with respect to Section 20(a) fails.

Defendants' sole basis for challenging the Section 20(a) claim is that it must be dismissed when the underlying violation has been dismissed. (Defs.' Br. 30, ECF No. 63.) Because Plaintiffs have adequately pleaded an underlying violation of section 10(b) for the reasons set forth above, Defendants' entirely derivative argument against the section 20(a) claim necessarily fails. *See Pugh*, 521 F.3d at 693 ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5.").

**Conclusion**

Defendants' Motion to Dismiss the Amended Complaint, (ECF No. 61), is **denied**.

IT IS SO ORDERED.

Date: 09/30/2026

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution:

Darren Andrew Craig
FBT Gibbons LLP
dcraig@fbtgibbons.com

Timothy Clark Dauz
Grant & Eisenhofer PA
tdauz@gelaw.com

Karin Elizabeth Fisch
Grant & Eisenhofer PA
kfisch@gelaw.com

Mickaela Fouad
Hogan Lovells Cadwalader US LLP
mickaela.fouad@hlc.com

Jacey Lara Gottlieb
Hogan Lovells Cadwalader US LLP
jacey.gottlieb@hlc.com

Salvatore Graziano
Bernstein Litowitz Berger & Grossmann LLP
salvatore@blbglaw.com

Kandi Kilkelly Hidde
FBT Gibbons LLP
khidde@fbtgibbons.com

Kelly Hogan
Bernstein Litowitz Berger & Grossmann LLP
kelly.hogan@blbglaw.com

James Notis
Grant & Eisenhofer PA
jnotis@gelaw.com

William M Regan
Hogan Lovells Cadwalader US LLP
william.regan@hlc.com

Jeremy Robinson
Bernstein Litowitz Berger & Grossmann LLP
jeremy@blbglaw.com

Lauren J. Salamon
Grant & Eisenhofer PA
lsalamon@gelaw.com

Thomas Z Sperber
Bernstein Litowitz Berger & Grossmann LLP
thomas.sperber@blbglaw.com

Joseph N. Williams
Johnson Jensen Williams, LLP.
joe@jjwlawyers.com

Allison M. Wuertz
Hogan Lovells Cadwalader US LLP
allison.wuertz@hlc.com